# EXHIBIT A

1   McCARTER & ENGLISH, LLP
    MARK D. GIARRATANA (*pro hac vice*)
2   *mgiarratana@mccarter.com*
    THOMAS J. RECHEN (*pro hac vice*)
3   *trechen@mccarter.com*
    KEVIN L. REINER (*pro hac vice*)
4   *kreiner@mccarter.com*
    CityPlace I, 36th Floor
5   185 Asylum Street
    Hartford, CT 06103
6   Telephone: (860) 275-6700
    Facsimile: (860) 724-3397
7
    NOSSAMAN LLP
8   JAMES H. VORHIS (SBN 245034)
    *jvorhis@nossaman.com*
9   DAVID C. LEE (SBN 193743)
    *dlee@nossaman.com*
10  50 California Street, 34th Floor
    San Francisco, CA 94111
11  Telephone:  (415) 398-3600
    Facsimile:   (415) 398-2438
12
    Attorneys for Defendant FINELITE, INC.
13
                    UNITED STATES DISTRICT COURT
14
                    NORTHERN DISTRICT OF CALIFORNIA
15

16  SEOUL SEMICONDUCTOR CO., LTD., and      Case No:  3:22-cv-02869-TLT
    SEOUL VIOSYS CO., LTD.,
17                                          **DECLARATION OF DR. DANIEL
                      Plaintiffs,           VAN DER WEIDE**
18  v.
                                            Date: November 22, 2023
19  FINELITE, INC.,

20                    Defendant.

21  -------------------------------------------------------

22  FINELITE, INC.,

23                    Third-Party Plaintiff,

24  v.

25  SAMSUNG SEMICONDUCTOR, INC.,

26                    Third-Party Defendant.

27

28

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

I, Dr. Daniel van der Weide, hereby declare as follows:

## I.    INTRODUCTION

1.      I am over the age of eighteen and competent to make this declaration.

2.      If called upon as a witness, I could competently testify as to the matters herein.

3.      I understand that the meaning and validity of certain claim terms in the patents-in-suit are disputed by the parties.

4.      I have been asked by counsel for Finelite, Inc. ("Finelite") to testify as an expert for Finelite in the above-captioned litigation, and I submit this declaration in support Finelite's Responsive Claim Construction Brief.

5.      Though I am being compensated for the time I spend on this matter, no part of my compensation depends upon the outcome of this case, and I have no other interest in the case.

6.      My curriculum vitae (ECF 144-3 at 51-96), my September 14, 2023 expert report (ECF 144-3) at paragraphs 6-16, and my October 5, 2023 expert report (ECF 144-11) at paragraph 4 set forth in part my education, training and experience.

7.      The materials that I have reviewed in formulating my opinions include those listed my September 14, 2023 expert report (ECF 144-3 at paragraph 17), my October 5, 2023 expert report (ECF 144-11 at paragraph 5 and Exhibit A), and the exhibits presented to me at my deposition in this matter on October 9, 2023. I have also reviewed Plaintiffs' Opening Claim Construction brief and the documents and exhibits filed therewith, and the deposition transcript of Plaintiffs' expert, Professor DenBaars, taken on November 14, 2023.

## II.    SUMMARY OF OPINIONS

8.      Based upon my review of the materials described above and my knowledge and experience, it is my opinion that:

(i)      A person of ordinary skill in the art ("POSITA") would understand the term "an overflow prevention layer … which is doped with impurities of first conductive type and which prevents overflow of electrons or holes" in claim 1 of U.S. Patent no.

DECLARATION OF DR. DANIEL VAN DER WEIDE
- 1 -
ME1 46815772v.1

7,397,069 ("the '069 patent") to mean as a $Ga_{0.8}Al_{0.2}N$ layer doped with $4\times10^{18}$ cm$^{-3}$ to $5\times10^{19}$ cm$^{-3}$ of Mg, and equivalents;

(ii)     A POSITA would view the limitation "low-doped layer" / "intermediate-doped layer" / "first and second low-doped layers and [a / at least one intermediate] doped layer disposed between the [first and second] low-doped layers [and the second low-doped layers include]" in claims 1 and 14 of U.S. Patent no. 9,799,800 ("the '800 patent") as indefinite. In addition, A POSITA would understand the term "a hole injection layer" in claim 1 of the '800 patent to mean a gallium nitride-based (GaN) semiconductor layer, having a thickness from 5 nm to 20 nm, and a Mg p-type dopant concentration of from $1x10^{20}$/cm$^3$ to $5x10^{20}$/cm$^3$, and equivalents;

(iii)    A POSITA would view the "the gallium nitride-based first interlayer comprises a single composition" limitation in claim 1 of U.S. Patent no. 8,664,638 ("the '638 patent") as indefinite;

(iv)    A POSITA would view the "spacer layer … [has/having] a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer" limitation in claims 1 and 9 of U.S. Patent no. 9,716,210 ("the '210 patent") and in claims 1 and 14 of U.S. Patent no. 10,418,514 ("the '514 patent") as indefinite;

(v)     A POSITA would understand the term "current blocking portion" in claim 1 of U.S. Patent no. 7,982,207 ("the '207 patent") to mean a distributed Bragg reflector, and equivalents;

(vi)    A POSITA would understand the term "a reflection structure disposed on the second conductive type semiconductor layer" in claim 1 of U.S. Patent no. 10,672,952 ("the '952 patent") to mean a reflection structure disposed in contact with the second conductive type semiconductor layer; and

(vii)   A POSITA would understand the term "the molding part is made of materials including at least one of silicone, epoxy, polymethylmethacrylate (PMMA), polyethylene (PE) and polystyrene (PS)" in claim 15 of U.S. Patent no. 10,510,933 ("the

'933 patent") to mean that the molding part is made of materials including one or more of each of the following: silicone, epoxy, polymethylmethacrylate (PMMA), polyethylene (PE) and polystyrene (PS).

### III.   OPINIONS REGARDING CLAIM CONSTRUCTION

#### A.   The level or ordinary skill in the art

9.   As I understand, a claim is construed with reference to the understanding of a person of ordinary skill in the art ("POSITA"). I understand that, except for the '210 patent and the '514 patents that are related to each other, the patents at issue are unrelated to each other and inventions claimed in them were invented at different times.

10.   However, in my opinion, for all the alleged inventions I discuss in this declaration, a POSITA would have a bachelor's degree in chemical engineering, materials engineering, electrical engineering, or similar scientific or engineering degree, with about 3 to 5 years of experience in the research, design and/or fabrication of LEDs, or alternatively, a master's degree in chemical engineering, materials engineering, electrical engineering, or similar scientific or engineering degree, with a corresponding lesser amount of experience in the research, design and/or fabrication of LEDs.

11.   I understand that Plaintiffs have proposed a different definition of one of ordinary skill in the art. However, the differences between my and Plaintiffs' definitions do not affect my opinions in this declaration.

#### B.   The '069 patent

12.   The '069 patent is generally directed to a semiconductor device including an active layer, a first semiconductor layer, a second semiconductor layer, an overflow prevention layer and an impurity diffusion prevention layer. *E.g.*, Abstract, col. 2:6 – 3:13; Figures 1, 3A-9.

13.   I understand that the parties dispute the construction of the term "an overflow prevention layer … which is doped with impurities of first conductive type and which prevents overflow of electrons or holes" in claim 1 of this patent. In my opinion, the term "an overflow

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

prevention layer …" is subject to 35 U.S.C. § 112(6), and a POSITA would understand the term to mean a $Ga_{0.8}Al_{0.2}N$ layer doped with $4\times10^{18}$ cm$^{-3}$ to $5\times10^{19}$ cm$^{-3}$ of Mg, and equivalents.

14.    The term does not name particular structure(s) nor provide a sufficiently definite meaning as the name for structure as would be understood by a POSITA. In contrast to a term such as "screwdriver," I am aware of no structure or structure(s) in the art where the name for that structure is "overflow prevention layer." Nor does the term recite sufficiently definite structure, but rather recites function without reciting sufficient structure for performing that function. In this context, the term "layer" is a nonce word that does not connote definite structure. *See* Exhibit 1 hereto, https://www.merriam-webster.com/ dictionary/; Exhibit 2 hereto, https://www.ahdictionary.com/word/search.html?q=layer; Exhibit 3 hereto, https://www. collinsdictionary.com/dictionary/english/layer.

15.    Further, the term recites that the function of the "layer" is to prevent overflow of electrons or holes, but the term fails to recite sufficient structure to perform that function. The language "overflow prevention layer" recites no structure other a "layer." A POSITA would understand "prevention" to mean "the act of stopping something from happening," Exhibit 4 hereto, https://dictionary.cambridge.org/dictionary/english/prevention, and "overflow" to mean "the act of overflowing" or "something that overflows." Exhibit 5 hereto, https://www. ahdictionary.com/word/search.html?q=overflow. Thus, "overflow prevention layer" merely recites a layer that stops overflowing from happening. It does not, though, recite sufficient structure to perform that function.

16.    The claim does recite that the layer is "doped with impurities of first conductive type." However, a POSITA would understand that a layer doped with impurities of a first conductive type does not recite sufficient structure to prevent overflow of electrons or holes. Almost every LED contains layers that are doped with impurities of a first conductive type, that do not prevent overflow of electrons or holes. Examples of this are the first and second semiconductor layers of first conductive type recited in claim 1. Thus, the mere recitation that

DECLARATION OF DR. DANIEL VAN DER WEIDE
- 4 -
ME1 46815772v.1

the layer is doped with impurities of first conductive type does not recite *sufficient* structure to prevent overflow of holes or electrons.

17.    I have reviewed the specification of the '069 patent for corresponding structure/materials. Such corresponding structure is found at col. 6, lines 1-7:

> And then a $Ga_{0.8}Al_{0.2}N$ layer having a thickness of about 10 nm is grown on the p-type first guide layer 6. The $Ga_{0.8}Al_{0.2}N$ layer is doped with about $4\times10^{18}$ $cm^{-3}$ to about $5\times10^{19}$ $cm^{-3}$ of Mg. The $Ga_{0.8}Al_{0.2}N$ layer is provided to prevent overflow of electrons and thus also called the overflow prevention layer 7.

A POSITA would understand this passage to clearly link the structure recited in it to the claimed function of preventing overflow of electrons, because, just after reciting the structure of the layer, it says that such "is provided to prevent overflow of electrons." Moreover, this description contains both a definite thickness ("10 nm") and specific range of doping of a given species.

18.    I do note that other portions of the specification describe the overflow prevention layer, including those cited by Plaintiffs to the Court. However, in contrast to the above-quoted passage that clearly links the described structure to the prevention of overflow, the other passages do not clearly link the described structure to the recited function, nor would a POSITA understand those passages to do so, because those passages do not discuss the function of the structure.

19.    I have also reviewed the prosecution history of the '069 patent, and do not find any statement or other basis therein from which a POSITA would conclude that the term "overflow prevention layer …" would have a different construction.

20.    I have further reviewed Plaintiffs' proposed construction(s) of this term. Plaintiffs first propose that this term has its "Plain and ordinary meaning." In my opinion, for the reasons discussed above why the term is subject to 35 U.S.C. § 112(6), a POSITA would not understand the term to have a plain and ordinary meaning in the art, *e.g.*, as a name for structure. Further, as discussed above, the plain and ordinary meaning of the claim language is merely that the claimed semiconductor has a layer that prevents overflow and does not recite adequate structure to perform that function.

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

21.     I also disagree with the Plaintiffs' proposed alternative construction that the term means a "layer … configured to suppress the flow of electrons" for multiple reasons. First, Plaintiffs' proposal would, in effect, remove the term "prevention" from the claim, *i.e.*, remove the preventing function of the "layer," and rewrite the term so that the layer merely suppresses overflow, *i.e.*, does something less than <u>prevent</u> overflow.

22.     In addition, Plaintiffs' proposed construction merely recites a (different) function of the "layer" without reciting sufficient structure to perform that function. It does no more to define the scope of the claim than does the claim language itself. Plaintiffs' proposal would effectively eviscerate the meaning of the term.

**C.     The '800 patent**

**1.     "an electron blocking layer"**

23.     Independent claim 1 of the '800 patent recites "an electron blocking layer disposed between [a] p-type semiconductor layer and [an] active layer." I understand that the parties dispute the construction of the term "an electron blocking layer."

24.     I disagree with Plaintiffs' proposed construction(s) of this term.

25.     Plaintiffs first propose that this term has its "Plain and ordinary meaning." In my opinion, the plain and ordinary meaning of the claim language is merely that the claimed light emitting diode has a layer that blocks electrons.

26.     I also disagree with the Plaintiffs' proposed alternative construction that the term means "a layer configured to suppress the flow of electrons" for multiple reasons. "Suppress" appears nowhere in the patent. Plaintiffs' proposal would also, in effect, remove the term "blocking" from the claim, *i.e.*, remove the blocking function of the "layer," and rewrite the term so that the layer merely suppresses electrons, *i.e.*, does something less than <u>block</u> electrons. Plaintiffs' proposal would effectively eviscerate the meaning of the term.

27.     Moreover, Plaintiffs' proposed construction merely recites a function of the "layer." It does no more to define the scope of the claim than does the claim language itself.

28. Plaintiffs' construction is also inconsistent with the specification. The specification makes no mention of "suppressing" electrons, only "blocking" them.

### 2. "a hole injection layer"

29. Independent claim 1 of the '800 patent recites "the p-type semiconductor layer includes a hole injection layer." I understand that the parties dispute the construction of the term "a hole injection layer." In my opinion, the term "a hole injection layer" is subject to 35 U.S.C. § 112(f), and a POSITA would understand the term to mean a gallium nitride-based (GaN) semiconductor layer, having a thickness from 5 nm to 20 nm, and a Mg p-type dopant concentration of from $1\times10^{20}$/cm$^3$ to $5\times10^{20}$/cm$^3$, and equivalents.

30. In this context, the term "layer" is a nonce word that does not connote definite structure. *See* Exhibits 1-3. Further, the term recites that the function of the "layer" is "hole injection," but the term fails to recite sufficient structure to perform that function. The language "hole injection layer" recites no structure other an a "layer." "Injection" is the act of introducing something into something else. *See* Exhibit 6, The Random House College Dictionary 686. Thus, that term merely further describes the function of the layer, *i.e.*, "introducing," and not structure. "Hole" simply refers to what is being injected/introduced, and likewise does not describe the structure of the layer.

31. Thus, the term does not name particular structure(s) nor does it provide a sufficiently definite meaning as the name for structure as would be understood by a POSITA. Nor does the term recite sufficiently definite structure, but rather recites function without reciting sufficient structure for performing that function. A POSITA would not consider the term to be a name for or refer to the *p*GaN structure in Li because its success was attributed to being grown at low temperature (ECF 144-9 at 6) and the hole injection layers in the '207 patent are grown at much higher temperatures of at least 970°C (col. 8, lines 15-17).

32. I have reviewed the specification of the '800 patent for corresponding structure/materials. Such corresponding structure is found as follows:

The hole injection layer 33 … can be or include gallium nitride-based semiconductor layer[], for example, GaN layers. [col. 5, lines 27-30]

\* \* \*

[A] method of fabricating a light emitting device includes … growing a hole injection layer on the substrate within the chamber by introducing an N source gas, a Ga source gas, an Mg source gas, $N_2$ gas, and $H_2$ gas into the chamber. [col. 2, lines 24-33]

\* \* \*

[T]he hole injection layer can have a dopant concentration from $1 \times 10^{20}/cm^3$ to $5 \times 10^{20}/cm^3$. [col. 1, lines 62-67; col. 3, lines 6-8; col. 5, lines 54-55]

[T]he hole injection layer 33 can have a thickness from 5 nm to 20 nm. [col. 5, lines 39-40]

\* \* \*

[T]he hole injection layer … includes a predetermined concentration of p-type type dopants (Mg). [col. 1, lines 62-67]

\* \* \*

The hole injection layer 33 can be grown by introducing the N source gas (for example, $NH_3$) and the Ga source gas (for example, TMGa and/or TEGa) together with an Mg source gas (for example, Cp2Mg), $N_2$ gas and $H_2$ gas into the chamber … the flow rate of the Mg source gas is selected to achieve a suitable doping concentration and the hole injection layer 33 can have an Mg concentration of from about $1 \times 10^{20}/cm^3$ to about $5 \times 10^{20}/cm^3$. [col. 8, lines 15-30]

A POSITA would understand these passages to clearly link the recited structure to the claimed function of preventing overflow of electrons.

33.     I have reviewed the prosecution history of the '800 patent, and do not find any statement or other basis therein from which a POSITA would conclude that the term "hole injection layer" would have a different construction.

34.     I have also reviewed Plaintiffs' proposed construction(s) of this term. Plaintiffs first propose that this term has its "Plain and ordinary meaning." In my opinion, for the reasons discussed above why the term is subject to 35 U.S.C. § 112(f), a POSITA would not understand

the term to have a plain and ordinary meaning in the art, *e.g.*, as a name for structure. Further, as discussed above, the plain and ordinary meaning of the of claim language is merely that the claimed light emitting diode has a layer that injects holes and does not recite adequate structure to perform that function.

35.     I also disagree with the Plaintiffs' proposed alternative construction that the term means "a layer that increases hole injection efficiency," for multiple reasons. First, Plaintiffs' proposed construction merely recites a function of the "layer" without reciting sufficient structure to perform that function. It does no more to define the scope of the claim than does the claim language itself. Moreover, Plaintiffs' construction recites a function of increasing efficiency that, as a POSITA would recognize, is not recited in the claim. Plaintiffs' construction appears to import a limitation into the claim from the specification.

                    **3.      Low/intermediate doped**

                              **a.      Claim 1**

36.     Claim 1 of the '800 patent recites that a "hole transport layer includes first and second low-doped layers and at least one intermediate doped layer … wherein dopant concentrations of the first and second low-doped layers are less than a dopant concentration of the at least one intermediate doped layer." In my opinion, when this limitation is viewed in light of the specification and prosecution history, it fails to inform a POSITA about the scope of the invention with reasonable certainty and is indefinite.

37.     Grammatically, the term "intermediate" in claim 1 is a term of degree that Professor DenBaars agrees is as an adverb that modifies "doped" and thus describes the level of "dopant" in the "layer." A POSITA would understand the "intermediate doped layer" limitation to require that this layer has a level of dopant that is intermediate, or between two other levels of doping. *See* https://www.merriam-webster.com/dictionary/intermediate ("being or occurring at the middle place, stage, or degree or between extremes"). However, the claim fails to provide any indication of what those other levels are. In other words, there is no indication as to what level of dopant is an "intermediate" level, including what levels of doping an intermediate doped

DECLARATION OF DR. DANIEL VAN DER WEIDE

layer is between. Nor does the specification or prosecution history provide a standard for determining whether a particular level of doping is "intermediate" or otherwise guide a POSITA as to the meaning of the term "intermediate doped" in claim 1. The specification and prosecution history fail to provide any objective boundary or guidance to enable a POSITA to determine what level of dopant is an "intermediate" level, as recited in claim 1.

38.     The specification provides an exemplary level of doping for the "intermediate doped layer," stating in pertinent part: "[T]he intermediate doped layer 35b of the hole transport layer can have a dopant concentration from $1 \times 10^{18}$/cm$^3$ to $1 \times 10^{20}$/cm$^3$. In this embodiment, the intermediate doped layer 35b can have a dopant concentration of $1 \times 10^{19}$/cm$^3$, without being limited thereto." '800 patent at 5:57-61; *see also id*. at 1:65-67 (same) and 3:9-11 (same). However, the specification is clear that this description is only exemplary and is not to be construed as a limitation on the scope of the claimed invention. The specification states, in pertinent part, as follows.

> The following embodiments are provided by way of example so as to fully convey the spirit of the present disclosure to those skilled in the art to which the present disclosure pertains. Accordingly, the present disclosure is not limited to the embodiments disclosed herein and can also be implemented in different forms." ['800 patent at 4:6-11].

> * * *

> Although the disclosure has been illustrated with reference to some embodiments in conjunction with the drawings, it will be apparent to those skilled in the art that various modifications, changes and substitutions can be made to the disclosure without departing from the spirit and scope of the disclosure. Therefore, it should be understood that these embodiments and the accompanying drawings are not to be construed as limiting the present disclosure, but are given to facilitate the understanding of some implementations of the disclosure to those skilled in the art. The scope of the present disclosure should be interpreted according to the following appended claims as covering all modifications or variations derived from the appended claims and equivalents thereof. ['800 patent at 10:24-36].

39.    Accordingly, the levels of dopant disclosed for the "intermediate doped layer" in the specification are disclosed as only exemplary and not to be construed as limiting the scope of the claims. This is in accord with my understanding that generally a limitation in the specification may not be read into a claim.

40.    This conclusion is reinforced by dependent claim 2. Claim 2 depends from claim 1 and states that the intermediate doped layer has the specific range of dopant described in the specification, *i.e.*, "the intermediate doped layer has a dopant concentration from $lx10^{18}/cm^3$ to $1x10^{20}/cm^3$." '800 patent at 10:62-57. The POSITA would understand from such claim drafting that the patentee did not intend to limit the "intermediate" level of doping in claim 1 to the specific range disclosed in the specification, but rather intended the limitation of claim 1 to be broader than that. In other words, the POSITA would conclude that by virtue of limiting the "intermediate" level of doping in claim 2 to the range disclosed in the specification, *i.e.*, "a dopant concentration from $lx10^{18}/cm^3$ to $1x10^{20}/cm^3$," the patentee did not intend to limit the "intermediate" level of dopant in claim 1 to that amount.

41.    Nowhere does the specification or prosecution history guide the POSITA as to what levels of doping the claimed "intermediate" level is between. For example, Figure 2 of the specification includes a graph depicting a profile of a Mg concentration of the light emitting device according to an exemplary embodiment:

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

1
2
3
4
5
6
7
8
9
10
11
12
13



Figure 2

14  In the exemplary embodiment, the intermediate doped layer 35b has a higher Mg concentration

15  than the undoped layers 35a and a lower Mg concentration than the hole injection layer 33 or the

16  p-type contact layer 37. However, Figure 2 does not indicate what the dopant concentration of

17  the intermediate doped layer is. This is demonstrated at least in that the vertical axis of Figure 2

18  does not include any numerical values on it, nor any indication of what "units" by which the

19  concentration is being graphed. The latter is confirmed at least in that the vertical axis is labeled

20  with the term "arb. units," which the POSITA would understand to mean "arbitrary units."

21       42.     In addition, although claim 1 recites "a p-type semiconductor layer" and "a hole

22  injection layer," it does not require that such layers have *any* doping, much less a level of doping

23  higher than the "intermediate doped layer" as schematically shown in the example of Figure 2.

24  This uncertainty as to whether the claimed "p-type semiconductor layer" and "hole injection

25  layer" have any level of doping, much less any indication of what the levels of doping would be

26  if they did have dopants, adds to the failure to inform the POSITA with reasonable certainty

27
28

about what level of dopant the claimed "intermediate" level is, and what levels the "intermediate" level is between.

43.     Accordingly, when claim 1 is read in light of the specification and prosecution history, it fails to inform a POSITA with reasonable certainty about what level of dopant is an "intermediate" level as recited in the claim, and therefore fails to inform with reasonable certainty the scope of the invention.

44.     In his Responsive Declaration, Professor DenBaars disagrees with my opinion that the asserted claims of '800 patent are indefinite. ECF 144-10 ¶ 8.

45.     Professor DenBaars asserts that I "misapprehend" the technology at issue because I purportedly contend that the claimed p-type semiconductor layer does not require any doping. ECF 144-10 ¶ 14 (citing ¶ 66 of my September 14, 2023 report). He also contends that the statement about the doping of the "hole injection layer" is inconsistent with my proposed construction of that term, which, as I stated elsewhere in my report, has a certain level of magnesium doping. ECF 144-10 ¶ 15. Professor DenBaars misconstrues my report.

46.     As an initial matter, it should have been clear to Professor DenBaars that the text "a p-type semiconductor layer" in paragraph 66 of my report was referring to the "p-type contact layer" that I was in the midst of discussing, *e.g.*, in the preceding paragraph 65 of the report.

47.     Moreover, the entirety of my sentence at issue was that

> [A]lthough claim 1 ***recites*** "a p-type semiconductor layer" and "a hole injection layer," it does not require that such layers have any doping, much less a level of doping higher than the "intermediate doped layer" as schematically shown in the example of Figure 2. (emphasis added)

It should have been clear to Professor DenBaars that, in the context of discussing what the claim "recites," my comment about doping was in fact what the claim recites. Claim 1 does not recite anything about doping of either the p-type contact layer or the hole injection layer, which Professor DenBaars does not appear to dispute.

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

48.     The next sentence discussing whether these layers have "any level of doping" was likewise made about the language of the claim, *e.g.*, what it fails to recite. Again, the claim does not limit the level of such doping. Accordingly, as I stated above, this absence "adds to the failure to inform the POSITA with reasonable certainty about what level of dopant the claimed 'intermediate' level is, and what levels the 'intermediate' level is between."

49.     I disagree with Professor DenBaars that "[a] POSA would understand from the … disclosure [at 5:54-59 and 6:49-52 of the '800 patent] that the 'intermediate' modifier – when considered in the context of dopant levels rather than location – means that the intermediate doped layer has a doping level between that of the claimed low-doped layers and the hole injection and p-type contact layers." ECF 144-10 ¶ 12. As I explained above, claim 1 simply recites "a hole injection layer" and "a p-type contact layer." The plain language of the claim does not assign *any* level of doping to either such layer. In other words, under the plain language of the claim, each of the "hole injection layer" and the "p-type contact layer" may have any level of doping, including lower than, the same as, or higher than the level of doping of any of "the first and second low-doped layers" or of "the at least one intermediate doped layer disposed between the first and second low-doped layers." Professor DenBaars attempts to read into the claim additional limitations that do not appear anywhere in the claim. Specifically, he attempts to read into the claim the additional limitations that both the "hole injection layer" and the "p-type contact layer" have a doping level that is higher than the doping levels of the "first and second low-doped layers" and higher than the doping level of "the at least one intermediate doped layer disposed between the first and second low-doped layers." ECF 144-10 ¶¶ 11-12.

50.     In my opinion, a POSITA reading claim 1 in the context of the entire specification and prosecution history would not read such limitations into the claim. Nor does Professor DenBaars identify any basis in the specification or prosecution history for doing so. Professor DenBaars' only supporting citations are to column 6, lines 49-52 and column 5, lines 54-59. Significantly, both passages explicitly state that the "hole injection layer" and the "p-type contact layer" "*can* have" the disclosed levels of Mg or dopant concentrations. *Id*. (emphasis added). In

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

fact, the '800 patent's specification is rife with permissive language. Nowhere does the specification state that the hole injection and p-type contact layers *must* have or *can only* have such dopant levels. Nor does the specification otherwise disavow or disclaim other dopant levels. To the contrary, the language disclosing such dopant levels is entirely non-limiting and open-ended. Consistent with the plain language of the claims, the hole injection and p-type contact layers "can have" the disclosed dopant levels, but "can have" other dopant levels as well. Indeed, the specification explicitly proscribes reading any such limitations from the specification into the claims. The specification states, in pertinent part, as follows:

> Although the disclosure has been illustrated with reference to some embodiments in conjunction with the drawings, it will be apparent to those skilled in the art that various modifications, changes and substitutions can be made to the disclosure without departing from the spirit and scope of the disclosure. Therefore, it should be understood that these embodiments and the accompanying drawings are not to be construed as limiting the present disclosure, but are given to facilitate the understanding of some implementations of the disclosure to those skilled in the art. The scope of the present disclosure should be interpreted according to the following appended claims as covering all modifications or variations derived from the appended claims and equivalents thereof.

'800 patent at 10:24-36; *see also id*. at 4:6-11 ("Hereinafter, exemplary embodiments of the disclosure will be described in more detail with reference to the accompanying drawings. The following embodiments are provided by way of example so as to fully convey the spirit of the present disclosure to those skilled in the art to which the present disclosure pertains. Accordingly, the present disclosure is not limited to the embodiments disclosed herein and can also be implemented in different forms.").

51.     A POSITA would take the patentee at its word, would not read any such "exemplary embodiments" into the claims and would not limit the claims to any such embodiments, but rather would understand that the claims are broader than such embodiments, and must be read in accordance with their literal scope as "as covering all modifications or variations derived from the . . . claims and equivalents thereof." '800 patent at 10:24-36. When

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

claim 1 is read in light of the specification and prosecution history, it fails to inform a POSITA with reasonable certainty about what level of dopant is an "intermediate" level as recited in the claim, and therefore fails to inform with reasonable certainty the scope of the invention.

### b.    Claim 14

52.    Independent claim 14 of the '800 patent recites that "the p-type semiconductor layer includes first and second low-doped layers and a doped layer disposed between the low-doped layer." '800 patent at 12:19-21. The claim goes on to state that "the first low-doped layer . . . has a dopant concentration less than that of the doped layer." *Id.* at 12:27-29. The claim, though, does not state whether the "second low-doped layer" has a dopant concentration that is less than that of the doped layer. Thus, the "second low-doped layer" could have a dopant concentration that is greater than, less than, or the same as the dopant concentration of either the "first low-doped layer" or the "doped layer."

53.    Accordingly, similar to the "intermediate doped" limitation of claim 1 above, there is no indication in claim 14 for this term of degree as to what level of doping is a "second low-doped" level. Nor does the specification or prosecution history provide a standard allowing a POSITA to determine whether a particular level of doping is a "second low-doped" level or otherwise guide a POSITA as to the meaning of the term "second low-doped" in claim 1. The specification and prosecution history fail to provide any objective boundary or guidance to determine what level of dopant is a "second low-doped" level, as recited in claim 14.

54.    The specification does not use the terms "low-doped layer" or "second low-doped layer," and therefore fails to provide meaningful guidance as to the meaning of the term in the claim. On the other hand, the specification describes "undoped layers." A POSITA would understand that an "undoped" layer is different from a "low-doped" layer. As explained in the '800 specification, an "undoped" layer does not include a dopant, is "substantially free" of dopant, or may include "unintended" dopant, such as due to some dopant "remaining in the growth chamber" or where the dopant is "diffused" from another layer. '800 patent at 6:56-67. A "low-doped" layer, on the other hand, necessarily includes dopant; otherwise, it would not be

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

"low doped." Accordingly, a POSITA would understand that a "low-doped" layer necessarily includes some level of dopant and is different from an "undoped" layer.

55.     During prosecution of the '800 patent application, claim 14 (which was application claim 17) was amended to change "undoped" to "low-doped" as follows:

---

17.   (Currently Amended) A light emitting device, comprising:

a substrate;

an n-type semiconductor layer formed over the substrate;

an active layer formed over the n-type semiconductor layer;

a p-type semiconductor layer formed over the active layer, wherein the p-type semiconductor layer includes ~~undoped~~ <u>low-doped</u> layers and a doped layer disposed between the ~~undoped~~ <u>low-doped</u> layers and the ~~undoped~~ <u>low-doped</u> layers include a hole concentration decreasing region and a hole concentration increasing region<u>; and</u>

<u>a p-type contact layer formed over the doped layer, and</u>

<u>wherein one of the low-doped layers adjoins to the p-type contact layer and has a dopant concentration less than that of the doped layer</u>

---

**First amendment of pending claim 17 (issued claim 14) of the '800 patent application**

---

"Amendment in Response to Non-Final Office Action," dated September 29, 2016. In the "Remarks" accompanying the amendment, the patentee did not provide guidance as to the meaning of "low-doped layer" in claim 17 other than to state that "claim 17 has been amended in the similar manner as claim 1." *Id.*, p. 9. Clearly, the patentee understood and acknowledged that claim 17 was different from claim 1. As indicated above, claim 17 was amended to state that only "one of the low-doped layers . . . has a dopant concentration less than that of the doped layer." Thus, the patentee intended, and a POSITA would understand the claim to allow for, another of the "low-doped layers" to have a dopant concentration that is <u>not</u> less than that of the doped layer, *i.e.*, where one of the "low-doped layers" has a dopant concentration that is the same as or greater than that of the "doped layer." The claim was amended again prior to issuance, but still required that only one of the low-doped layers have a dopant concentration less than that of the doped layer. *See* "RCE, Amendment After Final Action Under 37 C.F.R. 1.116,

And Response to Advisory Action," dated May 16, 2017 (the "RCE") (patentee amended claim 17 and argued "the first low-doped layer . . . has a dopant concentration less than that of the doped layer"). Accordingly, when the claims are read in light of the specification and prosecution history, a POSITA would understand them to allow for the "second low-doped layer" to have a dopant concentration that is less than, the same as, or greater than the dopant concentration of the "first low-doped layer" and the "doped layer."

56.     The Plaintiffs assert, based on the specification, that the "second low-doped layer" is "a layer having a lower concentration of dopants relative to the doped layer." However, nowhere do the claims, specification or prosecution history inform the POSITA of such, and a POSITA would not understand the limitation to have this meaning. The claim does not define the amount of doping of the "doped layer." Rather, the claim simply recites "a doped layer," and therefore the "doped layer" could have any level of doping. In addition, the claim explicitly recites that the "first low-doped layer … has a dopant concentration less than that of the doped layer." '800 patent at 12:19-21 and 27-29. Significantly, the claim does not state whether the "second low-doped layer" has a dopant concentration that is less than that of the doped layer, and thus the "second low-doped layer" could have a dopant concentration that is greater than, less than, or the same as the dopant concentration of either the "first low-doped layer" or the "doped layer." Plaintiffs' attempts to read into the claim an additional limitation that does not appear anywhere in the claim. Specifically, they attempt to read into the claim the additional limitation that the "second low-doped layer" has a dopant concentration less than the dopant concentration of the "doped layer." ECF 144-10 ¶ 19. In my opinion, a POSITA reading claim 14 in the context of the entire specification and prosecution history would not read such limitation into the claim.

57.     Rather, POSITA would understand from the language of the claim that the patentee intended to limit only the concentration of dopant of the "first low-doped layer." Conversely, since the claim does not similarly limit the "second low-doped layer," the POSITA would understand that the "second low-doped layer" is not so limited.

58. Professor DenBaars' relies on column 8, lines 46-55 and Figure 2. The cited passage states in relevant part that "the dopant concentration of the undoped layers 35*a* can be reduced." '800 patent at 8:48-50. As to Figure 2, the description thereof is similarly non-limiting or open-ended. The specification plainly states that the "hole injection layer," "p-type contact layer," and "intermediate layer," "*can* have" the disclosed levels of Mg or dopant concentrations. '800 patent at 6:49-52. Nowhere does the specification state that the any such layer must have or can only have such dopant levels. Nor does the specification otherwise disavow or disclaim other dopant levels. To the contrary, the language disclosing such dopant levels is entirely non-limiting and open-ended. As set forth above, the specification explicitly proscribes reading any such limitations from the specification into the claims. *Id*. at 10:24-36; *see also id*. at 4:6-11.

59. A POSITA would take the patentee at its word, would not read any such "exemplary embodiments" into the claims, and would not limit the claims to any such embodiments, but rather would understand that the claims are broader than such embodiments, and must be read in accordance with their literal scope as "as covering all modifications or variations derived from the . . . claims and equivalents thereof." *Id*. When claim 14 is read in light of the specification and prosecution history, a POSITA would understand that the "second low-doped layer" can have a dopant concentration that is less than, the same as, or greater than the dopant concentration of each of the "first low-doped layer" and the "doped layer." Accordingly, when claim 14 is read in light of the specification and prosecution history, it fails to inform a POSITA with reasonable certainty about what level of dopant is a "second low-doped" level as recited in the claim, and therefore fails to inform with reasonable certainty the scope of the invention.

60. For the reasons summarized above, the concentration of dopant in the "doped layer" is undefined and thus the "second low-doped layer" could have a dopant concentration that is less than, the same as, or greater than the concentration of the "doped layer."

61. Claim 14 further recites that "the second low-doped layers include a hole concentration decreasing with increasing distance from the active layer and then increasing with

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

decreasing distance to the doped layer." '800 patent at 12:21-25. This language is incoherent and would be viewed as such by a POSITA. This is because the claim earlier recites "first and second low-doped layers and a doped layer disposed between the low-doped layers," which would appear to indicate that the claim requires only one "second low-doped layer." However, the claim's later use of the plural "layers" when reciting "the second low-doped layers include …" appears to require more than one second low-doped layer. But if there are plural "second low-doped layers," that is, three or more "low-doped layers," it is unclear which of the "low-doped layers" the "doped layer [is] disposed between," as also recited in the claim.

62.    The claim is also unclear as to whether every one of the "second low-doped layers" requires the "hole concentration decreasing with increasing distance …" as recited, or whether only one or less than all of the "second low-doped layers" requires this characteristic. Accordingly, a POSITA would view such claim language as incoherent.

63.    Nor does the specification or the prosecution history provide the POSITA guidance as to the scope of the claim. The prosecution history reveals that the patentee intended the claim to read as is. Below is a copy of claim 14 as amended during prosecution of the patent application (pending claim 17 issued into claim 14 of the patent):

17.    (Currently Amended) A light emitting device, comprising:

a substrate;

an n-type semiconductor layer formed over the substrate;

an active layer formed over the n-type semiconductor layer;

a p-type semiconductor layer formed over the active layer, wherein the p-type semiconductor layer includes first and second low-doped layers and a doped layer disposed between the low-doped layers and the second low-doped layers include a hole concentration decreasing with increasing distance from the active layer region and a hole concentration and then increasing with decreasing distance to the doped layer region; and

a p-type contact layer formed over the doped layer, and

wherein the first one of the low-doped layer[[s]] adjoins [[to]] the p-type contact layer and has a dopant concentration less than that of the doped layer.

**Second amendment of pending claim 17 (issued claim 14)**

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

| **during prosecution of the '800 patent application** |
|---|

64.     The patentee repeated the claim language during prosecution and acknowledged this is how the claim was intended to read. In the RCE, the patentee's attorney reiterated that the claim requires plural "second low-doped layers" where he argued in part:

> [T]he Final Office Action and the Advisory Action equated the second p-side nitride semiconductor layers 17 and 17' to the claimed first and second low-doped layers. *None of the second p-side nitride semiconductor layer 17 and 17' satisfies the claimed feature 'the second low-doped layers include* a hole concentration decreasing with increasing distance from the active layer and then increasing with decreasing distance to the doped layer.' Accordingly, Sanga fails to teach or suggest the claimed light emitting device as recited in Claim 17.

RCE at 11 (emphasis added). Based on the prosecution history, the patentee plainly intended to amend the claims to state "the second low-doped layers include a hole concentration . . . ." The patentee's attorney repeatedly argued during prosecution that the prior art did not teach plural "second low-doped layers." RCE at 9 ("Claim 17 has been amended to recite, among others, 'the second low-doped layers include . . .'); at 10 ("None of the second p-side nitride semiconductor layer 17 and 17' satisfies the claimed feature 'the second low-doped layers include . . .''").

65.     In response to the RCE, the Examiner at the U.S. Patent & Trademark Office ("USPTO") issued a Notice of Allowability, where he stated that he allowed claim 17 (issued claim 14) because "the prior art does not disclose or fairly suggest wherein *the second low-doped layers including* . . .," thus reiterating that the claim requires plural "second low-doped layers." "Notice of Allowability," June 26, 2017, p. 3 (emphasis in original). In response, the patentee submitted "Comments on Examiner's Reasons for Allowance," dated September 21, 2017. In its "Comments," the patentee never corrected the Examiner's statement that the claim limitation requires plural "second low-doped layers . . .," as indicated above. Rather, the patentee simply stated that "the claims may be patentable for other reasons as well." *Id.* p. 1.

66.     Nor does the prosecution history inform a POSITA with reasonable certainty as to whether only one, some, or all of the "second low-doped layers" must meet the "hole concentration decreasing …" limitation in claim 14.

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

67.     In view of the foregoing, the POSITA would understand that the patentee intended the claim to read as issued in the patent, *i.e.*, that the claim requires plural "second low-doped layers." The specification does not provide clear guidance to correct the incoherence. For example, the specification does not disclose that the device must include only one "second low-doped layer." Rather, the specification discloses that "other . . . intervening elements or layers can be present," '800 patent at 4:14-20, and "that various modifications, changes and substitutions can be made to the disclosure without departing from the spirit and scope of the invention," *id*. at 10:24-29.

68.     Accordingly, when claim 14 is read in light of the specification and prosecution history, it fails to inform with reasonable certainty the scope of the invention for these additional reasons.

69.     Professor DenBaars opines that the recitation in claim 14 that "the second low-doped layers include a hole concentration decreasing with increasing distance from the active layer and then increasing with decreasing distance to the doped layer" is a "clear error," and that a POSITA "would readily understand and ascertain" such, and would rewrite the claim as follows (strike through deleted and underline added): "the second low-doped ~~layers include~~ <u>layer includes</u> a hole concentration decreasing with increasing distance from the active layer and then increasing with decreasing distance to the doped layer." Professor DenBaars uses *six* numbered paragraphs to explain why he believes a POSITA would readily appreciate and correct the error in the manner that he says it should be corrected. ECF 144-10 ¶¶ 21-26. I disagree with Professor DenBaars at least because his proposed correction is subject to significant debate based on the claim language and the specification, and the prosecution history does suggest a different interpretation than the one that he proposes.

70.     As discussed above, the specification does not use any of the terms "low-doped layer," "first low-doped layer," "second low-doped layer" or "second low-doped layers." The specification repeatedly refers to plural "undoped layers 35*a*," and never identifies or describes any such layer as a "first" or "second" layer, much less as first or second "low-doped" layers.

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

1   Col. 5, lines 26, 44, 47; col. 6, lines 18, 19, 31, 53, 56, 59, 61; col. 8, lines 34, 47, 50; col 9, line

2   32. Although Figure 2 shows two undoped layers 35*a*, the specification is clear that the

3   disclosure is not limited to the embodiments disclosed, can be implemented in different forms,

4   and that other intervening elements or layers can be present. '800 patent at 4:7-18. The

5   prosecution history, on the other hand, clearly demonstrates that the patentee intended the

6   amended claim to read as issued in the patent, *e.g.*, that the amended claim language requires

7   plural "second low-doped layers."

8          71.    Professor DenBaars relies on the prosecution history to conclude that a POSITA

9   would readily appreciate and correct the error in the manner that he says it should be corrected.

10  *See* ECF 144-10 ¶¶ 23-26. However, as discussed above, the prosecution history demonstrates

11  that the patentee unambiguously intended to amend the claim language at issue to read as it does

12  in the issued patent, that the patentee argued that the amended claim language distinguished over

13  the prior art, that the USPTO Examiner, in turn, acknowledged the amended claim language, and

14  explicitly stated that the amended claim language was part of the reason for allowing the claim

15  over the prior art of record. Accordingly, the prosecution history is clear that the patentee and the

16  USPTO Examiner intended the amended claim language to read as it does in the issued patent.

17         72.    Professor DenBaars points to the September 29, 2016 Amendment where pending

18  claim 17 (issued claim 14) was amended in pertinent part as follows: "the ~~undoped~~ low-doped

19  layers include a hole concentration decreasing region and a hole concentration increasing

20  region." ECF 144-10 ¶23. However, this Amendment shows that the patentee intended to, and

21  did claim the hole concentration gradients with respect to plural "low-doped layers." Professor

22  DenBaars then points to the May 16. 2017 Amendment where the claim was further amended in

23  pertinent part as follows: "the second low-doped layers include a hole concentration decreasing

24  with increasing distance from the active layer ~~region and a hole concentration~~ and then

25  increasing with decreasing distance to the doped layer ~~region~~." This Amendment further

26  reinforces that the patentee intended to claim the hole concentration gradients with respect to

27  plural layers, not one layer as argued by Professor DenBaars. Indeed, since pending claim 17

28

DECLARATION OF DR. DANIEL VAN DER WEIDE
- 23 -

1   (issued claim 14) was filed as part of the original patent application, it always claimed plural

2   layers including the hole concentration gradients, where such layers were initially described as

3   "undoped layers," and the claim was later amended to state "low-doped layers." *See* original

4   claim 17 attached hereto as Exhibit 7. Accordingly, rather than demonstrate an intent to claim

5   only one "low-doped layer" including the hole concentration gradients, a POSITA would

6   understand the prosecution history to demonstrate that the patentee consistently claimed plural

7   layers including such hole concentration gradients and intended the claim to state as much.

8        73.    In addition, when the patentee made the final amendment to pending claim 17

9   (issued claim 14), its patent attorney explicitly affirmed that the claim had "been amended to

10   recite, among others, '*the second low-doped layers include* a hole concentration decreasing with

11   increasing distance . . . .'" ECF 144-13 at 7 (emphasis added). Further, the patentee's attorney

12   explicitly argued that the claim was patentable over the prior art because of the amended

13   limitation: "None of the second p-side nitride semiconductor layer 17 and 17' satisfies the

14   claimed feature '*the second low-doped layers include* a hole concentration decreasing with

15   increasing distance . . . .'" *Id*. (emphasis added). A POSITA would understand that the patent

16   attorney's actions were hardly mistaken or unintentional where he repeated the amended claim

17   language twice in his argument, and explicitly argued that such amended claim language was the

18   reason the claim distinguished over the prior art.

19        74.    The USPTO Examiner issued a Notice of Allowability in response to the

20   patentee's May 15, 2017 Amendment, where the Examiner stated that the reason he allowed

21   pending claim 17 (issued claim 14) was because it included the claim limitation repeated and

22   argued by the patent attorney in the last Amendment. The USPTO Examiner stated in pertinent

23   part: "Regarding claim 17, the known prior art does not teach the claim as a whole. In particular,

24   the prior art does not disclose or fairly suggest wherein *the second low-doped layers including a*

25   *hole concentration decreasing with increasing distance* . . . ." Notice of Allowability at p. 3,

26   Exhibit 8 hereto (emphasis in original). A POSITA would understand from this prosecution

27   history that both the patentee and the USPTO Examiner understood how pending claim 17

28

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

1  (issued claim 14) was amended, and believed that the amendment distinguished the claim over

2  the prior art.

3    75.    In response to the Notice of Allowability, the patentee filed a "Response to Notice

4  of Allowance" which included detailed "Comments on Examiner's Reasons for Allowance."

5  Response to Notice of Allowance, Exhibit 9 hereto. A POSITA would understand that if the

6  patentee provided such "Comments on Examiner's Reasons for Allowance," the patentee had

7  read and understood the Examiner's reasons for allowance, and would have expressed any

8  disagreement, or requested a change or modification if it believed one was required. However,

9  the patentee did no such thing. Rather, the patentee acknowledged that the "Examiner's reasons

10 for allowance indicate that particular claim elements are not disclosed or suggested by the prior

11 art of record," and otherwise did not ascertain any error in pending claim 17 (issued claim 14) or

12 in the Examiner's stated reasons for allowing the claim. *Id*. Thus, a POSITA would conclude that

13 the patentee and the USPTO Examiner both intended pending claim 17 (issued claim 14) to

14 recite "the second low-doped layers including a hole concentration decreasing with increasing

15 distance . . .," as stated in the patent.

16    76.    Professor DenBaars argues that a POSITA would rewrite claim 14 in accordance

17 with his proposed construction because "the specification . . . does not disclose plural second

18 low-doped layers." ECF 144-10 ¶ 25. However, a POSITA would understand that the '800

19 specification does not identify or describe any "second low-doped layers." Rather, as indicated

20 above, the '800 specification does not use the words "second" or "low-doped" anywhere.

21 Instead, the specification repeatedly describes "a plurality of undoped layers" or simply states

22 "undoped layers." *See, e.g.,* '800 patent at Abstract and 1:52-53. Further, the specification

23 describes the plural "undoped layers" as including the hole concentration gradients. *See, e.g.,*

24 '800 patent at 3:21-25 ("the undoped layers include a hole concentration decreasing region and a

25 hole concentration increasing region"). Thus, the specification does not limit the claimed hole

26 concentration gradients to any given "undoped layer," but rather explicitly contemplates all

27 "undoped" layers including such feature. Indeed, the passages cited by Professor DenBaars do

28

1   not state that only one of the "undoped" layers may include the claimed hole concentration

2   gradients, but rather state that "at least one of the undoped layers 35a can include" such feature.

3   '800 patent at 6:30-33.

4          77.    In view of the foregoing, Professor DenBaars' proposed correction of claim 17 is

5   subject to significant debate based on the claim language and specification, and the prosecution

6   history suggests a different interpretation than that proffered by Professor DenBaars, *e.g.*, it does

7   not suggest rewriting the claim in pertinent part as follows (strike through deleted and underline

8   added): "the second low-doped ~~layers include~~ layer includes a hole concentration."

9                      **c.    Plaintiffs' construction of "intermediate doped layer"**

10         78.    I have also reviewed Plaintiffs' proposed construction for "intermediate doped

11  layer," which they contend means "a layer having acceptor impurities located between the first

12  and second low doped layers." In my opinion, even if the claim was not indefinite, a POSITA

13  would not understand this term means what Plaintiffs propose.

14         79.    First, under Plaintiffs' construction, the term "intermediate doped layer" itself

15  identifies the location of the "intermediate doped layer" – between the first and second low

16  doped layers. However, the claim contains separate language reciting that the intermediate doped

17  layer is "disposed between the first and second low doped layers." '800 patent at col. 10, lines

18  53-54. If "intermediate doped layer" itself identified the location of the layer as Plaintiffs

19  contend, such would render the later-recited "disposed between …" language superfluous,

20  duplicative and meaningless. A POSITA would not understand the claim to do that, and thus

21  would not understand "intermediate doped layer" to identify the location of the layer.

22         80.    In addition, though the claim does recite that the layer is doped, it does not limit

23  what the layer is doped with, much less limit it to being doped with acceptor impurities as per

24  Plaintiffs' construction. Thus, a POSITA would not understand the claim to require such.

25         81.    Nor would a POSITA understand the specification to limit the type of dopant in

26  the intermediate doped layer. For example, as discussed above, the specification in multiple

27  places states that the layer has a dopant concentration, *e.g.*, '800 patent at 1:65-67; 3:9-11; 5:57-

28

61; 10:62-57, but those passages do not state that the dopant is any particular type of dopant, nor that the dopant must be an acceptor impurity. The specification does not use the term "acceptor impurity."

82.     As discussed above, though, the specification provides an example of an intermediate doped layer doped with magnesium (Mg). *E.g.*, '800 patent FIG. 2. Plaintiffs' construction thus appears to import a limitation into the claims from the specification. Nonetheless, the specification does not state, and a POSITA would not understand the specification to require, that the dopant must be Mg, or any other acceptor impurity. Further, though Mg can be used as an acceptor impurity, a POSITA would not understand the specification to describe the dopant broadly as being an (any) acceptor impurity, as opposed merely Mg.

### D.     The '225 patent

83.     I disagree with Plaintiffs' proposed construction of "carrier trap" portion as "[a] physical shape or a quantum mechanical energy state that can confine injected electrons and holes."

84.     The '225 patent is generally directed to a light emitting device including a substrate, a first semiconductor layer on the substrate, a second semiconductor layer on the first semiconductor layer, a multi-quantum well structure between the first and second semiconductor layers, and a carrier trap portion formed in at least one layer within the multi-quantum well structure. *E.g.*, Abstract, col. 1:16-21; 2:13-23; Figures 1, 3. The purported purpose of the invention is to address the problem that "crystal defects such as dislocations in the active region trap carriers introduced into the active region and do not emit light, thereby acting as a non-radiative center and significantly deteriorating internal quantum efficiency of the LED." '225 patent at col. 1, line 63 – col. 2, line 2. To this end, the invention's purpose is "to prevent a reduction in internal quantum efficiency which is caused by crystal defects such as dislocations in an active region" and "improve crystal quality of a multi-quantum well structure." '225 patent at col. 2, lines 5-13. To this end, "[t]he carrier trap portion 27 serves to trap carriers by taking the

DECLARATION OF DR. DANIEL VAN DER WEIDE

1  place of dislocations in the multi-quantum well structure" and "acts as the radiative center … to

2  emit light." '225 patent at col. 4, lines 14-16, 48-50.

3      85.   The specification does state, as Plaintiffs cite to the Court, that "the carrier trap

4  portion 27 may be a physical shape or a quantum-mechanical energy state." Col. 4, lines 43-46.

5  However, the entire phrase states: "the carrier trap portion 27 may be a physical shape or a

6  quantum-mechanical energy state <u>capable of efficiently using the carriers which can be trapped</u>."

7  *Id.* (emphasis added). Similarly, while that same portion of the specification states that the

8  "carrier trap portion 27 …. traps carriers injected," the entire phrase is that "the carrier trap

9  portion 27 <u>acts as the radiative center </u>that traps carriers injected <u>into the multi-quantum well

10  structure 17 to emit light.</u>" *Id.* at 4:48-50 (emphasis added).

11      86.   I have also reviewed the Schubert article Plaintiffs cite to the Court. But Schubert

12  does not contain the term "carrier trap portion" or even "carrier trap." Schubert does discuss non-

13  radiative "traps," but as a POSITA would recognize, non-radiative traps are not relevant to the

14  "radiative" carrier trap portion(s) of the '225 patent.

15      87.   I further note that the '225 patent does not contain the word "confine" or any form

16  thereof.

17      88.   Professor DenBaars incorrectly contends that I am "not aware of carrier traps."

18  ECF 144-10 ¶ 29. I have been "aware" of carrier traps for many years, and I have publications on

19  measuring the transport of single electrons through quantum dots, which, as Professor DenBaars

20  explains (though the '225 patent does not), are a type of carrier trap. But the '225 patent does not

21  claim a "carrier trap," but a "carrier trap portion." Professor DenBaars appears to acknowledge

22  that the term "carrier trap portion" is not "found in the scientific literature." *Id.* ¶ 32.

23      **E.   The '638 patent**

24      89.   Claim 1 of the '638 patent recites, among other limitations, that a "the gallium

25  nitride first interlayer comprises a single composition . . . ." '638 patent at 11:48-49. In my

26  opinion, when this limitation is viewed in light of the specification and prosecution history, it

27

28

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

fails to inform a POSITA about the scope of the invention with reasonable certainty and is indefinite.

90.    The plain meaning of "composition" is "the manner in which something is composed," the "general makeup," or "the qualitative and quantitative makeup of a chemical compound." https://www.merriam-webster.com/ dictionary/composition. In a light emitting diode, each layer has a respective composition or makeup. A POSITA would understand that the term "composition" is used consistent with its plain meaning throughout the '638 specification. The '638 specification repeatedly describes one layer of the LED as having "the same composition" as another layer of the LED. For example, the "Summary" states that "the second interlayer may have *the same composition* as that of the first interlayer," the "first p-type interlayer may have *the same composition* as that of the first upper semiconductor layer," and "the second p-type interlayer may have *the same composition* as that of the first p-type interlayer." '638 patent at 3:10-11, 45-46 and 53-54 (emphasis added); *see also id*. at 2:65-67, 4:29-31, 41-42, 5:6-8, 16-17, 48-49, 7:14-18, 43-45, 8:10-15, 9:24-28, 51-53, 10:20-24. In each case, the respective layer has a composition, and that composition is the same as the composition of another layer. Significantly, each layer has one and only one composition. On the other hand, it would be nonsensical to state that any such layer has more than one, or plural compositions. As would be readily understood by a POSITA, particularly in light of the '638 specification, each layer of an LED has only one composition, and it would not make sense to state or otherwise imply that a layer of the LED could have more than one such composition. However, that is exactly what claim 1 does.

91.    Claim 1 recites "wherein the gallium nitride-based first interlayer *comprises a single composition . . . .*" The claim was amended during prosecution as follows to include this limitation:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

> 1.    (Currently Amended) A light emitting diode, comprising:
>
> a substrate;
>
> a buffer layer disposed on the substrate;
>
> a gallium nitride-based n-type contact layer disposed on the buffer layer;
>
> a gallium nitride based p-type contact layer disposed on the n-type contact layer;
>
> an active layer interposed between the n-type contact layer and the p-type contact layer;
>
> a gallium nitride-based first lower semiconductor layer interposed between the buffer
> layer and the n-type contact layer; and
>
> a gallium nitride-based first interlayer interposed between the first lower semiconductor
> layer and the n-type contact layer,
>
> wherein the first interlayer comprises a single composition and has lower dislocation
> density than that of the buffer layer and has higher dislocation density than that of the first lower
> semiconductor layer, and
>
> wherein the first interlayer comprises the same composition as that of the n-type contact
> layer.
>
> **Amendment of claim 1 during prosecution of '638 patent**

16
17
18
19

ECF 144-12 at 4. The limitation that the first interlayer "comprises a single composition" does not appear anywhere in the specification. Rather, this language was first added to the '638 patent application through the amendment above. Nowhere does the specification explain what this limitation means.

20
21
22
23
24
25
26
27

92.    My understanding is that the phrase "comprises a" generally carries the meaning of comprising "one or more of." In other words, the claimed invention can include one or more of the elements that follow "comprises a." However, here, the patentee appears to have intended to limit the claim to comprising only a single such element, *i.e.*, "a single composition." Thus, the claim implies that the "first interlayer" could comprise a plurality of compositions, but that the claim is limited to only "a single composition." It is my opinion that a POSITA would view this limitation as nonsensical because a layer can have only one composition.

28

93.     Based on my review of the prosecution history, the patentee clearly did not intend for this limitation to be meaningless. To the contrary, the patentee argued that the addition of this limitation purportedly distinguished the claimed invention over the cited prior art. Claim 1 was rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent Application Pub. No. 2001/0035531 to Kano et al. ("Kano"). The patentee argued that "Kano shows that the first super lattice defect reducing layer 30 is itself a super lattice layer composed of 5 pairs of InGaN/AlGaN." ECF 144-12 at 13. The patentee went on to argue that the claimed invention purportedly distinguished over Kano because "[t]he claimed first interlayer comprises a single composition as opposed to a super lattice layer . . . ." *Id.*

94.     This argument only further confuses the issue. In Kano, the "1st super lattice defect reducing layer 30" is a superlattice including 5 pairs of InGaN/AlGaN layers alternately layered on one another. Kano at Table 1, ¶ [0065]. Kano describes the "composition" of each such layer as follows: the composition of each InGaN layer is "$In_{0.05}Ga_{0.95}N$," and the composition of each AlGaN layer as "$Al_{0.25}Ga_{0.75}N$." *Id.* Thus, in Kano, each layer of the superlattice 30 has one and only one composition, which is either $In_{0.05}Ga_{0.95}N$ or $Al_{0.25}Ga_{0.75}N$. Thus, the argument appears to make a distinction over Kano that does not exist. In any event, the patentee never explains what the claim limitation "comprises a single composition" means, and the argument made concerning this limitation only further confuses the issue.

95.     Accordingly, it is my opinion that when "the gallium nitride first interlayer comprises a single composition . . ." limitation is read in light of the specification and prosecution history, it fails to inform a POSITA with reasonable certainty about the scope of the invention and is indefinite.

96.     Professor DenBaars criticizes my opinion that the claim term "the gallium nitride first interlayer comprises a single composition . . . ." is indefinite on grounds that I am "either unaware of or obtuse to the fact that the layers in semiconductors and LEDs are often made up of more than one composition, or are often made of sublayers having different compositions." ECF

DECLARATION OF DR. DANIEL VAN DER WEIDE

144-10 ¶ 39. I have long been aware of such. I am also aware that a semiconductor or LED layer often is not made up of multiple sublayers.

97.     Professor DenBaars' argument about a layer having multiple sublayers is divorced from the claims and specification of the '638 patent. It might make sense if the claims recited a "first interlayer" having multiple layers or sublayers. But nothing in the claim or specification requires this.

98.     First, the claim recites "interlayer," which is singular, and the plain and ordinary meaning thereof is that the claim requires one such "interlayer."

99.     In addition, the specification describes and shows the first interlayer being a single layer, not a layer made of multiple layers. *E.g.*, '638 patent 6:47-53 ("Referring to Fig. 2, the light emitting diode includes … a first interlayer 56a"); 7:5-6 ("A first interlayer 56a is disposed on the first lower semiconductor layer …); 8:56-64 ("Referring to FIG. 3, the light emitting diode includes … the first interlayer 56a"); Abstract ("The light emitting diode includes … a first interlayer"); FIG. 2 (showing the first interlayer 56a as being a single layer); FIG. 3 (same). When describing the manufacturing of the first interlayer, the specification makes no indication that the process involves the growing of multiple sublayers to form the first interlayer. Rather, the specification repeatedly describes the first interlayer merely as being grown. *E.g.*, *id.* 4:5-17 ("the method includes … growing a gallium nitride-based first interlayer"); 13:1-10 (claim 12: "A method … comprising … growing a gallium nitride-based first interlayer …").

100.     Nor is there anything inherent about a "first interlayer" that would require it to be made of "multiple different and discreet types" of layers or sublayers. This contrasts with Professor DenBaars' example of an active layer (ECF 144-10 ¶ 39) that necessarily requires multiple semiconductor layers (quantum well layers and barrier layers).

101.     I also disagree with Professor DenBaars reading of the prosecution history, more specifically, the amendment to the claims adding the "single composition" limitation and the corresponding arguments to the Examiner by the patentee that I discuss above. As Professor DenBaars notes, what the patentee argued to the Examiner was that "[t]he claimed first interlayer

1    comprises a single composition as opposed to a super lattice layer." ECF 144-10 ¶ 41. A

2    POSITA would understand from that argument that the patentee was distinguishing the first

3    interlayer from a "super lattice."

4        102.    However, the fact that the patentee disavowed one structure from the scope of the

5    claim does not serve to define what is within the scope of the claim. That is, merely because, as

6    Professor DenBaars says, "Kano's 'first super lattice defect reducing layer 30' does not satisfy

7    the amended claim limitation," ECF 144-10 ¶ 42, this does not mean that claim, when read in

8    light of the specification and prosecution history of the patent, informs a POSITA about the

9    scope of the invention with reasonable certainty. Thus, the claim at issue fails to do so, and is

10   indefinite.

11       **F.    The '210 patent and the '514 patent**

12       103.    These claims require, among other limitations, a spacer layer having "a bandgap

13   smaller than that of the barrier layer and greater than that of the quantum well layer." This

14   limitation was referred to in the prosecution history of the '210 patent as the "bandgap

15   limitation." In my opinion, when the bandgap limitation is viewed in light of the specification

16   and prosecution history, it fails to inform a POSITA about the scope of the invention with

17   reasonable certainty and is indefinite.

18       104.    Plaintiffs assert that this limitation should be construed to mean that "[t]he

19   bandgap of each individual sublayer of the spacer layer has a bandgap that is smaller than the

20   bandgap of the barrier layer and greater than the bandgap of the quantum well layer." ECF No.

21   129, Appendix A, p. 13. It is my opinion that a POSITA would consider this construction to be

22   contrary to the plain language of the claims and the specification.

23       105.    The claim language requires, for example, that the spacer layer (i) have a plurality

24   of layers (or in the case of the '514 patent, one more spacer layers), and (ii) have a bandgap

25   smaller than that of the barrier layer and greater than that of the quantum well layer. A POSITA

26   would understand the plain meaning of such claim language to require the spacer layer to have

27   one or more bandgaps that meet the bandgap limitation, *i.e.*, a bandgap smaller than that of the

28

DECLARATION OF DR. DANIEL VAN DER WEIDE

barrier layer and greater than that of the quantum well layer. Thus, under the plain meaning of the claim language, if any layer of a multi-layer spacer met the bandgap limitation, the bandgap limitation would be met.

106. A POSITA also would understand this to be consistent with the specification. The specification states that "[t]he spacer layer 128 may be made of a (Al, In, Ga) N-based group III-nitride semiconductor layer having a smaller bandgap than that of the barrier layer of the active region 129 and a larger bandgap than that of the well layer. For example, the spacer layer 128 may include $In_xGa_{1-x}N$ (0≤x<1)." '210 patent at 10:5-10.

107. The specification more specifically describes with reference to FIG. 8 that the spacer 128 is a multilayer spacer comprising a plurality of repeating spacer layers 128a, 128b and another spacer layer 128c.



108. The repeating layers 128a, 128b are described as follows: "as shown in FIG. 8, the spacer layer 128 may have a structure in which (Al, In, Ga) N-based group III-nitride semiconductor layers 128a and 128b having a smaller bandgap than that of the barrier layer of the active region 129 and larger bandgap than that of the well layer are alternatively stacked." '210 patent at 10:40-45. The specification next describes, as also shown in FIG. 8, that the spacer 128 further includes "a spacer layer 128c adjacent to the active region 129." *Id*. at 11:19-25. The spacer layer 128c is described as an "InGaN layer further including a greater amount of In compared to other semiconductor layers configuring the spacer layer 128," where "the amount of

In included in the spacer layer 128c adjacent to the active region 129 may be higher than that in the quantum well layer of the active region 129." *Id.*

109.    It was acknowledged during prosecution of the '210 patent that "it was known in the art that indium has the effect of lowering the bandgap energy of GaN-based semiconductors," and "the bandgap energy of a layer decreases as the indium concentration increases." ECF 144-14 at 10, 11, "Decision Denying Institution of *Inter Partes* Review" of '210 patent (the "Decision")

110.    Professor DenBaars does not dispute that the spacer layer 128c having a higher indium content than the quantum well layer as the specification describes would have a lower band gap than the quantum well layer and thus would not meet Plaintiffs' proposed construction. However, Professor DenBaars contends that the claimed spacer layer need not cover the spacer layer 128c shown in Fig. 8 because there is no "requirement in the patent law that requires a patent claim to cover all embodiments described in the specification." ECF 144-10 ¶¶ 52-54. But the spacer layer 128 shown in Fig. 8 including spacer layer 128c is the only embodiment of a spacer layer disclosed in the '210/'514 patents. *See* '210 patent at 4:44-46 (stating that Fig. 8 is "an exemplary embodiment of the present invention"). The patents do not show or describe a spacer layer that does not have a spacer layer 128c in it. A POSITA would not interpret the claims in the patents to exclude the only embodiment disclosed. Rather, a POSITA would interpret the claims to include that embodiment, *e.g.*, the spacer layer 128 including its spacer layers 128a, 128b and 128c.

111.    Professor DenBaars also appears to argue that Fig. 8 does not, in fact, show a spacer layer 128c having a lower bandgap than the quantum well layer because the specification uses the word "may" to describe the indium content of the spacer layer 128c. ECF 144-10 ¶ 52. However, that contention is inconsistent with his assertion that that "the embodiment shown in Fig. 8" has "spacer layers 128a and 128b with an indium concentration between that of the barrier layer and quantum layer or, in the words of claim 1: 'having a bandgap smaller than that

of the barrier layer and greater than that of the quantum well layer.'" This is because the

specification describes the bandgap of the spacer layers 128a, 128a also using the word "may":

> [T]he spacer layer 128 **may** have a structure in which (Al, In, Ga)N-based group III-nitride semiconductor layers 128a and 128b having a smaller bandgap than that of the barrier layer of the active region 129 and a larger bandgap than that of the well layer

'210 patent 10:40-45 (emphasis added)

112.    Professor DenBaars further argues that the spacer layer must have "a bandgap in between that of the quantum well layer(s) and the barrier layer(s) that comprise the active region" because "[i]f the spacer layer has a bandgap greater than that of the barrier layer, it will act as a second barrier layer. And if the spacer layer has a bandgap smaller than that of the quantum well layer, it will act as a well layer and result in the emission of light within the spacer layer."[1] ECF 144-10 ¶ 50. However, the claims do not recite that the spacer layer may not act as a second barrier layer or may not emit light. Thus, Professor DenBaars' argument does not hold water.

113.    Regardless, there is no technical reason why the spacer layer cannot have a bandgap between that of the quantum well layer and the barrier layer because it contains a sublayer 129c in it. That is, the inclusion in the spacer layer 128 of layer 128c having a lower band gap than the quantum well layer does not necessarily mean the spacer layer 128 would have a lower bandgap than the quantum well layer. The bandgap of the spacer layer 128 is dependent upon several factors, including, the bandgaps of all of its layers and the thicknesses of those layers, not the bandgap of any single layer.

114.    Accordingly, the POSITA would understand that the spacer layer 128c disclosed in the '210/'514 patents would not meet the bandgap limitation. In other words, the POSITA would understand that the spacer layer 128c would have a higher indium concentration and a lower bandgap than the quantum well layer.

---

[1] Professor DenBaars also discusses other purported functions of the spacer layer. ECF 144-10 ¶¶ 47-48. However, the claims do not recite that the spacer layer performs these functions either.

DECLARATION OF DR. DANIEL VAN DER WEIDE

ME1 46815772v.1

115.    In view of the foregoing, the POSITA would not understand the bandgap limitation, when viewed in the context of the specification, to mean that "each individual sublayer of the spacer layer has a bandgap that is smaller than the bandgap of the barrier layer and greater than the bandgap of the quantum well layer," as argued by Plaintiffs. The POSITA would understand this construction to exclude from the claim the spacer 128 disclosed in the specification, and therefore would be contrary to both the plain language of the claims and the specification. Therefore, Plaintiffs' proposed construction of "spacer layer" in the claims of the '210 and '514 patents is inconsistent with the claims and the specification.

116.    In connection with the prosecution history of the '210 patent, the Board denied institution of *Inter Partes* Review of the '210 patent. In its Decision, the Board explicitly pointed out that it was not construing any of the claim limitations. Decision at 8 ("we determine that we do not need to expressly construe any terms for purposes of this Decision"). The Petitioner asserted that claim 1 was anticipated by the prior art reference to Sanga. The Petitioner "provided evidence that Sanga discloses a spacer layer (n-side multilayer 10) that includes at least on GaN layer and one $In_{0.03}Ga_{0.97}N$ layer, *i.e.*, a plurality of layers." Decision at 13. The "Petitioner . . . also provided evidence that the bandgap of the $In_{0.03}Ga_{0.97}N$ layer in the n-side multilayer 10 is smaller than the bandgap of the GaN barrier layer in Sanga Example 1 based on the relative indium concentrations in each layer." *Id*. However, the Board determined that this was not enough to meet bandgap limitation; rather, the Board determined that the bandgap limitation cannot "be satisfied by comparing the bandgap of one specific layer of the spacer layer to the bandgap of the barrier layer." *Id*. at 11-12.

117.    The Board noted that the above quoted language from the '210 patent at 10:40-44 "suggests that for a spacer layer having a plurality of layers, *each layer* of the spacer layer has a bandgap that is smaller than the bandgap of the barrier layer." Decision at 14 (emphasis in original); *see also* Exhibit 10 attached hereto, Patent Owner's Preliminary Response at 3, 29 ("the proper construction of 'a spacer layer' having 'a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer' requires that each layer within a multilayer

spacer layer have a bandgap between that of the barrier layer and that of the quantum well layer."). However, that the Board did not acknowledge or address that the spacer 128 includes the spacer layer 128c, and that such layer would have a higher indium concentration and a lower bandgap than the quantum well layer and would not meet the bandgap limitation. The Board went on to note, based on the prior art Sanga reference, where the spacer has "layers having different band gaps [which] are alternatively stacked, *the bandgap of a layer having the largest band gap* . . . is considered when comparing the band gap of the . . . of the multilayer . . . with other layers." Decision at 14-15 (emphasis in original) (internal quotations omitted). The Board further noted that where the spacer "is composed of multiple layers having different compositions," it is not enough to compare the bandgap of any one layer, but rather it may be necessary to compare the "overall bandgap" of the multilayer. Decision at 15.

118.     Professor DenBaars contends that I mischaracterized what the Board said in the IPR decision regarding the '210 patent. ECF 144-10 ¶¶ 56-57. I did not. What I did is quote multiple statements by the Board that (1) were inconsistent with the plain language of the claims viewed in the context of the specification, and (2) noted different ways in which the claims might be interpreted.[2] The fact that the Board noted multiple ways in which the claims might be interpreted but, as I stated, "explicitly pointed out that it was not construing any of the claim limitations," shows that "it is not clear" what the bandgap limitation requires. Thus, as I explained above, a POSITA would find the language of the claims read in light of the specification to be inconsistent with and contradicted by the prosecution history, and therefore, the bandgap limitation fails to inform a POSITA about the scope of the invention with reasonable certainty.

119.     Professor DenBaars misses the point. He argues *his* interpretation of what the Board said in its Decision. ECF 144-10 ¶ 57. However, he fails to consider how a POSITA would understand the IPR Decision, and more specifically, how a POSITA would understand the patentee's arguments reflected in, and the statements of the Board in, the IPR Decision, how they

---

[2] Professor DenBaars does not dispute the accuracy of my quotations.

DECLARATION OF DR. DANIEL VAN DER WEIDE

are inconsistent with the plain language of the claims when viewed in the context of the entire specification, and the impact of such inconsistencies on the POSITA's understanding of the bandgap limitation.

120.    In view of the foregoing, the treatment of the bandgap limitation in the prosecution history is inconsistent with the plain language of the claims viewed in the context of the specification. As a result, it is not clear to the POSITA whether the bandgap limitation requires (i) that each layer of a multilayer spacer must meet the bandgap limitation (although a POSITA would consider this to be contrary to the plain language of the claims and the specification, as indicated above), (ii) that the layer of the multilayer spacer with the largest bandgap must meet the bandgap limitation, or (iii) that the "overall bandgap" of the multilayer spacer must meet the bandgap limitation (although the specification and prosecution history do not disclose how one would arrive at such an overall bandgap).

121.    In view of the foregoing, a POSITA would find the language of the claims read in light of the specification to be inconsistent with and contradicted by the prosecution history, and therefore, the bandgap limitation fails to inform a POSITA about the scope of the invention with reasonable certainty.

### G.    The '207 patent

122.    The '207 patent is generally directed to a light-emitting diode including a substrate, an n-type semiconductor layer, an active layer, a p-type semiconductor layer, a transparent electrode layer with an opening exposing the p-type semiconductor layer, a Distributed Bragg Reflector ("DBR") arranged in the opening, and an electrode pad covering the DBR. *E.g.*, Abstract, col. 1:20-32; 1:64-66; Figures 1, 3.

123.    I understand that the parties dispute the construction of the term "a current blocking portion" in claim 1 of this patent. In my opinion, the term "current blocking portion" is subject to 35 U.S.C. § 112(6), and a POSITA would understand the term to mean a DBR, and equivalents.

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

124.    The term does not name particular structure(s) nor provide a sufficiently definite meaning as the name for structure as would be understood by a POSITA. I am aware of no structure or structure(s) in the art where the name for that structure is "current blocking portion." Nor does the term recite sufficiently definite structure, but rather recites function without reciting sufficient structure for performing that function. In this context, the term "portion" is a nonce word that does not connote definite structure. Exhibit 11 hereto, https://www.merriam-webster.com/dictionary/portion; Exhibit 12 hereto https://www.ahdictionary.com/word/search.html?q=portion; Exhibit 13 hereto, https://www.collinsdictionary.com/dictionary/english/portion.

125.    Further, the term recites that the function of the "portion" is "current blocking." That is, the "portion" blocks current. But the term fails to recite sufficient structure to perform that function.

126.    I have reviewed the specification of the '207 patent for corresponding structure/materials. The specification makes no mention of a "current blocking portion." The only discussion of a structure performing the function of blocking current is found in the passage "The DBR 330 blocks current …." Col. 4, lines 12-15. In my opinion, this passage clearly links or associates the disclosed DBR structure/materials with the claimed function of blocking current, as a POSITA would understand.

127.    Further, claim 1 recites a "a transparent electrode layer … comprising an opening" and the "current blocking portion arranged in the opening." Figs. 1 and 3 of the patent and the related portions of the specification show/describe the DBR 330 arranged in the opening 342 of the transparent electrode layer 310. *See also* '207 patent at col. 2:5-15; 2:51-67; 3:46:62.

128.    Accordingly, a POSITA would understand the DBR disclosed in the ''207 patent to be the structure/materials corresponding to the claimed current blocking function.

129.    I have also reviewed the prosecution history of the '207 patent, and do not find any statement or other basis therein from which a POSITA would conclude that the term "current blocking portion" would have a different construction.

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

130.     I have also reviewed Plaintiffs' proposed construction(s) of this term. Plaintiffs first propose that this term has its "Plain and ordinary meaning." In my opinion, for the reasons discussed above why the term is subject to 35 U.S.C. § 112(6), a POSITA would not understand the term to have a plain and ordinary meaning in the art, *e.g.*, as a name for structure. Further, as discussed above, the plain and ordinary meaning of the of claim language is merely that the claimed light emitting diode has a portion that blocks current and does not recite adequate structure to perform that function.

131.     I also disagree with the Plaintiffs' proposed alternative construction that the term means "a structure that makes the current flow difficult," for multiple reasons. First, Plaintiffs' proposal would, in effect, remove the term "blocking" from the claim, *i.e.*, remove the blocking function of the "portion," and rewrite the term so that the portion does something less than block current. Unlike current flow that is blocked and thus cannot flow, current flow that is "difficult" can still flow. I see no basis in the patent or prosecution history, and a POSITA would see no basis, to change "blocking" in the claim to mean something else.

132.     Moreover, Plaintiffs' proposed construction merely recites a function of the "portion" without reciting sufficient structure to perform that function. It does no more to define the scope of the claim than does the claim language itself.

133.     Plaintiffs' construction is also inconsistent with the specification. A POSITA would find nothing in the specification discussing making current flow "difficult" (but not blocked) or teaching a structure that achieves that. I note that Plaintiffs have cited several portions of the patent to the Court (1:51-54, 3:61-4:22, 4:66-5:10) but none of them support Plaintiffs' construction. That is, none of those passages mentions or even suggests that the claimed portion makes current flow "difficult," but not blocked. As discussed above, the passage at col. 3, line 61 through column 4, line 22 of the '207 patent discusses that the DBR "blocks current."

134.     As for the passage at col. 4, line 66 through column 5, lines 10 of the patent, it discusses a diode where the DBR is "omitted." In its place is a "layer 330'" in "ohmic contact

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

with the electrode pad 340." Nowhere does that passage teach or describe to a POSITA that current flow is made "difficult." To the contrary, the fact that the layer 330' is in "ohmic contact" with the pad 340 means that current flows between the layers, *i.e.*, the opposite of current being blocked or even "difficult" to flow.

135.     I have also reviewed the Schubert article Plaintiffs cited to the Court. Schubert discusses current-blocking layers, not current-blocking ***portions***. Regardless, as a POSITA would understand, Schubert makes clear that a "current blocking layer" blocks current, and states nothing about making current flow "difficult." As Schubert expressly states, "the current flows around the current-blocking layer as indicted in FIG. 8.13." p. 142. A POSITA would understand this to mean that current is blocked from flowing through the current-blocking layer, not that current passes through the layer, even with difficulty.

136.     To the extent Plaintiffs might contend that Schubert demonstrates that "current blocking portion" is not subject to 35 U.S.C. § 112(6), I disagree. Schubert makes clear to a POSITA that "current blocking portion" or even "layer" is not a name for particular structure(s) nor recite sufficiently definite structure. Rather, Schubert makes clear that the term generically refers to any structure(s) that blocks current, *i.e.*, cause current to "flow[] around the current-blocking layer." While Schubert gives an example of an n-type conductive layer, it does not provide the level of n-type doping in that layer nor distinguish it from other types of n-type layers commonly found in LEDs. Furthermore, The DBR 330 does not have n-type conductivity. In addition, a POSITA would understand that the GaS layer Schubert discusses applies only to AlGaInP LEDs and would not be used in a GaN-based LED of the '207 patent.

### H.     The '952 patent

137.     The '952 patent is generally directed to a light-emitting diode including a substrate, a first semiconductor layer, an active layer, a second semiconductor layer, a reflection structure, and a barrier layer. *E.g.*, Abstract, col. 1:34-2:2; Figures 1-27.

138.     I understand that the parties dispute the construction of the term "a reflection structure disposed on the second conductive type semiconductor layer" in claim 1 of this patent.

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

1   In my opinion, a POSITA would understand the term to mean a reflection structure disposed in

2   contact with the second conductive type semiconductor layer.

3       139.    My opinion is based on the plain and ordinary meaning of the language of the

4   claim viewed in the context of the specification. A POSITA would understand that the use of the

5   word "on" means, in view of its plain and ordinary meaning, that the recited reflection structure

6   is in contact with the recited second conductive type semiconductor layer. The foregoing is

7   consistent with and supported by dictionary definitions of the word "on." *E.g.*, Exhibit 14,

8   Webster's Ninth New Collegiate Dictionary 823-24; Exhibit 15, https://www.merriam-

9   webster.com/ dictionary/on; Exhibit 16, https://www.collinsdictionary.com/dictionary/

10  english/on; Exhibit 17, https://dictionary.cambridge.org/dictionary/english/on?q=on_1.

11      140.    I have reviewed the specification of the '952 patent and find that the above

12  construction is fully consistent with the specification. In every embodiment shown in the patent,

13  the reflection structure (reference 50/140 in the specification and drawings) is in contact with the

14  second conductive type semiconductor layer (reference 40/130). FIGS. 1-27. More specifically,

15  the ohmic contact layer 141 and conductive barrier layer 144 of the reflection structure 140 are in

16  contact with the second semiconductor layer 130.

17      141.    I have also reviewed the prosecution history of the '952 patent, and do not discern

18  any amendment or statement therein that a POSITA would understand to be a disavowal or

19  alteration of the scope of the term "on" or the limitation as a whole.

20      142.    I have also reviewed Plaintiffs' proposed construction(s) of this term. Plaintiffs

21  propose that this term has its "Plain and ordinary meaning." In my opinion, as discussed above,

22  the POSITA would understand the plain and ordinary meaning of this claim term, particularly

23  the term "on," to mean that the reflection structure is in contact with the second conductive type

24  semiconductor layer.

25      143.    However, I understand that Plaintiffs have cited to the Court language in the

26  specification, "In this patent document when a layer is referred to as being on or over another

27  layer or substrate, the layer can be directly on or over the other layer or substrate or intervening

28

1   layers may also be present." '952 patent at column 3, lines 33-36. In my opinion, a POSITA

2   would not understand this language to alter the plain and ordinary meaning of "on" in the claim

3   language at issue, for multiple reasons. First, a POSITA would understand that the

4   specification's language is general and located within multiple paragraphs of boilerplate in the

5   specification ('952 patent at column 4, lines 33-61). Also, that language addresses only the term

6   "layer," but claim 1 recites "reflection structure." Thus, a POSITA would understand that the

7   specification is not referring to the claimed term "structure," but a different term.

8       144.   Further, Plaintiffs have also cited to the Court FIG. 3 of the patent and language

9   describing FIG. 3, "Referring to FIG. 3, a first semiconductor layer 110, an active layer 120, a

10  second semiconductor layer 130, and a reflection pattern 140 are formed or disposed on or over a

11  substrate 100." Col. 5, lines 1-4. FIG. 3 shows the reflection patterns 140 in contact with the

12  second semiconductor layer 130:



FIG. 3

13

14

15

16

17

18

19

20

21

22

23  A POSITA would understand that, by the patent describing the reflection structure in FIG. 3 that

24  is in contact with the second semiconductor layer as being "disposed on or over" the second

25  semiconductor layer, the term "disposed on" (and "over") in the context of describing the

26  location of the reflection structure relative to the second semiconductor layer means that the

27  former is in contact with the latter. A POSITA would also understand in view of this description

28

1    that is specific to the reflection structure, that the boilerplate language elsewhere in the patent

2    referring generally to "layers" does not apply to the claimed "reflection structure."

3    **I.    The '933 patent**

4    145.    The '933 patent is generally directed to a light-emitting diode package including a

5    housing, a light-emitting diode chip in the housing, and a molding part containing phosphors.

6    *E.g.*, Abstract, Figures 1-8, 12; col. 6:26-45; 7:8-15; 16:6-11; 17:10-13; 19:7-10; 20:16-22.

7    146.    I understand that the parties dispute the construction of the term "the molding part

8    is made of materials including at least one of silicone, epoxy, polymethylmethacrylate (PMMA),

9    polyethylene (PE) and polystyrene (PS)" in claim 15 of this patent. In my opinion, a POSITA

10   would understand the term to mean that the molding part is made of materials including one or

11   more of each of the following: silicone, epoxy, polymethylmethacrylate (PMMA), polyethylene

12   (PE) and polystyrene (PS).

13   147.    My opinion is based firstly on the plain and ordinary meaning of the language of

14   the claim. The claim recites that the molding part is made of "materials." A POSITA would

15   understand that the use of the plural "materials" means that the molding part is made of more

16   than one material.

17   148.    The claim then recites a list of materials, with the word "and" between the

18   second-to-last and last materials. "And" is conjunctive, and, when used in a list as in claim 15, is

19   universally understood as meaning that the subject of the sentence, here "the molding part,"

20   includes each and every item in the list.

21   149.    The claim also recites "at least one of" prior to the list of the materials. The plain

22   meaning of this language is that, not only does the molding part contain each material in the list,

23   it contains "at least one," *i.e.*, one or more, of each material in the list.

24   150.    I have reviewed the specification of the '933 patent and find that the above

25   construction is fully consistent with the specification. Each of the descriptions of the make-up of

26   the molding part states that the molding part has multiple of the listed materials in it:

27           To obtain the desired hardness, the molding part 104 may be made
28           of ***materials*** including at least one of silicone, epoxy, polymethyl

DECLARATION OF DR. DANIEL VAN DER WEIDE

methacrylate (PMMA), polyethylene (PE), and polystyrene (PS) … The molding part 104 may be formed by an injection molding process using the foregoing ***materials***. [col. 7, lines 8-15 (emphasis added)].

\* \* \*

The molding part 104 may include various ***materials*** such as a resin, a hardener, or other ***additives*** in addition to the phosphors 107, 103, and 108 to form the molding part 104. For example, the molding part 104 may include ***at least one of*** silicone, epoxy, polymethyl methacrylate (PMMA), polyethylene (PE), ***and*** polystyrene (PS) in addition to the phosphors 107, 103, and 108. [col. 20, lines 16-22-15 (emphasis added)]

151.    A POSITA would understand that, from the specification's listing of the materials recited in the claim, and then stating that the molding part may be formed "using the foregoing materials," that "foregoing" refers to the listed materials, and that the use of "the" and the plural "materials" means that the molding part is made using all the listed materials.

152.    Thus, in my opinion, the POSITA would understand the specification to be consistent with the above-proposed construction.

153.    Further, I do not discern any statement in the specification that a POSITA would understand to be a disavowal or alternation of the scope of the claim term. I have also reviewed the prosecution history of the '933 patent, and likewise do not discern any amendment or statement therein that a POSITA would understand to be a disavowal or alternation of the scope of the claim term.

154.    In addition, in my opinion a POSITA would understand, that there is no technical impediment to the molding part containing all of the listed ingredients.

155.    I have also reviewed Plaintiffs' proposed construction(s) of this term. Plaintiffs first propose that this term has its "Plain and ordinary meaning." In my opinion, as discussed above, the POSITA would understand the plain and ordinary meaning of this claim term to be that the molding part is made of materials including one or more of each of silicone, epoxy, polymethylmethacrylate (PMMA), polyethylene (PE) and polystyrene (PS).

156.     I disagree with the Plaintiffs' proposed alternative construction that term means "the molding part is made of materials, where at least one of said materials is silicone or epoxy or polymethylmethacrylate (PMMA) or polyethylene (PE) or polystyrene (PS)," for multiple reasons. First, Plaintiffs' proposal would, in effect, rewrite the term so to remove the word "and" from it and substitute it with the word "or." A POSITA would not understand "and" to mean "or."

157.     Second, Plaintiffs' proposed construction includes a comma that is not found in the original claim language, *i.e.*, "the molding part is made of materials, …" Plaintiffs' comma in effect breaks the original claim language into two parts, the first part reciting that the molding part made of materials, the second part reciting what one or some of those materials are. A POSITA would not understand the original claim language as containing two parts, one of which merely recites that the molding part is made of materials, which would be obvious and understood by a POSITA without its recitation as Plaintiffs propose.

158.     I understand that Plaintiffs have cited to the Court language in the specification "For the purposes of this disclosure, 'at least one of X, Y, and Z' … may be construed as X only, Y only, Z only, or any combination of two or more of X, Y, and Z …," '933 patent at column 4, lines 27-32. In my opinion, a POSITA would not understand this language to alter the plain and ordinary meaning of "and" in the claim language at issue. The language in the specification is general, located within four paragraphs of boilerplate in specification (col. 4, line 7 – col. 5, line 6), and makes no reference to the "molding part" limitation.

159.     In contrast, where the specification in fact discusses the molded part, it states that the molding part is made of "materials," *i.e.*, more than one material, lists those materials ("at least one of silicone, epoxy, polymethyl methacrylate (PMMA), polyethylene (PE), and polystyrene (PS)"), and then states that the molding part is made "using the ***foregoing*** materials," *i.e.*, the previously-listed "at least one of silicone, epoxy, polymethyl methacrylate (PMMA), polyethylene (PE), and polystyrene (PS)." '952 patent at col. 7, lines 8-15 (emphasis added) A POSITA would understand that, in view of the language in the specification specifically

1   regarding the limitation at issue, the above-discussed boilerplate does not clearly re-define the

2   term "and" in the claim.

3

4

5

6   I declare under penalty of perjury under the laws of the United States that the foregoing is true

7   and correct.  Executed on November 22, 2022, in Madison, Wisconsin.

8

9

10                                                        _____

11                                                        Dr. Daniel van der Weide

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. DANIEL VAN DER WEIDE
ME1 46815772v.1

# EXHIBIT 1



# **layer**  1 of 2   **noun**

lay·er   ˈlā-ər 🔊   ˈler 🔊

Synonyms of *layer* ›

**1**   **:** one that lays something (such as a worker who lays brick or a hen that lays eggs)

**2**   **a :** one thickness, course, or fold laid or lying over or under another

    **b :** STRATUM

    **c :** HORIZON sense 2

**3**   **a :** a branch or shoot of a plant that roots while still attached to the parent plant

    **b :** a plant developed by layering

   ˈlā-ərd 🔊   ˈlerd 🔊   **adjective**

# **layer**  2 of 2   **verb**

**layered; layering; layers**

*transitive verb*

**1**   **:** to propagate (a plant) by means of layers

**2**   **a :** to place as a layer

    **b :** to place a layer on top of

      pancakes *layered* with butter and syrup

                8/3/2023, 1:05 PM

**FINELITE 009217**

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer

‹                                                                ✕      🔍

Dictionary                              Thesaurus

**1  a :** to separate into layers

  **b :** to form out of superimposed layers

**2    of a plant  :** to form roots where a stem comes in contact with the ground

## Noun

Everything was covered by a thin *layer* of sand.

The top *layer* of the rug is badly worn but the bottom *layer* is still OK.

The cake has three *layers*.

See More ⌄

**FINELITE 009218**

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer



Plus there's a *layer* of moisture-wicking New Zealand wool.

— Isis Briones, *Men's Health*, 28 July 2023

**See More** ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'layer.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.

## First Known Use

### Noun

13th century, in the meaning defined at sense 1

### Verb

1832, in the meaning defined at transitive sense 1

**FINELITE 009219**

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer

‹                                                    ✕        🔍

Dictionary                                    Thesaurus

germ layer                              F layer

Malpighian layer                        ozone layer

thin-layer chromatography               atomic layer deposition

**See More** ⌄

lay elder
**layer**
layer's cramp

See More Nearby Entries ›

**Style**    MLA

"Layer." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merri
am-webster.com/dictionary/layer. Accessed 3 Aug. 2023.

FINELITE 009220

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer



‹                                                        ✕        🔍

Dictionary                                   Thesaurus

**f** Facebook          **🐦** Twitter

# layer   1 of 2   *noun*

lay·er   ˈlā-ər 🔊   ˈle(-ə)r

**1**   **:** one that lays

    their hens were poor *layers*

**2**   **:** one thickness or fold over or under another

    a *layer* or rock

        ˈlā-ərd 🔊   ˈle(-ə)rd   *adjective*

# layer   2 of 2   *verb*

**1**   **:** to separate into layers

**2**   **:** to form by adding layers

FINELITE 009221

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer



# layer *noun*

lay·er    ˈlā-ər, ˈle(-ə)r ◀))

1    : one thickness, course, or fold laid or lying over or under another

2    : STRATUM sense 1

       the outer *layers* of the skin

              **verb**

Thesaurus: All synonyms and antonyms for *layer*
Nglish: Translation of *layer* for Spanish Speakers
Britannica English: Translation of *layer* for Arabic Speakers

Last Updated: 1 Aug 2023 - Updated example sentences

---

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

FINELITE 009222

Layer Definition & Meaning - Merriam-Webster                                    https://www.merriam-webster.com/dictionary/layer



Dictionary                                                    Thesaurus



Can you solve 4 words at once?

Play



**WORD OF THE DAY**

incarcerate

See Definitions and Examples »

8/3/2023, 1:05 PM

FINELITE 009223

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer

Dictionary                                    Thesaurus

# Word Games

### Name That Animal: Volume 2
Can you tell a meerkat from a wombat?

**Take the quiz**

### Challenging Words You Should Know
Not a quiz for the pusillanimous

**Take the quiz**

### True or False?
Test your knowledge - and maybe learn something a...

### Spelling Bee Quiz
Can you outdo past winners of the National Spelli...

FINELITE 009224

Layer Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/layer



## Learn a new word every day. Delivered to your inbox!

Your email address    >

**OTHER MERRIAM-WEBSTER DICTIONARIES**

MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY

SCRABBLE® WORD FINDER

MERRIAM-WEBSTER DICTIONARY API

NGLISH - SPANISH-ENGLISH TRANSLATION

BRITANNICA ENGLISH - ARABIC TRANSLATION

**FINELITE 009225**



| Dictionary | Thesaurus |
|---|---|

Join MWU | Videos | Word of the Year | Kid's Dictionary | Law Dictionary |
Medical Dictionary | Privacy Policy | Terms of Use

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary |
Browse the Kid's Dictionary

© 2023 Merriam-Webster, Incorporated

Information from your device can be used to personalize your ad experience.

Do not sell or share my personal information.

FINELITE 009226

# EXHIBIT 2

# The American Heritage Dictionary entry: layer

*HarperCollins Publishers*

*n.*

**1.**

**a.** One that lays: *a tile layer.*

**b.** A hen kept for laying eggs.

**2.**

**a.** A single thickness of a material covering a surface or forming an overlying part or segment: *a layer of dust on the windowsill; a cake with four layers.*

**b.** A usually horizontal deposit or expanse; a stratum: *layers of sedimentary rock; a layer of warm air.*

**c.** A depth or level: *a poem with several layers of meaning.*

**3.** *Botany* A stem that is covered with soil for rooting while still part of the living plant.

**4.** An item of clothing worn over or under another.

*v.* **lay·ered**, **lay·er·ing**, **lay·ers**

*v.tr.*

**1.** To divide or form into layers: *layered gravel and charcoal to make a filter.*

**2.** To cut (hair) into different, usually overlapping lengths.

**3.** *Botany* To propagate (a plant) by means of a layer.

**4.** To wear (clothing) in layers.

*v.intr.*

**1.** To form or come apart as layers.

**2.** *Botany* To take root as a result of layering.

---

The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2022 by HarperCollins Publishers. All rights reserved.

# Indo-European & Semitic Roots Appendices

**FINELITE 009215**

Thousands of entries in the dictionary include etymologies that trace their origins back to reconstructed proto-languages. You can obtain more information about these forms in our online appendices:

Indo-European Roots

Semitic Roots

The Indo-European appendix covers nearly half of the Indo-European roots that have left their mark on English words. A more complete treatment of Indo-European roots and the English words derived from them is available in our Dictionary of Indo-European Roots.

8/3/2023, 1:13 PM

FINELITE 009216

# EXHIBIT 3

# Layer definition and meaning | Collins English Dictionary

## layer

(leɪəʳ  )

**Word forms:** plural, 3rd person singular present tense layers , present participle layering , past tense, past participle layered

1. countable noun **B2**

A layer of a material or substance is a quantity or piece of it that covers a surface or that is between two other things.

A fresh layer of snow covered the street. [+ of]

...the depletion of the ozone layer.

Arrange all the vegetables except the potatoes in layers.

2. countable noun

If something such as a system or an idea has many layers, it has many different levels or parts.

...an astounding ten layers of staff between the factory worker and the chief executive. [+ of]

Critics and the public puzzle out the layers of meaning in his photos. [+ of]

3. verb

If you layer something, you arrange it in layers.

Layer the potatoes, asparagus and salmon in the tin. [VERB noun]

By lifting and layering her hair, Michael created a lighter frame for her face. [VERB noun]

Collins COBUILD Advanced Learner's Dictionary. Copyright © HarperCollins Publishers

## Video: pronunciation of

## layer

British English pronunciation

**FINELITE 009227**

Layer definition and meaning | Collins English Dictionary                    https://www.collinsdictionary.com/dictionary/english/layer



American English pronunciation



## layer in British English

( ˈleɪə ⓘ )

noun

4.  horticulture

8/3/2023, 1:11 PM

FINELITE 009228

https://www.collinsdictionary.com/dictionary/english/layer

a.

a shoot or branch rooted during layering

b.

a plant produced as a result of layering

verb

5.

to form or make a layer of (something)

6.

to take root or cause to take root by layering

Collins English Dictionary. Copyright © HarperCollins Publishers

Word origin

C14 leyer, legger, from lay1 + -er1

# layer in American English

(ˈleɪər )

noun

1.

a person or thing that lays

2.

a single thickness, coat, fold, or stratum

3.

a shoot or twig (of a living plant) bent down and partly covered with earth so that it may take root

verb transitive

6.

to arrange in or as if in layers

7.

to trim and style (hair) to hang in layers

Webster's New World College Dictionary, 4th Edition. Copyright © 2010 by Houghton Mifflin Harcourt. All rights reserved.

8/3/2023, 1:11 PM

FINELITE 009229

# layer in American English

(ˈleiər)

noun

1.

a thickness of some material laid on or spread over a surface

a layer of soot on the window sill

two layers of paint

2.

alternating layers of basalt and sandstone

3.

a person or thing that lays

a carpet layer

4.

a hen kept for egg production

5.

one of several items of clothing worn one on top of the other

6. Horticulture

a.

a shoot or twig that is induced to root while still attached to the living stock, as by bending and covering with soil

transitive verb

9.

to form or arrange in layers

10.

to arrange or wear (clothing) in layers

You can layer this vest over a blouse or sweater

11. Horticulture

to propagate by layering

FINELITE 009230

intransitive verb

12.

to separate into or form layers

13. (of a garment)

to permit of wearing in layers; be used in layering

Frilly blouses don't layer well

Most material © 2005, 1997, 1991 by Penguin Random House LLC. Modified entries © 2019 by Penguin Random House LLC and HarperCollins Publishers Ltd

Derived forms

layerable

adjective

Word origin

[1350–1400; ME leyer, legger. See lay1, -er1]

# Examples of 'layer' in a sentence

## layer

These examples have been automatically selected and may contain sensitive content that does not reflect the opinions or policies of Collins, or its parent company HarperCollins.

Those creatures then died and their shells formed thick layers on the seabed.Spread mustard over the fat and press on a layer of sugar.It was covered in a protective layer of ash.The lower layers give you support and the upper layers let you sink into it.Top up with a fresh layer of compost and sow into that.Spread a layer of the frosting on top and add another layer of cake.You get on with your job, just as you always have, sheltered from politics by many layers of secrecy and officialdom.This just adds another layer of suffering for her parents. Drain and arrange in layers with a sliced onion in an ovenproof dish.Cover the pan with a double layer of tin foil, sealing it tightly around the edges.

# COBUILD Collocations

## layer

Show more...

FINELITE 009231

# EXHIBIT 4





*Meaning of **prevention** in English*

# prevention

***noun*** [ U ]

UK 🔊 /prɪˈven.ʃᵊn/  US 🔊 /prɪˈven.ʃᵊn/

Add to word list ≣

**the act of stopping something from happening or of stopping someone from doing something:**

• *crime prevention*

• *The organization is committed to AIDS prevention and education.*

— **Fewer examples**

　　• *As far as health is concerned, it is often said that prevention is better than cure.*

　　• *His research in the field of disease prevention produced unexpected results.*

　　• *Accident prevention must be viewed as a priority.*

　　• *fire prevention officers*

　　• *Health education in the local population is crucial to the prevention of killer diseases.*

＋ **SMART Vocabulary: related words and phrases**

**Idiom**

prevention is better than cure

*(Definition of **prevention** from the **Cambridge Advanced Learner's Dictionary & Thesaurus** © Cambridge University Press)*

EXAMPLES of **prevention**





**FINELITE 009377**

*From the Hansard archive*

There have been no preventions, because other employment was found for those men.

*From the Hansard archive*

Now we are discussing preventions.

*From the Hansard archive*

Two *prevention* strategies have been proposed: chemoprophylaxis and immunoprophylaxis.

*From the Cambridge English Corpus*

The application of these assays to the current *prevention* strategies will simplify the *prevention* practice and rationalise the use of antibiotics.

*From the Cambridge English Corpus*

Further insights into these mechanisms could pave the way to new treatments for the *prevention* of metastasis.

*From the Cambridge English Corpus*

However, until a safe treatment is identified the focus of care must be *prevention*.

*From the Cambridge English Corpus*

The *prevention* of preterm labour and delivery is the single most important challenge to modern obstetrics today.

*From the Cambridge English Corpus*

The second is that there is controversy concerning what existing *prevention* and intervention studies can tell us about the significance of early experience.

*From the Cambridge English Corpus*

Understanding such multifinality is critical to identifying processes underlying different forms of psychopathology and developing appropriate treatment and *prevention* approaches.

*From the Cambridge English Corpus*

Since the epidemiology of varicella varies worldwide, adopting foreign *prevention* policies may not always be applicable.

*From the Cambridge English Corpus*

*Prevention* may depend more on engineering than on medical skills.

FINELITE 009378

controversy exists over specific areas of *prevention* and treatment.

*From the Cambridge English Corpus*

Perhaps understanding will replace complacency and indifference with *prevention* and treatment strategies and ultimately reduce the socio-economic burden of this condition.

*From the Cambridge English Corpus*

Noncompliance is multifactorial in cause and *prevention*, detection and solutions must reflect this.

*From the Cambridge English Corpus*

See all examples of prevention

These examples are from corpora and from sources on the web. Any opinions in the examples do not represent the opinion of the Cambridge Dictionary editors or of Cambridge University Press or its licensors.

COLLOCATIONS with **prevention**

# prevention

**These are words often used in combination with *prevention*.**

Click on a collocation to see more examples of it.

## accident prevention

• The reduction of home hazards was a frequent focus of accident prevention work.

*From the Cambridge English Corpus*

## cancer prevention

• It is also considered a useful adjunct to all other treatments as part of skin cancer prevention.

*From the Cambridge English Corpus*

## crime prevention

• The economics of having these inmates 'serve all' may outweigh the demands of justice and the public policy concerns related to crime prevention.

*From the Cambridge English Corpus*

These examples are from corpora and from sources on the web. Any opinions in the examples do not represent the opinion of the Cambridge Dictionary editors or of Cambridge University Press or its licensors.

See all collocations with prevention

**FINELITE 009379**

Translations of prevention

in Chinese (Traditional)
阻止，妨礙,預防…

See more

in Chinese (Simplified)
**阻止，妨碍,预防…**

See more

in Spanish
**prevención, prevención [feminine, singular]…**

See more

in Portuguese
**prevenção, prevenção [feminine]…**

See more

in more languages ⌄

_____

Need a translator?

Get a quick, free translation!

**Translator tool**

**Browse**

preventative

prevented

preventer    BETA

preventing

**prevention**

prevention is better than cure *idiom*

preventive

preventive detention    BETA

**FINELITE 009380**

                                                    

Test your vocabulary with our fun image quizzes



Try a quiz now

**More meanings of *prevention***

− **All**

prevention *noun*, at prevent
prevention is better than cure *idiom*
an ounce of prevention is worth a pound of cure *idiom*
prevention is better than cure, at an ounce of prevention is worth a pound of cure *idiom*
an ounce of prevention is worth a pound of cure, at prevention is better than cure *idiom*

**See all meanings**

**+ Idioms and phrases**

f   🐦

WORD OF THE DAY

# heraldic

UK 🔊  /herˈæl.dɪk/ US 🔊   /herˈæl.dɪk/

relating to coats of arms (= special shields or shield-shaped patterns that are the sign of a
family, university, or city) and the history of the families, universities, etc. that they belong to

 About this

FINELITE 009381

PREVENTION | English meaning - Cambridge Dictionary





BLOG

A flash in the pan (Newspaper idioms)

August 30, 2023

Read More

FINELITE 009382

NEW WORDS

# global boiling

August 28, 2023

More new words

LEARN

DEVELOP

ABOUT

FINELITE 009383

PREVENTION | English meaning - Cambridge Dictionary



FINELITE 009384

# EXHIBIT 5

# The American Heritage Dictionary entry: overflow

*HarperCollins Publishers*

*v.* **o·ver·flowed**, **o·ver·flow·ing**, **o·ver·flows**

*v.intr.*

**1.** To flow or run over the top, brim, or banks: *The river overflowed and flooded surrounding neighborhoods.*

**2.** To be filled beyond capacity, as a container or waterway.

**3.** To have a boundless supply; be superabundant. See Synonyms at [teem](#)[1].

*v.tr.*

**1.** To flow over the top, brim, or banks of.

**2.** To spread or cover over; flood.

**3.** To cause to fill beyond capacity.

*n.* (ō&#91;fl&#93;vər-flō′)

**1.** The act of overflowing.

**2.** Something that flows over; an excess.

**3.** An outlet or vent through which excess liquid may escape.

**4.** *Computers* A condition in which a calculation produces a unit of data too large to be stored in the location allotted to it.

---

The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2022 by HarperCollins Publishers. All rights reserved.

## Indo-European & Semitic Roots Appendices

Thousands of entries in the dictionary include etymologies that trace their origins back to reconstructed proto-languages. You can obtain more

information about these forms in our online
appendices:

[Indo-European Roots](#)

[Semitic Roots](#)

The Indo-European appendix covers nearly half of the
Indo-European roots that have left their mark on
English words. A more complete treatment of Indo-
European roots and the English words derived from
them is available in our [Dictionary of Indo-European
Roots](#).

# EXHIBIT 6

# The Random House

# College

# Dictionary

## REVISED EDITION

Based on **The Random House Dictionary of the English Language**

**THE UNABRIDGED EDITION**

**JESS STEIN • EDITOR IN CHIEF**

# TABLE OF CONTENTS

| | |
|---|---|
| *Prefaces* | v |
| *Editorial Staff* | vi |
| *Consultant Staff* | vii |
| *Indo-European Language Chart* | x |
| *Historical Sketch of the English Language* | xi |
| *Etymology Key* | xv |
| *Pronunciation Key* | xvi |
| *Pronunciation of English* | xvii |
| *Usage, Dialects, and Functional Varieties* | xix |
| *Guide to the Dictionary* | xxii |
| *Table of English Sounds and Their Common Spellings* | xxxii |

| | |
|---|---|
| A DICTIONARY OF THE ENGLISH LANGUAGE | 1 |

| | |
|---|---|
| *Signs and Symbols* | 1535 |
| *United States Colleges and Universities* | 1539 |
| *Canadian Colleges and Universities* | 1551 |
| *English Given Names* | 1552 |
| *Basic Manual of Style* | 1559 |

REVISED EDITION

COPYRIGHT © 1984, 1982, 1980, 1979, 1975 BY RANDOM HOUSE, INC.

Previous edition copyright © 1973, 1972, 1969, 1968 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher. All inquiries should be addressed to Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

Based on *The Random House Dictionary of the English Language–The Unabridged Edition* Copyright © 1983, 1981, 1979, 1973, 1971, 1970, 1969, 1967, 1966 by Random House, Inc.

PUBLISHED IN THE UNITED STATES OF AMERICA BY RANDOM HOUSE, INC., NEW YORK
AND SIMULTANEOUSLY IN CANADA BY RANDOM HOUSE OF CANADA LIMITED, TORONTO

A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

*Chart of Periodic Table of the Elements*, Copyright © 1964 by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, Copyright © 1950, © 1956 by Alfred A. Knopf, Inc.

LIBRARY OF CONGRESS CATALOGING IN PUBLICATION DATA
Main entry under title:
The Random House college dictionary.
Based on the Random House dictionary of the English language, unabridged ed.
Published in 1968 under title: The Random House dictionary of the English language, college ed.
1. English language—Dictionaries.
PE1625.R34 1975   423   75-4858   ISBN 0-394-43500-1
ISBN 0-394-43600-8 thumb-indexed ed.

rs. e/ud
Manufactured in the United States of America

iniquity 686 Inner Light

**in·iq·ui·ty** (i nik′wi tē), *n., pl.* **-ties.** 1. gross injustice; wickedness. 2. a violation of right or duty; wicked act; sin. [ME < L *iniquitās* unevenness, unfairness = *iniqu(us)* uneven, unfair (in- IN³ + -īquus, var. of *aequus* EQUI-) + -ITY]

**init.,** initial.

**in·i·tial** (i nish′əl), *adj., n., v.,* **-tialed, -tialing** or (*esp. Brit.*) **-tialled, -tialling.** —*adj.* 1. of or pertaining to the beginning; first: *the initial step in a process.* —*n.* 2. an initial letter, as of a word. 3. the first letter of a proper name. 4. a letter of extra size or an ornamental character used at the beginning of a chapter or other division of a book or the like. —*v.t.* 5. to mark or sign with an initial or the initials of one's name, sometimes as a token of approval. [< L *initiāl(is)* = *initi(um)* beginning (*init(us)* begun (ptp. of *inīre* to go in, enter upon) = *in-* IN³ + -*i-* go + -*tus* ptp. suffix + -*ium* n. suffix) + -*ālis* -AL¹] —**in·i′tial·er;** *esp. Brit.,* **in·i′tial·ler,** *n.* —**in·i′tial·ly,** *adv.*

**In·i′tial Teach′ing Al′phabet,** an alphabet system of 44 letters representing the basic sounds of English, often used in teaching beginners to read. *Abbr.:* I.T.A.

**in·i·ti·ate** (*v.* i nish′ē āt′; *adj., n.* i nish′ē it, -āt′), *v.,* **-at·ed, -at·ing,** *adj., n.* —*v.t.* 1. to begin, set going, or originate. 2. to introduce into the knowledge of some art or subject. 3. to admit with formal rites into secret knowledge, a society, etc. 4. to propose (a measure) by initiative procedure: *to initiate a constitutional amendment.* —*adj.* 5. initiated; begun. 6. admitted into a society, club, etc., or into the knowledge of a subject. —*n.* 7. a person who has been initiated. [< L *initiāt(us)* initiated (ptp. of *initiāre*). See INITIAL, -ATE¹] —**in·i′ti·a′tor** *referring to a woman,* **in·i′ti·a′tress,** *n.* —**Syn.** 1. commence; introduce, inaugurate. See begin. 2. teach, indoctrinate.

**in·i·ti·a·tion** (i nish′ē ā′shən), *n.* 1. formal admission into a society, club, etc. 2. the ceremonies of admission. 3. the act of initiating. 4. the fact of being initiated. [< L *initiātiōn-* (s. of *initiātiō*)]

**in·i·ti·a·tive** (i nish′ē ə tiv, i nish′ə-), *n.* 1. an introductory act or step; leading action: *to take the initiative.* 2. readiness and ability in initiating action; enterprise. 3. one's personal, responsible decision: *to act on one's own initiative.* 4. *Govt.* a. a procedure by which a specified number of voters may propose a statute, constitutional amendment, or ordinance. Cf. **referendum** (def. 1). b. the general right to present a new legislative bill. —*adj.* 5. of or pertaining to initiation; serving to initiate. —**in·i′ti·a·tive·ly,** *adv.*

**in·i·ti·a·to·ry** (i nish′ē ə tôr′ē, -tōr′ē), *adj.* 1. introductory; initial; *an initiatory step.* 2. serving to initiate or admit into a society, club, etc. —**in·i·ti·a·to·ri·ly** (i nish′ē ə tôr′ə lē, -tōr′-), *adv.*

**in·ject** (in jekt′), *v.t.* 1. to force (a fluid) into a passage, cavity, or tissue. 2. to introduce (something new or different) into a thing. 3. to introduce arbitrarily or inappropriately; intrude. 4. to interject (a remark, suggestion, etc.), as into conversation. [< L *inject(us)* thrown in (ptp. of *inj(i)cere* = *in-* IN³ + -*jec-* (var. of *jac-* throw) + -*tus* ptp. suffix] —**in·ject′a·ble,** *adj.* —**in·jec′tor,** *n.*

**in·jec·tion** (in jek′shən), *n.* 1. the act of injecting. 2. anything that is injected. 3. a liquid injected into the body, esp. for medicinal purposes, as a hypodermic. [< L *injectiōn-* (s. of *injectiō*)]

**in·ju·di·cious** (in′jōō dish′əs), *adj.* not judicious; unwise; imprudent. —**in′ju·di′cious·ly,** *adv.* —**in′ju·di′cious·ness,** *n.*

**In·jun** (in′jən), *n. Dial.* an American Indian. [var. of INDIAN]

**in·junc·tion** (in jungk′shən), *n.* 1. *Law.* a judicial process or order requiring the person or persons to whom it is directed to do or refrain from doing a particular act. 2. the act or an instance of enjoining. 3. a command; order; admonition. [< LL *injunctiōn-* (s. of *injunctiō*) = L *injunct(us)* joined to, brought upon (ptp. of *injungere;* see ENJOIN) + -*iōn- -ION*] —**in·junc′tive,** *adj.* —**in·junc′tive·ly,** *adv.*

**in·jure** (in′jər), *v.t.,* **-jured, -jur·ing.** 1. to do or cause harm of any kind to; damage; hurt; impair: *to injure one's hand.* 2. to do wrong or injustice to: *to injure a friend's feelings.* [back formation from INJURY] —**in′jur·a·ble,** *adj.* —**in′jur·er,** *n.* —**Syn.** 1. spoil, mar. 2. maltreat, abuse. —**Ant.** 1. benefit.

**in·jured** (in′jərd), *adj.* 1. wounded or harmed; damaged; hurt. 2. offended; wronged: *an injured reputation.* 3. showing or revealing a feeling of injury; offended; reproachful: *Her face wore an injured look.* —**in′jured·ly,** *adv.* —**in′jured·ness,** *n.*

**in·ju·ri·ous** (in jŏŏr′ē əs), *adj.* 1. harmful, hurtful, or detrimental, as in effect. 2. insulting; abusive; offensive. [late ME < L *injūriōsus.* See INJURY, -OUS] —**in·ju′ri·ous·ly,** *adv.* —**in·ju′ri·ous·ness,** *n.* —**Syn.** 1. damaging, deleterious; destructive. 2. derogatory, defamatory, slanderous, libelous. —**Ant.** 1. beneficial.

**in·ju·ry** (in′jə rē), *n., pl.* **-ju·ries.** 1. harm done or sustained. 2. a particular form or instance of harm: *an injury to his pride.* 3. wrong or injustice done or suffered. 4. *Law.* any wrong or violation of the rights, property, reputation, etc., of another. 5. *Obs.* injurious speech; calumny. [ME *injurie* < L *injūria,* n. use of fem. of *injūrius* injurious = *in-* IN-³ + *jūr-* (s. of *jūs* right, law) + -*ius -OUS*] —**Syn.** 1. damage, impairment, mischief. 2-4. INJURY, HURT, WOUND refer to material or moral impairments or wrongs. INJURY, originally denoting a wrong done or suffered, is now used for any kind of evil, impairment, or loss, caused or sustained: *physical injury; injury to one's reputation.* HURT suggests esp. physical injury, often bodily injury attended with pain: *a bad hurt from a fall.* A WOUND is usually a physical hurt caused by cutting, shooting, etc., or an emotional hurt: *a serious wound in the shoulder; to inflict a wound by betraying someone's trust.* —**Ant.** 1. benefit.

**in·jus·tice** (in jus′tis), *n.* 1. the quality or fact of being unjust; inequity. 2. violation of the rights of others; unjust or unfair action or treatment. 3. an unjust act; wrong; unfairness. [ME < MF < L *injustitia*] —**Syn.** 2. injury, wrong.

**ink** (ingk), *n.* 1. a fluid or viscous substance used for writing or printing. 2. a dark, protective fluid ejected by the cuttlefish and other cephalopods. —*v.t.* 3. to mark, stain, or smear with ink. [ME *inke, enke* < MF *enque* < LL *enc(austum)* < Gk *énkauston* purple ink, n. use of neut. of *énkaustos* burnt in. See EN-², CAUSTIC] —**ink′er,** *n.* —**ink′i·ness,** *adj.* —**ink′y,** *adj.*

**ink·ber·ry** (ingk′ber′ē, -bə rē), *n., pl.* **-ries.** 1. a shrub, *Ilex glabra,* having leathery, evergreen leaves and black berries. 2. the pokeweed. 3. the berry of either plant.

**Ink·er·man** (ingk′kər mān′), *n.* a town in S Crimea, in the SW Soviet Union in Europe: Russian defeat by the English and French 1854.

**ink·horn** (ingk′hôrn′), *n.* a small container of horn or other material, formerly used to hold writing ink.

**in·kle** (ing′kəl), *n.* 1. a linen tape used for trimmings. 2. the linen thread or yarn from which this tape is made. [?]

**ink·ling** (ingk′ling), *n.* 1. a slight suggestion; hint; intimation. 2. a vague idea or notion; slight understanding. [ME *inkle* to hint (NE *incle*) + *-ing;* akin to OE *inca* suspicion]

**ink·stand** (ingk′stand′), *n.* 1. a small stand for holding ink, pens, etc. 2. an inkwell.

**Ink·ster** (ingk′stər), *n.* a city in SE Michigan, near Detroit. 38,595 (1970).

**ink·well** (ingk′wel′), *n.* a container for ink. Also called, *esp. Brit.,* **ink·pot** (ingk′pot′).

**ink·y** (ing′kē), *adj.,* **ink·i·er, ink·i·est.** 1. black as ink; *inky shadows.* 2. resembling ink. 3. stained with ink: *inky fingers.* 4. of or pertaining to ink. 5. consisting of or containing ink. —**ink′i·ness,** *n.*

**ink′y cap′,** any mushroom of the genus *Coprinus,* esp. *C. atramentarius,* whose gills disintegrate into blackish liquid after the spores mature.

**in·land** (*adj.* in′lənd; *adv., n.* in′land′, -lənd), *adj.* 1. pertaining to or situated in the interior part of a country or region. 2. *Brit.* carried on within a country; domestic. —*adv.* 3. in or toward the interior of a country. —*n.* 4. the interior part of a country; away from the border. [ME, OE]

**In·land·er** (in′lən dər), *n.* a person living inland.

**In′land Sea′,** a sea in SW Japan, enclosed by the islands of Honshu, Shikoku, and Kyushu. 240 mi. long.

**in·law** (in′lô′), *n.* a relative by marriage. [back formation from MOTHER-IN-LAW and the like]

**in·lay** (*v.* in′lā′, in′lā′; *n.* in′lā′), *v.,* **-laid, -lay·ing,** *n.* —*v.t.* 1. to decorate (an object) with veneers of fine materials set in its surface. 2. to insert or apply (layers of fine materials) in the surface of an object. —*n.* 3. a veneer of fine material inserted in something else, esp. for ornament. 4. a design or decoration made by inlaying. 5. *Dentistry.* a filling of metal, porcelain, or the like, that is first shaped to fit a cavity and then cemented into it. —**in′lay·er,** *n.* —**in′lb.,** inch-pound.

**in·let** (in′let, -lit; *n.* in′let′, in let′), *n., -let, -let·ting.* —*n.* 1. an indentation of a shoreline, usually long and narrow. 2. a narrow passage between islands. 3. an entrance. 4. something put in or inserted. —*v.t.* 5. to put in; insert. [ME]

**in·li·er** (in′lī′ər), *n. Geol.* an outcrop of a formation completely surrounded by another of later date. [IN + (OUT)LIER]

**in loc. cit.,** in the place cited. [L *in locō citātō*]

**in lo·co** (in lō′kō), *Latin* in place; in the proper place.

**in lo·co pa·ren·tis** (in lō′kō pə ren′tis; *Eng.* in lō′kō pə ren′tis), *Latin.* in the place of a parent; as a parent.

**in·ly** (in′lē), *adv. Chiefly Literary.* 1. inwardly. 2. intimately; deeply. [ME *inlīche,* OE *inlīce*]

**in·mate** (in′māt′), *n.* 1. a person who is confined in a hospital, prison, etc. 2. *Archaic.* a person who dwells with another or others in the same house.

**in me·di·as res** (in mē′dē əs′ rēs′; *Eng.* in mā′dē əs′ rēz′, in mā′dē əs′ rās′), *Latin.* in the middle of things: used esp. of a narrative that opens in the middle rather than at the chronological beginning.

**in mem.,** in memoriam.

**in me·mo·ri·am** (in mə môr′ē əm, -mōr′-), *n.* memory (of); to the memory (of); as a memorial (to). [< L]

**in·mesh** (in mesh′), *v.t.* enmesh.

**in·most** (in′mōst′ *or, esp. Brit.,* -məst), *adj.* 1. situated farthest within: *the inmost recesses of the forest.* 2. most intimate: *one's inmost thoughts.* [ME (see IN-¹, -OST²); inmest, OE *innemest* = *inne-* within + *-mest* -MOST]

**inn** (in), *n.* 1. a commercial establishment that provides lodging, food, etc., for the public, esp. travelers; small hotel. 2. a tavern. 3. (*cap.*) *Brit.* a. any of certain buildings used as a place of residence for students. Cf. **Inns of Court.** b. a legal society occupying such a building. [ME, OE *inn* house; akin to local *inn*] —**Syn.** 1. hostelry. See **hotel.**

**Inn** (in), *n.* a river in central Europe, flowing from Switzerland through Austria and Germany into the Danube. 320 mi. long.

**in·nards** (in′ərdz), *n.* (*construed as pl.*) *Informal.* 1. the interior parts of an animal body; entrails; viscera. 2. the internal parts of a mechanism or structure: *the engine's innards.* [var. of *inwards,* n. use of INWARD]

**in·nate** (i nāt′, in′āt), *adj.* 1. existing in one from birth; inborn; native: *innate talent.* 2. inherent in the character of something: *an innate defect in the hypothesis.* 3. arising from the intellect or the constitution of the mind, rather than learned through experience: *innate knowledge.* [ME < L *innāt(us),* ptp. of *innāscī.* See IN-³, NATAL, congenital] —**in·nate′ness,** *n.*

**in·ner** (in′ər), *adj.* 1. situated farther inward: *the inner circle.* 2. more intimate, private, or secret: *his inner life.* 3. mental; spiritual: *the inner life.* 4. not obvious, or obscure: *an inner meaning.* [ME, OE *innerra*] —**in′ner·ness,** *n.* —**in′ner·ly,** *adv.*

**in′ner ear′,** *Anat.* the labyrinth. See illus. under **ear.**

**In′ner Heb′ri·des,** See under **Hebrides.**

**In′ner Light′,** (in Quakerism) the light of Christ in the soul of every man, considered as a guiding force.

**in·ner-di·rect·ed** (in′ər di rek′tid), *adj.* guided by internalized values rather than external pressures. Cf. **other-directed.** —**in′ner-di·rec′tion,** *n.*

# EXHIBIT 7

U.S. Patent Application
Attorney Docket No. 114896-8067.US00 / P15-6054/US

WHAT IS CLAIMED IS:

1.    A light emitting device, comprising:

an n-type semiconductor layer;

a p-type semiconductor layer;

5    an active layer disposed between the n-type semiconductor layer and the p-type

semiconductor layer; and

an electron blocking layer disposed between the p-type semiconductor layer

and the active layer,

wherein:

10    the p-type semiconductor layer includes a hole injection layer, a p-type contact

layer, and a hole transport layer disposed between the hole injection layer and the p-

type contact layer,

the hole transport layer includes a plurality of undoped layers and at least one

intermediate doped layer disposed between the undoped layers,

15    at least one of the undoped layers includes a zone in which hole concentration

decreases with increasing distance from the hole injection layer or the p-type contact

layer, and

the intermediate doped layer is disposed to be at least partially overlapped with

a region of the hole transport layer, the region having the hole concentration of  62% to

20    87% of the hole concentration of the p-type contact layer.

LEGAL127388895.1

SSC_FINELITE00005284

2.      The light emitting device of claim 1, wherein the hole injection layer has a dopant concentration from $1\times10^{20}/cm^3$ to $5\times10^{20}/cm^3$, the p-type contact layer has a dopant concentration of $4\times10^{20}/cm^3$ or more, and the intermediate doped layer has a dopant concentration from $1\times10^{18}/cm^3$ to $1\times10^{20}/cm^3$.

3.      The light emitting device of claim 1, wherein the hole transport layer has a greater thickness than a total thickness of the hole injection layer and the p-type contact layer.

4.      The light emitting device of claim 3, wherein the intermediate doped layer has a thickness from 10 nm to 20 nm, and the undoped layers have a thickness from 15 nm to 30 nm.

5.      The light emitting device of claim 1, wherein the hole injection layer adjoins the electron blocking layer.

6.      The light emitting device of claim 1, wherein the zone in which the hole concentration decreases with increasing distance from the hole injection layer or the p-type contact layer includes a region in which the hole concentration linearly decreases.

7.      The light emitting device of claim 1, wherein at least one of undoped layers further includes a zone in which the hole concentration increases with decreasing distance to the intermediate doped layer.

22

SSC_FINELITE00005285

U.S. Patent Application
Attorney Docket No. 114896-8067.US00 / P15-6054/US

8.   The light emitting device of claim 7, wherein the zone in which the hole concentration increases with decreasing distance to the intermediate doped layer includes a region in which the hole concentration linearly increases.

5

9.   The light emitting device of claim 1, wherein the intermediate doped layer has higher electrical resistance than the undoped layers.

10.   A method of fabricating a light emitting device, including:

10   growing an n-type semiconductor layer, an active layer, an electron blocking layer, and a p-type semiconductor layer on a substrate within a chamber ,

wherein the growing the p-type semiconductor layer includes:

growing a hole injection layer on the substrate within the chamber by introducing an N source gas, a Ga source gas, an Mg source gas, $N_2$ gas, and $H_2$ gas

15   into the chamber;

growing an undoped layer on the hole injection layer by introducing an N source gas, a Ga source gas and $N_2$ gas into the chamber while blocking introducing of the Mg source gas and $H_2$ gas;

growing an intermediate doped layer on the undoped layer by introducing an N

20   source gas, a Ga source gas, $N_2$ gas and an Mg source gas into the chamber;

growing an undoped layer on the intermediate doped layer by introducing an N source gas, a Ga source gas, and $N_2$ gas into the chamber while blocking introducing of the Mg source gas; and

23

SSC_FINELITE00005286

growing a p-type contact layer on the undoped layers by introducing an N

source gas, a Ga source gas, an Mg source gas, $N_2$ gas and $H_2$ gas into the chamber.

11.    The method of claim 10, further including:

introducing an N source gas and $N_2$ gas into the chamber while blocking

introducing of a Ga source gas, an Mg source gas and $H_2$ gas to change an atmosphere

of the chamber into a nitrogen and $NH_3$ atmosphere, before the growing the hole

injection layer.

12.    The method of claim 10, wherein, during growth of the hole injection layer

and the p-type contact layer, a flow rate of the $H_2$ gas is higher than the flow rate of the

$N_2$ gas.

13.    The method of claim 12, wherein, during growth of the hole injection layer

and the p-type contact layer, a flow rate of the $H_2$ gas is three to five times the flow rate

of the $N_2$ gas.

14.    The method of claim 13, wherein, during growth of the hole injection layer

and the p-type contact layer, a flow rate of the $NH_3$ gas is smaller than the flow rate of

the $H_2$ gas, and during growth of the hole transport layer, the flow rate of the $N_2$ gas is

higher than the flow rate of the $NH_3$ gas.

LEGAL127388895.1

SSC_FINELITE00005287

U.S. Patent Application
Attorney Docket No. 114896-8067.US00 / P15-6054/US

15.    The method of claim 10, wherein the hole injection layer has a dopant concentration from $1 \times 10^{20}/cm^3$ to $5 \times 10^{20}/cm^3$, the p-type contact layer has a dopant concentration of $4 \times 10^{20}/cm^3$ or more, and the intermediate doped layer has a dopant concentration of from $1 \times 10^{18}/cm^3$ to $1 \times 10^{20}/cm^3$.

16.    The method of claim 10, wherein the growing of the n-type semiconductor layer, the active layer, the electron blocking layer, and the p-type semiconductor layer includes performing a metal organic chemical vapor deposition.

17.    A light emitting device, comprising:

a substrate;

an n-type semiconductor layer formed over the substrate;

an active layer formed over the n-type semiconductor layer;

a p-type semiconductor layer formed over the active layer,

wherein the p-type semiconductor layer includes undoped layers and a doped layer disposed between the undoped layers and the undoped layers include a hole concentration decreasing region and a hole concentration increasing region.

18.    The light emitting device of claim 17, wherein the p-type semiconductor layer further comprises:

a hole injection layer formed under the doped layer; and

a p-type contact layer formed over the doped layer.

25

SSC_FINELITE00005288

U.S. Patent Application
Attorney Docket No. 114896-8067.US00 / P15-6054/US

19.    The light emitting device of claim 18, wherein the doped layer is arranged apart from the p-type contact layer such that the doped layer includes a region with a hole concentration of  62% to 87% of that of the p-type contact layer.

20.    The light emitting device of claim 18, wherein the sum of the thicknesses of the undoped layers and the doped layer is greater than the sum of the thickness of the hole injection layer and the p-type contact layer.

LEGAL127388895.1

SSC_FINELITE00005289

# EXHIBIT 8

| | Application No. | Applicant(s) |
|---|---|---|
| | 14/830,651 | JANG ET AL. |
| ***Notice of Allowability*** | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | JORDAN KLEIN | 2829 | Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *Amendment and RCE filed 05/16/2017*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-11 and 15-23*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a) ☒ All    b) ☐ Some    *c) ☐ None of the:

        1. ☒ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

| /MICHAEL LEBENTRITT/ Primary Examiner, Art Unit 2829 | /JMK/ 06/14/2017 |
|---|---|

SSC_FINELITE00005478

### *Allowable Subject Matter*

1.      Claims 1-11 and 15-23 are allowed.

2.      The following is an examiner's statement of reasons for allowance: the whole application meets all formal and substantive requirements and the language of the claims is enabled by, and finds adequate descriptive support in, the application disclosure as originally filed. Concerning 35 U.S.C. § 102 and §103 requirements, the application meets all requirements.

3.      Regarding claim 1, the known prior art does not teach the claim as a whole. In particular, the prior art does not disclose or fairly suggest *wherein the dopant concentration of the first low-doped layer decreases with increasing distance from the intermediate doped layer and then increase with decreasing distance to the p-type contact layer* in combination with the remaining limitations called for in claim 1.

        None of the prior art on record contains such a limitation, nor given the prior art on record is it obvious to one ordinarily skilled in the art to add said limitations as recited in claim 1. Therefore, claim 1 is allowed as it is not anticipated by or obvious over the teachings of the prior art on record. Furthermore, claims 2-9 are also allowed as they depend from an allowed base claim.

4.      Regarding claim 10, the known prior art does not teach the claim as a whole. In particular, the prior art does not disclose or fairly suggest *growing an undoped layer on the hole injection layer by introducing an N source gas, a Ga source gas and $N_2$ gas into the chamber while blocking introducing of the Mg*

SSC_FINELITE00005479

Application/Control Number: 14/830,651                                          Page 3
Art Unit: 2829

*source gas and $H_2$ gas* in combination with the remaining limitations called for in claim 10.

None of the prior art on record contains such a limitation, nor given the prior art on record is it obvious to one ordinarily skilled in the art to add said limitations as recited in claim 10. Therefore, claim 10 is allowed as it is not anticipated by or obvious over the teachings of the prior art on record. Furthermore, claims 11, 15, and 16 are also allowed as they depend from an allowed base claim.

5.      Regarding claim 17, the known prior art does not teach the claim as a whole. In particular, the prior art does not disclose or fairly suggest wherein *the second low-doped layers including a hole concentration decreasing with increasing distance from the active layer and then increasing with decreasing distance to the doped layer* in combination with the remaining limitations called for in claim 17.

None of the prior art on record contains such a limitation, nor given the prior art on record is it obvious to one ordinarily skilled in the art to add said limitations as recited in claim 17. Therefore, claim 17 is allowed as it is not anticipated by or obvious over the teachings of the prior art on record. Furthermore, claims 18-23 are also allowed as they depend from an allowed base claim.

6.      Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should

SSC_FINELITE00005480

Application/Control Number: 14/830,651                                    Page 4
Art Unit: 2829

preferably accompany the issue fee.  Such submissions should be clearly labeled

"Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from

the examiner should be directed to JORDAN KLEIN whose telephone number is

(571)270-7544.  The examiner can normally be reached on Monday - Friday 9:00

- 5:00.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule

an interview, applicant is encouraged to use the USPTO Automated Interview

Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the

examiner's supervisor, Sue Purvis can be reached on (571) 272-1236.  The fax

phone number for the organization where this application or proceeding is

assigned is 571-273-8300.

SSC_FINELITE00005481

Application/Control Number: 14/830,651                                                Page 5
Art Unit: 2829

Information regarding the status of an application may be obtained from

the Patent Application Information Retrieval (PAIR) system.  Status information

for published applications may be obtained from either Private PAIR or Public

PAIR.  Status information for unpublished applications is available through

Private PAIR only.  For more information about the PAIR system, see http://pair-

direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-

free). If you would like assistance from a USPTO Customer Service

Representative or access to the automated information system, call 800-786-

9199 (IN USA OR CANADA) or 571-272-1000.

/JMK/
6/21/2017
/MICHAEL LEBENTRITT/
Primary Examiner, Art Unit 2829

# EXHIBIT 9

Docket No.: 114896-8067.US00
(PATENT)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:
Sam Seok Jang

| | |
|---|---|
| Application No.: 14/830,651 | Confirmation No.: 5736 |
| Filed: August 19, 2015 | Examiner: KLEIN, JORDAN M |
| For:   LIGHT EMITTING DEVICE AND METHOD OF FABRICATING THE SAME | Art Unit: 2829 |

**Mail Stop Issue Fee**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## RESPONSE TO NOTICE OF ALLOWANCE

In response to the Notice of Allowance mailed June 26, 2017, enclosed is a completed Issue Fee Transmittal Form PTOL-85b.

## COMMENTS ON EXAMINER'S REASONS FOR ALLOWANCE

It is recognized that in accordance with M.P.E.P. § 1302.14, the Examiner's reasons for allowance need not set forth all of the details as to why the claims are allowed.  In the above-referenced application, it is not conceded that the Examiner's stated reasons for allowance are the only reasons for which the claims are allowable.  The Examiner's reasons for allowance indicate that particular claim elements are not disclosed or suggested by the prior art of record, yet the claims may be patentable for other reasons as well, including the inventive combination of all of the recited claim elements.  It is not conceded that the specific limitations identified by the Examiner are necessary to distinguish the art of record or to satisfy the requirements of 35 U.S.C. § 112.  Moreover, the Examiner does not assert, and it would not be conceded, that the Examiner's reasons have any bearing on the patentability of claims in any other applications directed to the disclosed subject matter.

137006619.1

Inventor  :  Sam Seok Jang                                    Docket No.: 114896-8067.US00
Appl. No. :  14/830,651
Filed     :  August 19, 2015
Page      :  2 of 2

    In addition, each dependent claim stands on its own and may be allowable on its own merits.  In particular, each dependent claim may be allowable on the basis of a combination of some of the features recited in the dependent claim and its base claim(s), which combination of features may not include all of the limitations identified in the Examiner's reasons for allowance.

    The required fee in the amount of $960.00 is being paid by credit card.  Please apply any other charges or credits to Deposit Account No. 50 0665.

Respectfully submitted,

Date:_____2017-09-21_____      _____/Vinay Sathe/_____
                                            Vinay Sathe
                                            Reg. No. 55,595

Perkins Coie LLP
P.O. Box 1247
Seattle, Washington  98111-1247
Telephone:  (858) 720-5700
Facsimile:  (206) 359-7198

137006619.1

SSC_FINELITE00005503

# EXHIBIT 10

Filed on behalf of: Seoul Viosys Co., Ltd.

Entered: March 19, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SATCO PRODUCTS, INC.,
Petitioner,

v.

SEOUL VIOSYS CO., LTD.,
Patent Owner.

_____

Case IPR2020-00248
Patent No. 9,716,210

_____

**PATENT OWNER'S PRELIMINARY RESPONSE**

# Table of Contents

I.   Introduction................................................................................1

II.  Factual Background Relevant To This Preliminary Response.......................5

     A.   The '210 Patent And The Claimed "Spacer Layer"............................5

     B.   Patent Owner Added A Bandgap Requirement For The Spacer
          Layer To Overcome Tanizawa During Prosecution ............................7

     C.   Petitioner's Argument That Sanga-884 Discloses The Claimed
          "Spacer Layer" ..................................................................11

III. The Board Should Exercise Its Discretion To Decline Institution...............14

IV.  Petitioner Has Failed To Show A Reasonable Likelihood It Would
     Prevail ..............................................................................28

     A.   Petitioner Failed To Construe "Spacer Layer" Having "A
          Bandgap Smaller Than That Of The Barrier Layer And Greater
          Than That Of The Quantum Well Layer" And Has No
          Invalidity Challenge Under The Proper Construction .......................31

          1.   A proper construction requires that all layers composing
               the spacer layer have a bandgap between those of the
               barrier and quantum well layers................................................31

          2.   Petitioner has no invalidity argument under this proper
               construction................................................................35

     B.   There Is No Reasonable Basis To Credit Petitioner's
          Unexplained Reliance On An Imagined Single Layer Having
          The Same Overall Composition As A Multilayer Structure..............36

     C.   Petitioner Ignores Scientific Principles In Implicitly Arguing
          That A Superlattice Structure Has The Bandgap Of A Single
          Layer Having The Same Overall Composition...................................41

V.   Conclusion ............................................................................47

i

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adidas AG v. Nike, Inc.*,
  IPR2016-00921, Paper 31 (PTAB Feb. 19, 2019)................................28, 29, 30

*Advanced Bionics LLC v. Med-El Elektromedizinische Geräte GmbH*,
  IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020)................................................25

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ............................................................................32

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*,
  IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017) ...................................15, 24, 25

*Harmonic Inc. v. Avid Tech., Inc.*,
  815 F.3d 1356 (Fed. Cir. 2016) ............................................................14, 28, 29

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
  821 F.3d 1359 (Fed. Cir. 2016) ............................................................................30

*PersonalWeb Techs., LLC v. Apple, Inc.*,
  917 F.3d 1376 (Fed. Cir. 2019) ............................................................................46

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..............................................32, 33, 34

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ............................................................................33

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ....................................................................32, 34

*In re Sang-Su Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ............................................................................27

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) ............................................................................33

IPR2020-00248 (USP 9,716,210)                  Patent Owner's Preliminary Response

*U.D. Elec. Corp. v. Pulse Elecs., Inc.*,
   IPR2019-00508, Paper 9 (PTAB July 24, 2019) ..........................................21, 24

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................33

## STATUTES

35 U.S.C. § 312(a)(3)..............................................................................................30

35 U.S.C. § 314(a) ...........................................................................................14, 46

35 U.S.C. § 325(d) ...........................................................................................14, 21

## REGULATIONS

35 C.F.R. § 42.100(b) .............................................................................................32

37 C.F.R. § 42.104 .........................................................................................28, 30

37 C.F.R. § 42.108 .................................................................................................14

## OTHER AUTHORITIES

Patent Trial and Appeal Board Consolidated Trial Practice Guide
   (Nov. 2019) .................................................................................................15, 28

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

## Exhibit List

| Ex. | Description |
|---|---|
| 2001 | U.S. Patent No. 6,337,493 ("Tanizawa") |
| 2002 | U.S. Patent Application Publication No. US 2009/0008648 |
| 2003 | S.F. Chichibu et al., *Effective Band Gap Inhomogeneity and Piezoelectric Field in InGaN/GaN Multiquantum Well Structures*, 73 Applied Physics Letters 2006 (1998) |
| 2004 | A.D. Bykhovski et al., *Elastic Strain Relaxation and Piezoeffect in GaN-AlN, GaN-AlGaN and GaN-InGaN Superlattices*, 81 Journal of Applied Physics 6332 (1997) |
| 2005 | I. Gorczyca, *Theoretical Study of Nitride Short Period Superlattices*, Journal of Physics (2018) |

IPR2020-00248 (USP 9,716,210)                Patent Owner's Preliminary Response

## I.    Introduction

The Board should decline to institute *inter partes* review (IPR) of U.S.

Patent No. 9,716,210 ("the '210 Patent") for two independent reasons.  First, the

Board should exercise its discretion to deny IPR because Petitioner's sole prior art

reference, U.S. Patent No. 7,462,884 to Sanga-844 et al. ("Sanga-884"), is

substantially similar to, and cumulative of, the prior art that Patent Owner

overcame during the prosecution.  Second, Petitioner failed to show that a

reasonable likelihood that Sanga-884 discloses the very claim limitation added to

overcome the prior art during prosecution, which requires a "spacer layer" having

"a bandgap smaller than that of the barrier layer and greater than that of the

quantum well layer."

Petitioner's argument is substantially the same as the Examiner's argument

that Patent Owner overcame by amending the claims to specify a requirement for

the "bandgap" of the "spacer layer."  The Examiner rejected the pending claims

based on U.S. Patent No. 6,337,493 to Tanizawa et al. ("Tanizawa," Ex. 2001),

which—like Sanga-884—is assigned to Nichia Corporation.  In rejecting the

pending claims, the Examiner mapped Tanizawa's n-side multilayer structure to

the claimed "spacer layer."  Patent Owner responded by amending the pending

claims to require that the "spacer layer" have "a bandgap smaller than that of the

barrier layer and greater than that of the quantum well layer" and arguing that

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

Tanizawa was "silent" about this claimed feature.  The Examiner agreed and allowed the claims.

Here, Petitioner relies on an n-side multilayer structure in Sanga-884 that is composed of the same material disclosed in Tanizawa.  Like Tanizawa, Sanga-884 is silent about that n-side multilayer structure's bandgap.  Petitioner does not contend, much less demonstrate, that the Examiner erred in allowing the amended claims over Tanizawa or attempt to distinguish Sanga-884 from Tanizawa.  Accordingly, Petitioner offers no basis for revisiting the Examiner's decision to allow the claims.

Even if the Board were willing to revisit the Examiner's decision, Petitioner has failed to show that a reasonable likelihood that Sanga-884 discloses the limitation that the Examiner concluded was missing from the prior art—a "spacer layer" having "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Petitioner does not address the proper construction of this key limitation or explain how the bandgap of a multilayer structure should be determined.  Petitioner treats Sanga-884's multilayer structure as if it were a single, homogeneous layer to argue that its bandgap is between that of the barrier layer and that of the quantum well layer.  Neither Petitioner nor Petitioner's expert explain or justify this scientifically unsound approach.  Petitioner thus fails to fails to establish a reasonable likelihood that Sanga-884 discloses the claimed "spacer

layer" having "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer" for three reasons.

First, the proper construction of "a spacer layer" having "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer" requires that each layer within a multilayer spacer layer have a bandgap between that of the barrier layer and that of the quantum well layer. This construction is consistent with the specification of the '210 Patent, which teaches a spacer layer comprised of alternating layers that **both** have bandgaps between that of the barrier layer and that of the quantum well layer. Petitioner has no argument that Sanga-884 discloses the claimed "bandgap" of the "spacer layer" under this proper construction. Moreover, Petitioner does not argue for any alternative construction.

Second, Petitioner fails to explain its implicit argument that the bandgap of Sanga-884's purported "spacer layer" should be determined by imagining a single layer having, on average, the same overall composition as the multilayer structure. Neither the '210 Patent nor Sanga-884 support Petitioner's approach. As stated, the '210 Patent discloses **each** layer of a multilayer structure having a bandgap in between that of the barrier layer and that of the quantum well layer. Sanga-884 discloses comparing the bandgap of a multilayer structure to the bandgap of other layers by using a particular layer in a multilayer structure, e.g., the layer having the largest (or widest) bandgap, as the basis for comparison. If Petitioner followed this

teaching in Sanga-884, Petitioner would have no invalidity argument. Petitioner identifies no disclosure anywhere in the record of determining the bandgap of a multilayer structure by imagining a single, homogeneous layer having a composition that is the average of the compositions of the layers within the multilayer structure.

Third, Petitioner's unexplained, simplistic re-imagining of Sanga-884's multilayer structure as a single layer not only lacks any basis in the record but also is contrary to well-established scientific principles. Petitioner maps Sanga-884's n-side multilayer having a superlattice structure to the claimed "spacer layer." Petitioner, however, fails to account for the factors besides composition that are known to affect the bandgap of superlattice structures. Strain between layers in a superlattice structure affects the bandgap, and piezoelectric fields in a superlattice can dramatically affect bandgap. These well-understood phenomena were discussed in the '210 Patent and had been acknowledged in the literature. Petitioner entirely ignores these phenomena, as well as the hybridization of wave functions which can be another important factor in determining the bandgap of superlattice structures. Without any justification, Petitioner simplistically assumes—contrary to well-recognized scientific principles—that the bandgap of Sanga-884's purported "spacer layer" can be determined by imagining a single layer having the same average overall composition.

In sum, because Petitioner seeks to retread the ground covered during prosecution and fails to demonstrate a reasonable likelihood of prevailing, the Board should deny institution.

## II.   Factual Background Relevant To This Preliminary Response

### A.   The '210 Patent And The Claimed "Spacer Layer"

The inventions of the '210 Patent relate to light emitting diodes (LEDs) having improved characteristics and methods of fabricating such LEDs.  *See* Ex. 1001 at 1:24-28.  The '210 Patent explains some of the challenges that existed in LED design and discloses features, including a "spacer layer," that address those challenges.

For example, the '210 Patent points out that "there may be about 11% of lattice mis-match between GaN and InN," which can cause "interfacial strain" to "occur between a quantum well layer and a barrier layer in the InGaN-based multi-quantum well structure" that is often used in the "active region" of GaN-based LEDs.  *Id.* at 2:9-12; *see also id.* at 1:34-40.  "This strain may cause a piezoelectric field in the quantum well layer, thereby leading to degradation of internal quantum efficiency."  *Id.* at 2:12-24.

The '210 Patent also discusses an approach to lowering forward voltage that was known in the art but had certain drawbacks.  Specifically, the barrier layers of the multi-quantum well active region could be "doped with silicon (Si) in order to

lower … forward voltage Vf." *Id.* at 2:25-26.  The drawbacks of this approach include having "a negative effect on the crystal quality of the active region," requiring a "relatively thick" multi-quantum well structure, causing "crystal defects," and causing "a wavelength shift" "due to a space charge separation generated by a polarization field." *Id.* at 2:26-35.

The '210 Patent explains that the claimed "spacer layer" addresses these problems in prior art LED designs.  The '210 Patent states that "the present invention forms the spacer layer … of a plurality of layers between the contact layer and the active region, thereby making it possible to reduce strain generated in the active region." *Id.* at 14:23-26; *see also id.* at 10:52-55 (use of "spacer layer" to "improve the crystallinity of the active region" and "reduce strain"), 11:49-56 (similar).  The "spacer layer" also may be used to "lower the forward voltage Vf in the active region" "by selectively doping only" the layer of the multi-layer "spacer layer" that is "adjacent to the active region with the n-type impurity." *Id.* at 14:26-30; *see also id.* at 10:11-13 (use of "spacer layer" to "lower the forward voltage Vf"), 10:28-33 (use of "spacer layer" "so that electrons may be efficiently injected" into the "active region").

The "spacer layer" advantageously can be composed of one or more layers that ***all*** have a bandgap between those of the barrier and well layers that comprise the active layer.  Addressing a single-layer "spacer layer," the '210 Patent explains,

"[t]he spacer layer 128 may be made of a (Al, In, Ga)N-based group III-nitride semiconductor layer having a smaller bandgap than that of the barrier layer of the active region 129 and a larger bandgap than that of the well layer." *Id.* at 10:5-8. Similarly, addressing a multilayer "spacer layer," the '210 Patent states that both of the alternating layers in this multilayer structure have a bandgap between those of the barrier and well layers:  "[T]he spacer layer 128 may have a structure in which (Al, In, Ga)N-based group III-nitride semiconductor *layers 128a and 128b having a smaller bandgap than that of the barrier layer of the active region 129 and larger bandgap than that of the well layer* are alternately stacked." *Id.* at 10:40-45.[1]

### B.     Patent Owner Added A Bandgap Requirement For The Spacer Layer To Overcome Tanizawa During Prosecution

At the start of prosecution, the challenged independent claims both recited a "spacer layer."  Specifically, claim 43 during prosecution, which issued as claim 1, recited "a spacer layer including a plurality of layers disposed between the superlattice and the n-type contact layer."  Ex. 1002 at 76; *see also id.* at 351 (index of claims).  Claim 43 further specified requirements for the plurality of layers composing the spacer layer, including an indium composition requirement:

---

[1] All emphases added unless otherwise noted.

"at least one of the plurality of layers in the spacer layer is doped with n-type impurities and at least one layer of the plurality of layers in the spacer layer is positioned adjacent to the active region, and the at least one layer of the plurality of layers in the spacer layer comprises In at a composition ratio that is lower than the In composition ratio within the quantum well layer." *Id.* at 76.

Claim 51 during prosecution, which issued as independent claim 9, recited "a spacer layer disposed over the n-type contact layer and including a stack structure including a first semiconductor layer and a second semiconductor layer, wherein the first semiconductor layer is closer to the n-type contact layer than the second semiconductor layer." *Id.* at 77; *see also id.* at 351 (index of claims). Claim 51 specified additional requirements for the first and second semiconductor layers composing the "spacer layer," including an indium composition requirement: "the first and second semiconductor layers of the spacer layer have respective Indium (In) composition ratios and the In composition ratio of the first semiconductor layer is lower than the In composition ratio[] of the second semiconductor layer." *Id.* at 77.

The Examiner rejected claim 43 as anticipated by Tanizawa and rejected claim 51 as obvious over Tanizawa. *See id.* at 274, 276. The Examiner mapped claim 43 to Tanizawa as illustrated below with reference to Tanizawa's Figure 1. *See id.* at 275.



Ex. 1002 at 76 (annotated); Ex. 2001 at Fig. 1 (annotated).

In particular, the Examiner mapped the claimed "spacer layer" to Tanizawa's n-side multilayer structure 5. *Id.* Tanizawa disclosed that this "n-type" "multi-film layer 5" was composed of "at least three layers" 5*a*, 5*b*, and 5*c*. Ex. 2001 at 7:66-8:5. Tanizawa disclosed that these layers composing this n-side multilayer structure could have "various compositions," "represented by $In_gAl_hGa_{1-g-h}N$ ($0 \leq g < 1$, $0 \leq h < 1$)," and could "have either the same composition or different compositions." *Id.* at 8:21-27.

With respect to claim 51, the Examiner acknowledged that Tanizawa did not teach the claimed relative Indium (In) compositions of the first and second layers of the spacer layer in the Figure 1 embodiment on which he relied for the other claimed features. *See* Ex. 1002 at 277. The Examiner asserted it would have been

9

obvious to combine this embodiment with another embodiment in Tanizawa that he asserted disclosed the claimed composition ratios. *See id.*

In response to the Examiner's rejection, Patent Owner amended the claims. Patent Owner amended claim 43 to remove the claim limitation regarding the n-type doping and In composition of layers within the spacer layer and to add, after the claim limitation "a spacer layer including a plurality of layers disposed between the superlattice layer and the n-type contact layer," the new limitation "and having a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer." *Id.* at 319. Patent Owner similarly amended claim 51 to add at the end of the claim "and wherein the spacer layer has a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer." *Id.* at 321.

Patent Owner explained that these amendments distinguished Tanizawa. Patent Owner noted, "Claim 43 has been amended to clarify that the claimed spacer layer has a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer." *Id.* at 324. Patent Owner argued that Tanizawa failed to disclose each and every feature of amended claim 43 (issued claim 1) because "Tanizawa is entirely silent" about this bandgap requirement for the claimed spacer layer. *Id.* Patent Owner explained that pending claim 51 (issued claim 9) had "been amended in [a] similar manner" and that, "[a]s discussed,

Tanizawa does not show or describe the features as recited in [c]laim 51 as

amended." *Id.* at 325.

The Examiner allowed the amended claims. *See id.* at 347. In the

Examiner's reasons for allowance, the Examiner pointed out that the "prior art

does not teach" an LED having the features of the amended claims. *See id.* at 348.

### C.    Petitioner's Argument That Sanga-884 Discloses The Claimed "Spacer Layer"

Petitioner maps the "N-side Multilayer 10 having [a] Superlattice Structure"

described in Sanga-884's Example 1 to the claimed "spacer layer." Pet. at 27

(citing Ex. 1004 at 23:7-36); *see also id.* at 33-34 (quoting same and stating, "The

n-side multilayer 10 of Sanga-884 discloses the 'spacer layer' of the '210 patent.").

Sanga-884 states that this "n-type multilayer 10" "only need[s] to be made of at

least two nitride semiconductors having different compositions." Ex. 1004 at

23:18-20. Sanga-844 discloses, "Examples of two preferable compositions …

include AlGaN (including GaN) with [an] Al ratio of 0.1 or less and InGaN with

[an] In ratio of 0.1 or less." *Id.* at 23:20-22. The specific superlattice structure of

the n-side multilayer in Sanga-884's Example 1 includes 10 layers each of

alternately stacked GaN and $In_{0.03}Ga_{0.97}N$ layers and a final GaN layer. *Id.* at 23:8-

17.

Sanga-884 is silent regarding the bandgap of n-side multilayer 10 having a superlattice structure.  *See id.* at 23:7-36 (no mention of bandgap).  Petitioner does not contend otherwise.

Petitioner argues that, because the specific n-side multilayer of Sanga-884's Example 1 includes $In_{0.03}Ga_{0.97}N$ layers, Sanga-884's n-side multilayer would have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Pet. at 35.  Petitioner contends that the fact that Sanga-884's n-side multilayer includes an InGaN layer with 3% indium means that it has a smaller bandgap than the GaN barrier layers in Example 1.  *See id.* ("The indium content of the $In_{0.03}Ga_{0.97}N$ layer lowers the bandgap energy of the multilayer, such that the bandgap of the n-side multilayer 10 is lower than that of the GaN barrier layer.").  Relying again on relative indium concentration, Petitioner contends that InGaN quantum well layers have a lower bandgap than Sanga-884's n-side multilayer because those well layers have a higher indium concentration.  *See id.* ("Due to the higher indium amount in the quantum well layer, the bandgap energy of the quantum well layer is lower than the bandgap energy of n-side multilayer 10."); *see also id.* at 43 ("[T]he quantum well … is composed of $In_{0.3}Ga_{0.7}N$, which has a smaller bandgap than the aforementioned n-side multilayer 10 (the claimed spacer layer) due to the higher composition of indium.").

Petitioner relies on a declaration from Morgan Pattison, Ph.D.  *See* Ex. 1003.
Dr. Pattison states that "it was well known that GaN has a wider/larger bandgap
than InGaN, and that increasing the ratio of indium in a layer having an InGaN
composition narrows/reduces the bandgap of that layer."  *Id.* at 17 (¶ 36).  He
points to Kuramoto-242 (Ex. 1005) and O'Donnell (Ex. 1006) to "confirm[] the
well-known relationship between bandgaps and indium composition ratios."  Ex.
1003 at 20 (¶ 44).  Dr. Pattison cites Kuramoto-242's reference to a GaN barrier
layer as having a larger bandgap than an InGaN barrier layer.  *See id.* at 18 (¶ 39
(quoting Ex. 1005 at ¶ 7)).  He also cites a graph in O'Donnell (Ex. 1006) that
shows photoluminescence peak energy decreasing with increasing indium fraction
in InGaN.  *See id.* at 19 (¶ 42 (showing Figure 8 from Ex. 1006 at 6989)).

Dr. Pattison does not address any discussion in the literature of how to
determine the bandgap of a multilayer structure, such as a superlattice structure, or
the factors that affect its bandgap.  *See id.* at 17-20 (no discussion of multilayer
structures).  He also does not refer to any experience in determining bandgap, and
in particular does not discuss any expertise in determining the bandgap of
superlattice structures.  *See id.* at 1-3 (no discussion of experience determining
bandgap).

Dr. Pattison applies Sanga-884 to the challenged claims in a chart.  *See id.* at
24-40.  In addressing the "bandgap" requirement for the "spacer layer," he states

that, because Sanga-884's n-side multilayer 10 is composed of alternating GaN and In$_{0.03}$Ga$_{0.97}$N layers, "[t]his means that the n-side multilayer (10) has a bandgap between the relatively high bandgap of the GaN barrier layer and the relatively lower bandgap of the quantum well having an alloy composition of In$_{0.3}$Ga$_{0.7}$N." *Id.* at 31.  To reach this conclusion, Dr. Pattison compares the GaN barrier layers to the "InGaN layers within the spacer layer," stating, "GaN has a higher bandgap energy than the plurality of InGaN layers within the spacer layer." *Id.* at 32.  He does not compare bandgap of the GaN barrier layers to the bandgap of the GaN layers within the n-side multilayer.  *See id.* at 28-32.  Dr. Pattison also does not acknowledge that any factor besides the composition of the InGaN layers within Sanga-884's n-side multilayer having a superlattice structure affects the bandgap of that structure.  *See id.* at 31-32.

## III.   The Board Should Exercise Its Discretion To Decline Institution

The Board has discretion to deny institution of IPR and should exercise that discretion to deny institution of IPR here.  *See* 35 U.S.C. § 314(a); 37 C.F.R. § 42.108; *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."). In exercising its discretion, the Board "may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office."  35 U.S.C. § 325(d).  The

14

IPR2020-00248 (USP 9,716,210)                Patent Owner's Preliminary Response

Board has considered the following "*non-exclusive* factors" ("the *Becton Dickinson* factors") in evaluating whether the same or substantially the same prior art or arguments previously were presented to the Office:

>  (a) the similarities and material differences between the asserted art and the prior art involved during examination;
>
>  (b) the cumulative nature of the asserted art and the prior art evaluated during examination;
>
>  (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;
>
>  (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;
>
>  (e) whether the Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and
>
>  (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments.

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (PTAB Dec. 15, 2017) (precedential as to this portion) (original emphasis); *see also* Patent Trial and Appeal Board Consolidated Trial Practice Guide 63 (Nov. 2019) (recognizing that the *Becton Dickinson* factors "are considered by the Board when determining whether to institute a trial").

As explained below, the *Becton Dickinson* factors and additional considerations strongly favor denial of institution.

### (a) "the similarities and material differences between the asserted art and the prior art involved during examination"

The asserted art, Sanga-884, and the prior art involved during examination, Tanizawa, are very similar from the perspective of the challenged claims. These patents are both assigned to Nichia Corporation and disclose similar LED structures that Petitioner and the Examiner have mapped in analogous ways. This is illustrated by a comparison between Petitioner's mapping of Sanga-884 to the challenged claims in the Petition (below on the left) and the Examiner's mapping of Tanizawa to the claims during prosecution (on the right with corresponding colorization, *see supra* Section II.B).



Pet. at 27; Ex. 2001 at Fig. 1 (annotated).

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

Of particular relevance here, Sanga-884 and Tanizawa share substantially the same disclosure of what Petitioner and the Examiner, respectively, have mapped to the claimed "spacer layer."  Moreover, Petitioner failed to explain how Sanga-884 addresses the feature added by amendment—the requirement that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer"—in a manner distinct from Tanizawa.

To explain, Petitioner maps the claimed "spacer layer" to Sanga-884's "n-side multilayer 10," which is analogous to the Examiner's mapping of the claimed "spacer layer" to Tanizawa's "n-type" "multi-film layer 5" construed of "at least three layers" 5$a$, 5$b$, and 5$c$.  Pet. at 27, 33-34; Ex. 1002 at 275; Ex. 2001 at 7:66-8:5.  Sanga-884's disclosure that its n-side multilayer structure "only need[s] to be made of at least two nitride semiconductors having different compositions" is substantially the same as Tanizawa's disclosure that the layers composing its n-side multilayer structure can have "different compositions."  Ex. 1004 at 23:18-20; Ex. 2001 at 8:21-27.  Sanga-884 discloses that "two preferable compositions [of its n-side multilayer 10] include AlGaN (including GaN) with [an] Al ratio of 0.1 or less and InGaN with [an] In ratio of 0.1 or less."  Ex. 1004 at 23:20-22.  Tanizawa discloses that its n-side multilayer is composed of "In$_g$Al$_h$Ga$_{1-g-h}$N ($0 \leq g < 1$, $0 \leq h < 1$)," which encompasses Sanga-884's "two preferable compositions."  *Id.*; Ex. 2001 at 8:21-27.

The one potential difference between Sanga-884 and Tanizawa with respect to disclosure of their n-side multilayer structures is that Sanga-884 discloses an exemplary structure containing alternately stacked GaN and $In_{0.03}Ga_{0.97}N$ layers, whereas Tanizawa allows its n-side multilayer structure to be composed of such layers without specifically disclosing this example. *Compare* Ex. 1004 at 23:8-13 ("GaN" and "$In_{0.03}Ga_{0.97}N$" layers), *with* Ex. 2001 at 8:21-27 ("$In_gAl_hGa_{1-g-h}N$ ($0 \leq g < 1$, $0 \leq h < 1$)"). This is not a difference at all because Sanga-884 discloses that its n-side multilayer structure "only need[s] to be made of at least two nitride semiconductors having different compositions," and having GaN and $In_{0.03}Ga_{0.97}N$ layers falls squarely within the options Tanizawa discloses. Ex. 2001 at 8:21-27 ("The nitride semiconductors constituting the aforesaid lower layer 5*a* to upper layer 5*c* may be the nitride semiconductors having various compositions and represented by $In_gAl_hGa_{1-g-h}N$ ($0 \leq g < 1$, $0 \leq h < 1$).").

Further, even it were considered a difference, this difference would be immaterial. Petitioner does not contend that the "alternately stacked" nature of Sanga-884's exemplary structure has any significance in this IPR. Indeed, Petitioner relies on the "simplest form" of Sanga-884's n-side multilayer, which Petitioner contends is comprised of two layers—"a layer of GaN and a layer of

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

In$_{0.03}$Ga$_{0.97}$N."[2]  Pet. at 34.  Petitioner focuses its bandgap-related arguments on the inclusion of the In$_{0.03}$Ga$_{0.97}$N layer in Sanga-884's multilayer structure, and as explained, this specific composition falls squarely within Tanizawa's disclosure. *See id.* at 35; Ex. 2001 at 8:21-27 ("In$_g$Al$_h$Ga$_{1-g-h}$N (0≤g<1, 0≤h<1)").

Sanga-884 and Tanizawa also disclose exactly the same compositions for the barrier and well layers of the active layer, whose bandgaps must be compared to the bandgap of the spacer layer according to the challenged claims.  Specifically, both Sanga-884 and Tanizawa disclose use of GaN barrier layers and In$_{0.3}$Ga$_{0.7}$N well layers.  *Compare* Ex. 1004 at 23:38-41 ("[a] barrier layer made of undoped GaN … and … a well layer made of undoped In$_{0.3}$Ga$_{0.7}$N"), *with* Ex. 2001 at

---

[2] Sanga-884's statement that "[t]he n-type multilayer 10 is only needed to be made of at least two nitride semiconductors having different compositions" could be interpreted as referring to the smallest set of layers that can be repeated in the superlattice structure or the minimum number of total layers.  Ex. 1004 at 23:18-20.  Petitioner interprets this sentence to refer to the minimum number of total layers, stating that the "simplest form" of the n-side multilayer is "a layer of GaN and a layer of In$_{0.03}$Ga$_{0.97}$N."  Pet. at 34.  For purposes of this preliminary response only, Patent Owner accepts Petitioner's interpretation.

IPR2020-00248 (USP 9,716,210)                     Patent Owner's Preliminary Response

24:21-25 ("a barrier layer made of undoped GaN … and … a well layer made of undoped $In_{0.3}Ga_{0.7}N$"), 24:40-44 (same).

   Likewise, both Sanga-884 and Tanizawa are silent about the bandgap of the purported "spacer layer," and neither reference contains any disclosure about how the bandgap of its purported "spacer layer" compares to those of the barrier and well layers.

   The first *Becton Dickinson* factor thus strongly favors denial of institution.

### (b) *"the cumulative nature of the asserted art and the prior art evaluated during examination"*

Sanga-884 is cumulative of Tanizawa for the reasons explained above in addressing the first *Becton Dickinson* factor.  Petitioner has not attempted to argue otherwise, and Petitioner does not rely on any other art besides Sanga-884.

   Petitioner concedes that Patent Owner overcame the rejection during prosecution and secured allowance by amending the challenged independent claims to require that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Pet. at 6-7.  Petitioner, however, notably omits any mention of Tanizawa.  Petitioner merely states that Sanga-884 "was not cited or considered by the examiner during prosecution," but fails to address whether Sanga-884 was ***cumulative*** of the prior

IPR2020-00248 (USP 9,716,210)                Patent Owner's Preliminary Response

art applied during prosecution.  *Id.* at 7.  Sanga-884 is cumulative of Tanizawa, as discussed with respect to factor (a).

Accordingly, the second *Becton Dickinson* factor strongly favors denial of institution.

### (c) *"the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection"*

As discussed above, Sanga-884 was not evaluated during prosecution, but Tanizawa, which includes substantially the same relevant teachings, was evaluated during prosecution and was the basis for the Examiner's rejection.  Accordingly, the asserted teachings were evaluated during examination, were the basis for rejection, and were overcome by a claim amendment that resulted in the issued (and now challenged) claims.  *See*, *e.g.*, *U.D. Elec. Corp. v. Pulse Elecs., Inc.*, IPR2019-00508, Paper 9 at 15 (PTAB July 24, 2019) (recognizing that this factor extends to substantially the same teachings in a reference that was not before the Examiner and exercising discretion to deny institution under 35 U.S.C. §325(d)).

Specifically, Petitioner seeks to raise a duplicative challenge to the '210 Patent simply by relying on Sanga-884 rather than Tanizawa, even though their relevant disclosures are strikingly similar and Patent Owner overcame Tanizawa by amending the claims.  Petitioner provides no explanation of why Sanga-884 addresses the feature added by amendment—the requirement that the "spacer

IPR2020-00248 (USP 9,716,210)                 Patent Owner's Preliminary Response

layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer"—in a manner distinct from Tanizawa.  Sanga-884 and Tanizawa both disclose n-side multilayer structures as the purported "spacer layer," disclose that those structures can be composed of the same materials, and disclose GaN barrier layers and $In_{0.3}Ga_{0.7}N$ well layers.

This factor strongly favors denial of institution because Petitioner's challenge is substantially the same as the rejection that Patent Owner overcame by claim amendment during examination.

### (d) "the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art"

There is a high degree of overlap between the arguments made during examination and both the manner in which Petitioner relies on the prior art and Patent Owner distinguishes the prior art.

Petitioner relies on Sanga-884 in the same manner that the Examiner relied on Tanizawa, which (as discussed above) contains substantially the same teachings as Sanga-884.  As illustrated above, Petitioner's mapping of Sanga-884 to the challenged claims closely resembles the Examiner's mapping of Tanizawa to the asserted claims.  In particular, the Examiner argued that Tanizawa's n-side multilayer structure was the claimed "spacer layer," just as Petitioner argues Sanga-884's n-side multilayer structure is the claimed "spacer layer."

22

Petitioner's argument based on Sanga-884 the same as (or at least substantially the same as) the argument that the Examiner raised before pending claim 43 was amended to secure allowance.  Original claim 43, which was rejected by the Examiner, recited "at least one layer of the plurality of layers in the spacer layer comprises In at a composition ratio that is lower than the In composition ratio within the quantum well layer."  Ex. 1002 at 76.  Here Petitioner relies on the fact that, in Sanga-884's Example 1, the purported "spacer layer" includes a layer having a lower In composition ratio than the quantum well layer.  *See* Pet. at 35 ("[T]he quantum well layer is composed of $In_{0.3}Ga_{0.7}N$, so it has a much higher indium content than that of the $In_{0.03}Ga_{0.97}N$ layer of the simplest form of the n-side multilayer 10.").  Issued claim 1, however, does not recite any limitation regarding In composition because Patent Owner replaced this limitation with a bandgap requirement to overcome the Examiner's rejection.  Ex. 1002 at 319.  Tanizawa, like Sanga-884, is silent about the bandgap of its n-side multilayer structure.  *See id.* at 324, 348.

Patent Owner also distinguishes Sanga-884 here in the same manner that Patent Owner distinguished Tanizawa during examination.  As discussed above, Patent Owner overcame Tanizawa by amending the claims to require that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer" and pointing out that Tanizawa was silent

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

about this claimed feature.  Ex. 1002 at 319, 321; *see also id.* at 324.  Patent Owner

distinguishes Sanga-884 here because it is likewise silent about this claimed

feature and, as explained below, Petitioner fails to show a reasonable likelihood

that Sanga-884 discloses this claimed feature.

> The fourth *Becton Dickinson* factor therefore also strongly favors denial of

institution.

### (e)  *"whether the Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art"*

Petitioner does not contend that the Examiner erred in evaluating Tanizawa.

Although Sanga-884 is substantially the same as Tanizawa (as explained above),

Petitioner does not discuss Tanizawa at all.  *See*, *e.g.*, *U.D. Elec. Corp.*, IPR2019-

00508, Paper 9 at 17 (applying this factor to substantially similar art and denying

institution).

> If Petitioner believed that Sanga-884 was distinguishable from Tanizawa,

then Petitioner should have attempted to explain this difference.  On the other

hand, if Petitioner believed that the Examiner had erred in its evaluation of

Tanizawa, then Petitioner should have explained why Petitioner believed the

Examiner erred.  Petitioner has done neither.

> Far from "point[ing] out sufficiently how the Examiner erred in its

evaluation," Petitioner does not contend that the Examiner erred.  *Becton,*

IPR2020-00248 (USP 9,716,210)                Patent Owner's Preliminary Response

*Dickinson*, IPR2017-01586, Paper 8 at 17-18.  Petitioner acknowledges that the challenged claims were allowed after Patent Owner amended the claims to require that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Pet. at 6.  Petitioner does not contend that the Examiner made any mistake in allowing the amended claims over Tanizawa.  Petitioner does not argue that the Examiner misapprehended Tanizawa's disclosure or dispute that Tanizawa—like Sanga-884—discloses nothing about the bandgap of the purported "spacer layer."  Neither Petitioner nor its expert ever mention Tanizawa.

Petitioner's failure to point out how the Examiner erred (if Petitioner even believes that the Examiner erred) in evaluating very similar prior art to Sanga-884 strongly favors denial of institution.  *See Advanced Bionics LLC v. Med-El Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) ("If the 'same or substantially the same prior art or arguments previously were presented to the Office,' then the Board's decisions generally have required a showing that the Office erred in evaluating the art or arguments."); *see also id.* at 8-9 (stating that "the Director generally will exercise discretion not to institute *inter partes* review" when "the same or substantially the same" art or arguments were previously presented to the Office and Petitioner "fails to make a showing of material error").

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

#### *(f) "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments"*

Petitioner fails to present any additional evidence or facts that warrant reconsideration of the Examiner's decision to allow the challenged claims over Tanizawa.  Petitioner's proposed grounds rely entirely on Sanga-884, which as explained above contains very similar disclosure to Tanizawa.  In arguing that Sanga-884 discloses the bandgap limitation added to overcome Tanizawa, the only other evidence Petitioner cites are Dr. Pattison's declaration and two references he discusses in his declaration, Kuramoto-242 and O'Donnell.  None of this evidence warrants reconsidering the Examiner's decision to allow the claims, as amended, based on Patent Owner's arguments because it merely confirms generally well-known facts of which the Examiner presumably was well aware.

Specifically, Petitioner relies on a relationship between increasing In concentration in InGaN and decreasing bandgap that Dr. Pattison admits was "well known to a POSITA."  Ex. 1003 at 17 (¶ 36).  Dr. Pattison states, "In particular, it was well known that GaN has a wider/larger bandgap than InGaN, and that increasing the ratio of indium in a layer having an InGaN composition narrows/reduces the bandgap of that layer."  *Id.*  He reiterates that "this fact was generally well known."  *Id.*  Petitioner and Dr. Pattison merely point to Kuramoto-

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

242 and O'Donnell as "two background references … that confirm this well-known fact." *Id.*

Because Petitioner presents additional evidence merely to confirm a "generally well known" fact, Petitioner cannot plausibly contend that this additional evidence presents evidence in some new light, as would be necessary to argue for potential reconsideration of the Examiner's allowance of the challenged claims over Tanizawa. *Id.*; *see also In re Sang-Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002) ("The patent examiner and the Board are deemed to have experience in the field of the invention.").  Furthermore, the prosecution history reflects that the prior art considered by the Examiner acknowledged the "generally well known" fact, Ex. 1003 at 17 (¶ 36), that including indium in a layer decreases the layer's bandgap.  *See, e.g.,* Ex. 2002 (U.S. Appl. Pub. No. 2009/0008648) (which is listed on page 2 of the '210 Patent) at ¶¶ 152 ("well layers 16*a* of InGaN having a low bandgap energy and … barrier layers 16*b* of GaN having a wide bandgap energy"), 161 ("[T]he contact layer 20 is formed using InGaN having a bandgap energy lower than that of GaN.").

The final *Becton Dickinson* factor therefore strongly favors denial of institution.

*        *        *

27

IPR2020-00248 (USP 9,716,210)                Patent Owner's Preliminary Response

In sum, the Board should exercise its discretion to deny institution because Petitioner has failed to identify any reason why its desire to be heard should outweigh Patent Owner's interest in avoiding a duplicative challenge to the '210 Patent claims, and because denial of institution will promote efficient administration of the Office by preserving the Board's limited resources for trials that do not seek to retread the same ground covered during examination.  *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 62 (Nov. 2019).

## IV.   Petitioner Has Failed To Show A Reasonable Likelihood It Would Prevail

Petitioner has failed to show a reasonable likelihood that Sanga-884 discloses the claim limitation added to overcome Tanizawa during prosecution, requiring that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Petitioner was required to explain "[h]ow the challenged claim is to be construed" and "[h]ow the construed claim is unpatentable," but Petitioner did neither for this key claim limitation.  37 C.F.R. § 42.104.  Accordingly, the Board should deny institution because Petitioner failed to meet its "burden from the onset to show *with particularity* why the patent it challenges is unpatentable."  *Adidas AG v. Nike, Inc*., IPR2016-00921, Paper 31 at 49 (PTAB Feb. 19, 2019) (quoting *Harmonic Inc. v. Avid Tech., Inc*., 815 F.3d 1356, 1363 (Fed. Cir. 2016)) (PTAB's emphasis).

IPR2020-00248 (USP 9,716,210)         Patent Owner's Preliminary Response

Petitioner proposes no construction of the bandgap limitation for the "spacer layer."  As discussed below, the proper construction requires each layer in a multilayer "spacer layer" to have a bandgap between the respective bandgaps of the barrier and quantum well layers.  Petitioner has not, and cannot, present any invalidity challenge based on Sanga-884 under this proper construction. Moreover, Petitioner's failure to construe the bandgap limitation or otherwise explain how Petitioner believes that this limitation should be applied to a multilayer, superlattice structure makes it impossible to discern Petitioner's argument "*with particularity*."  *Adidas AG*, IPR2016-00921, Paper 31 at 49 (quoting *Harmonic Inc.*, 815 F.3d at 1363) (PTAB's emphasis).

Even if Petitioner is implicitly arguing that not all layers within the "spacer layer" need to meet the bandgap limitation as long as the overall bandgap of the "spacer layer" meets this limitation, Petitioner's invalidity challenge remains deficient.  Petitioner contends that Sanga-884's n-side multilayer structure having a superlattice structure is the claimed "spacer layer," but relies on just one of the layers within this structure to argue that the bandgap limitation is met. *See* Pet. at 35 (arguing that "[t]he indium content of the $In_{0.03}Ga_{0.97}N$ layer lowers the bandgap energy of the multilayer" so that it "is lower than that of the GaN barrier layer" and higher than that of "the quantum well layer … composed of $In_{0.3}Ga_{0.7}N$," which "has a much higher indium content").  Petitioner offers no explanation—let alone a

scientifically valid one—for determining the bandgap of Sanga-884's multilayer, superlattice structure based on the indium content of one of its lower bandgap constituent layers.  Petitioner appears to assume, without offering any justification, that Sanga-884's multilayer can be treated as equivalent to a single layer having the same overall composition.  Petitioner provides the Board with no reasonable basis to credit its simplistic treatment of Sanga-884's multilayer.

Finally, Petitioner fails to address the well-established scientific principles that apply to determining that the bandgap of multilayers having a superlattice structure.  Rather than identify evidence to address how strain, piezoelectric fields, and hybridization affect the bandgap of Sanga-884's multilayer, superlattice structure, Petitioner impermissibly ignores these physical phenomena, even though some of them are discussed in the '210 Patent.  *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'") (quoting 35 U.S.C. § 312(a)(3)).

Petitioner thus fails to carry its burden to justify institution of IPR.  *See id.*; *see also* 37 C.F.R. § 42.104; *Adidas AG*, IPR2016-00921, Paper 31 at 49.

### A.   Petitioner Failed To Construe "Spacer Layer" Having "A Bandgap Smaller Than That Of The Barrier Layer And Greater Than That Of The Quantum Well Layer" And Has No Invalidity Challenge Under The Proper Construction

Petitioner addresses construction of three terms but fails to address the construction of the key limitation that was added to overcome the prior art during prosecution, which requires the "spacer layer" to have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Petitioner concedes that construction of two terms Petitioner addresses—"barrier layer" and "multi-quantum well structure"—have no bearing on "any disputes in this proceeding."  Pet. at 10, 12.  Petitioner's decision to ignore construction of the key limitation added to secure allowance over very similar prior art to Sanga-884, and instead to focus on claim constructions that make no difference, is conspicuous. As explained below, Petitioner has no invalidity argument based on Sanga-884 under a proper construction of the claim limitations requiring that the "spacer layer" have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."

### 1.   A proper construction requires that all layers composing the spacer layer have a bandgap between those of the barrier and quantum well layers

Each challenged independent claim specifies that the "spacer layer" is comprised of multiple layers.  Ex. 1001 at cl. 1 ("a spacer layer including a

plurality of layers"), cl. 9 ("a spacer layer … including a stack structure including a first semiconductor layer and a second semiconductor layer").  These claims also recite limitations requiring the "spacer layer" to have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  *Id.* at cls. 1, 9. These "spacer layer" limitations should be construed to require that the entire spacer layer—including all of its sublayers, rather than just one or more selected sublayer(s)—has a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer.

Claim construction "begins and ends in all cases with the actual words of the claim."  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).[3]  Here the claims recite "a spacer layer … [has/having] a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer."  Ex. 1001 at cls. 1, 9.  The claim language itself thus specifies that the bandgap limitation applies to the "spacer layer"—not merely some portion of it.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claims themselves provide substantial guidance as to the

---

[3] The *Phillips* claim construction standard applies here because the Petition was filed after November 13, 2018.  *See* 35 C.F.R. § 42.100(b).

meaning of particular claim terms.").  Based on the claim language alone, the

bandgap limitation might be viewed as applying to all the layers within the "spacer

layer" either individually or collectively.  That possible ambiguity is resolved by

the specification, as discussed below.  *See Power Integrations, Inc. v. Fairchild*

*Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013) (Where the

meaning of a claim term "is not clear from a plain reading of the claim, 'we turn to

the remaining intrinsic evidence, including the written description, to aid in our

construction of that term.'") (quoting *Telemac Cellular Corp. v. Topp Telecom,*

*Inc.*, 247 F.3d 1316, 1326 (Fed. Cir. 2001)).

        The Federal Circuit has explained that "the specification 'is always highly

relevant to the claim construction analysis.  Usually, it is dispositive; it is the single

best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The

'210 Patent's specification consistently explains that all the layers composing the

spacer layer—whether it is composed of just one layer or multiple layers—have a

bandgap between those of the barrier and well layers.  In describing a single-layer

"spacer layer," the specification explains that this layer—not merely some part of

it—has a bandgap between those of the barrier and well layers.  *See* Ex. 1001 at

10:5-10 ("The spacer layer 128 may be made of a (Al, In, Ga)N-based group III-

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

nitride semiconductor layer having a smaller bandgap than that of the barrier layer

of the active region 129 and a larger bandgap than that of the well layer.").

Similarly, in describing a multilayer "spacer layer," the specification states

that **all** these layers have a bandgap between those of the barrier and well layers:

"[T]he spacer layer 128 may have a structure in which (Al, In, Ga)N-based group

III-nitride semiconductor *layers 128a and 128b having a smaller bandgap than*

*that of the barrier layer of the active region 129 and a larger bandgap than that*

*of the well layer* are alternately stacked." *Id.* at 10:40-45.  There may be anywhere

from 14 to 30 total layers 128*a* and 128*b* "having a smaller bandgap than that of

the barrier layer … and a larger bandgap than that of the well layer." *Id.*; *see also*

*id.* at 10:52-56 (spacer layer can have a stacked structure of between seven and

fifteen periods of layers 128*a* and 128*b*).

In view of this disclosure, the claim interpretation that "most naturally aligns

with the patent's description of the invention" requires **all** the layers composing the

"spacer layer" to have "a bandgap smaller than that of the barrier layer and greater

than that of the quantum well layer." *Phillips*, 415 F.3d at 1316 ("The construction

that stays true to the claim language and most naturally aligns with the patent's

description of the invention will be, in the end, the correct construction.") (quoting

*Renishaw*, 158 F.3d at 1250).  If Patent Owner had meant that only some of the

layers within the "spacer layer" needed to meet the bandgap requirement, then

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

Patent Owner would have used claim language to focus on the constituent layers,

as recited in other issued claims and as recited in pending claim 43, which became

issued claim 1, before it was amended.  *See* Ex. 1001 at cls. 4, 5 (reciting "at least

one layer of the plurality of layers in the spacer layer"); Ex. 1002 at 76 (reciting the

same three times in pre-amendment claim 43).[4]  Patent Owner did not do so.

> ### 2.    Petitioner has no invalidity argument under this proper construction

Under a proper construction of the challenged independent claims that

requires each layer composing the "spacer layer" to meet the bandgap requirement,

Petitioner has no tenable invalidity argument based on Sanga-884.  Petitioner relies

on Sanga-884's exemplary n-side multilayer structure composed of GaN and

$In_{0.03}Ga_{0.97}N$ layers.  *See* Pet. at 34 (citing Ex. 1004 at 23:7-36); *see also* Ex. 1003

at 31.  Petitioner compares the bandgap of this n-side multilayer structure to the

bandgap of Sanga-884's GaN barrier layers and $In_{0.3}Ga_{0.7}N$ quantum well layers.

*See* Pet. at 35; *see also* Ex. 1003 at 32.  Petitioner relies on relative indium

composition as a basis for comparing bandgaps.  Pet. at 35; *see also* Ex. 1003 at

---

[4] This construction also advantageously avoids the need to account for the

complexity that can arise in determining the bandgap of a set of layers that

compose a multilayer, superlattice structure, as discussed in Section IV.C. *infra*.

35

32.  Petitioner does not contend that the bandgap of the GaN layers in Sanga-884's purported "spacer layer" would have a different (or smaller) bandgap than Sanga-884's GaN barrier layers—both types of layers lack indium.  Consequently, Petitioner has no argument that all the layers in Sanga-884's purported "spacer layer" have a bandgap smaller than that of the barrier layer.

In other words, under a proper claim construction, Petitioner cannot maintain its invalidity challenges, and Petitioner proposes no alternative construction.

> **B.    There Is No Reasonable Basis To Credit Petitioner's Unexplained Reliance On An Imagined Single Layer Having The Same Overall Composition As A Multilayer Structure**

Petitioner's failure to construe the bandgap limitation or explain why Petitioner asserts that Sanga-884's exemplary n-side multilayer meets this limitation, despite containing GaN layers, makes it difficult to parse Petitioner's argument.  Petitioner appears to contend that the bandgap of Sanga-884's exemplary n-side multilayer should be compared to the respective bandgaps of the barrier and well layers by imagining a single-layer "spacer layer" having, on average, the same overall composition as Sanga-884's multilayer structure.  There is no reasonable basis to credit this approach.  Petitioner's argument therefore fails regardless of how the bandgap limitation is construed.

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

Petitioner acknowledges that the exemplary n-side multilayer that Petitioner maps to the claimed "spacer layer" contains at least the same number of GaN layers as $In_{0.03}Ga_{0.97}N$ layers. *See* Pet. at 34 ("[I]n its simplest form, the n-side multilayer 10 is a nitride based semiconductor having a layer of GaN and a layer of $In_{0.03}Ga_{0.97}N$."); *see also* Ex. 1003 at 31 ("N-side multilayer (10) has a superlattice structure which alternates, e.g., GaN and $In_{0.03}Ga_{0.97}N$ layers."). In the particular exemplary n-side multilayer structure containing $In_{0.03}Ga_{0.97}N$ layers on which Petitioner relies, there is one more GaN layer than $In_{0.03}Ga_{0.97}N$ layer, and the GaN layers are more than twice as thick as the $In_{0.03}Ga_{0.97}N$ layer. *See* Ex. 1004 at 23:8-17 ("[A]n undoped GaN layer is grown" on top of the layer "stack" and the GaN layers are "about 35 angstroms" while the $In_{0.03}Ga_{0.97}N$ layers are "about 15 angstroms."). But Petitioner focuses exclusively on the $In_{0.03}Ga_{0.97}N$ layers in discussing bandgap.

Petitioner asserts that the barrier layers in Sanga-884's active layer 30, "composed of GaN," "would have a higher bandgap energy than the n-side multilayer 10, because the simplest form of the n-side multilayer 10 includes an $In_{0.03}Ga_{0.97}N$ layer." Pet. at 35. Petitioner argues, "The indium content of the $In_{0.03}Ga_{0.97}N$ layer lowers the bandgap energy of the multilayer, such that the bandgap of the n-side multilayer 10 is lower than that of the GaN barrier layer." *Id.* Petitioner, however, does not directly confront the fact that the n-side

multilayer 10 also includes layers that—just like the barrier layers—are composed of GaN.  Dr. Pattison does not directly confront this fact in his declaration either. In stating why he believes the "spacer layer" has a smaller bandgap than the GaN barrier layer, he likewise focuses on the InGaN layers within Sanga-884's exemplary n-side multilayer.  *See* Ex. 1003 at 32 ("GaN has a higher bandgap energy than the plurality of InGaN layers within the spacer layer.").

These statements leave Patent Owner and the Board to guess exactly what theory Petitioner is advancing.  Is Petitioner simply ignoring the GaN layers within Sanga-884's purported "spacer layer" to assert that the bandgap limitation is met? If so, Petitioner cannot show a reasonable likelihood of prevailing.  There is no basis in the claim language to focus on some layers that compose the "spacer layer" and ignore others.  The bandgap limitation applies to the "spacer layer"— not selected layers within the "spacer layer."

Alternatively, is Petitioner contending that Sanga-884's purported "spacer layer" as a whole meets the bandgap limitation due to the presence of $In_{0.03}Ga_{0.97}N$ layers, despite the presence of at least as many GaN layers, which are thicker?  If so, then Petitioner seems to be arguing that Sanga-884's multi-layer "spacer layer" inherently meets the bandgap limitation because there is some indium within the "spacer layer" as a whole.  In other words, Petitioner treats Sanga-884's multilayer, superlattice structure having up to 10% indium, e.g., 3% indium, in every other

layer as equivalent to a single layer having that indium spread throughout the structure.[5] *See, e.g.,* Pet. at 43 ("Sanga-884 discloses that the indium ratio of the n-side multilayer is less than or equal to 0.1."); Ex. 1003 at 38 ("[T]the indium ratio means that the bandgap of the 'spacer layer' is less than that of the GaN barrier layer but still higher than that of the quantum well layer."). This argument likewise fails because, in comparing bandgap energies, there is no basis to treat the bandgap of a multilayer, superlattice structure composed of layers having different compositions as equivalent to the bandgap of a single layer having the same average composition.

Petitioner's approach is contrary to Sanga-884's teachings that, when comparing the bandgap of multilayer structures to, e.g., the bandgap of barrier or

---

[5] The '210 Patent discloses that the spacer layer can include a layer $128c$ in which "the amount of In … may be higher than that in the quantum well layer." Ex. 1001 at 11:22-25. Petitioner does not address this disclosure. Does Petitioner believe this embodiment is not covered by the claims, or that it would be covered by the claims if the average amount of indium in the spacer layer were less than that in the quantum well layer? Petitioner's failure to provide an express explanation of how Petitioner determines the bandgap of a multilayer structure leaves Patent Owner and the Board to guess the answer.

well layers, the layer with the ***largest*** bandgap within the multilayer structure should be used in performing the comparison.  For example, Sanga-884 teaches that the layer having the largest bandgap in multilayer structure 12 should be considered when comparing its bandgap to that of other layers:  "When the p-side wide band gap multilayer 12 has a structure in which layers having different band gaps are alternately stacked, ***the band gap of a layer having the largest band gap*** in the p-side wide band gap multilayer ***is considered when comparing the band gap*** of the p-side wide band gap multilayer 12 ***with other layers***."  Ex. 1004 at 16:30-35.  As another example, Sanga-884 teaches that the wide bandgap layers of superlattice structure 18 should be used to compare the bandgap of this structure to that of other layers:  "In a case where the third p-side nitride semiconductor layer 18 is made with a superlattice structure, a band gap of a ***layer having a wide band gap among the constituent layers*** of the third p-side semiconductor layer 18 ***can be used as the basis for comparison with the band gaps of other layers***."  *Id.* at 12:23-27.

Accordingly, if Petitioner had followed Sanga-884's teachings, then Petitioner would have selected the GaN layers within Sanga-884's exemplary n-side multilayer, superlattice structure 10 as the basis for comparing its bandgap to the respective bandgaps of the barrier and quantum well layers.  If Petitioner had done so, its invalidity challenges would have collapsed.  Petitioner has no

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

argument that the bandgap of the GaN layers of Sanga-884's n-side multilayer structure are smaller than the bandgap of GaN barrier layers.[6]  Petitioner therefore chose to imagine a single-layer equivalent to Sanga-884's multilayer structure to advance its invalidity challenges—in conflict with Sanga-884's teachings—and Petitioner has not justified (and cannot justify) that approach.

> **C.   Petitioner Ignores Scientific Principles In Implicitly Arguing That A Superlattice Structure Has The Bandgap Of A Single Layer Having The Same Overall Composition**

It is unsurprising that Petitioner fails to justify treating Sanga-884's exemplary n-side superlattice structure as if it were equivalent to a single layer having the same overall composition.  Petitioner cannot justify this approach because it conflicts with well-known scientific principles.  It is well established

---

[6] Petitioner has advanced no argument that any GaN layer has a different bandgap than another GaN layer.  Petitioner's bandgap arguments depend entirely on using the amount of indium in a layer as a proxy for the amount of bandgap reduction. *See* Pet. at 35; *see also id.* at 24 ("[T]he band gap of a given layer is widened by decreasing the indium ratio in an InGaN composition or by using a material having a larger bandgap than InGaN, such as GaN.").  According to Petitioner's arguments, all GaN layers have the same bandgap because they all lack indium.

that other phenomena besides layer composition affect the bandgap of such superlattice structures.[7]

Petitioner relies on the *Comprehensive Dictionary of Electrical Engineering*'s definition of a superlattice as "a stack of ultrathin layers of material," where "[l]ayer thicknesses are sufficiently thin to produce quantum-confined effects, typically 100-1000 angstroms."  Ex. 1012 at 619-20, *cited in* Pet. at 17.  Accordingly, the bandgap of a superlattice depends on the interaction among the "ultrathin layers" within the superlattice that produce "quantum-confined effects."  *Id.*

As recognized in the Background of the '210 Patent, lattice mismatch between GaN and indium-containing layers results in strain, and "[t]his strain may cause a piezoelectric field."  Ex. 1001 at 2:12-14.  As the '210 Patent teaches, a

---

[7] Under Patent Owner's construction, which requires all the layers composing the "spacer layer" to have "a bandgap smaller than that of the barrier layer and greater than that of the quantum well layer," there is no need to consider how other phenomena besides layer composition affect the bandgap of the overall superlattice structure.  Petitioner, however, needed to address the impact of these other phenomena because Petitioner implicitly relied on the bandgap of the overall superlattice structure.

IPR2020-00248 (USP 9,716,210)                    Patent Owner's Preliminary Response

purpose of having a multilayer spacer layer is to reduce this strain.  *Id.* at 14:23-26

("[T]he present invention forms the spacer layer formed of the plurality of layers

between the contact layer and the active region, thereby making it possible to

reduce strain generated in the active region."); *see also id.* at 10:52-61, 11:49-56.

"[T]he importance of the quantum confined Stark effect (QCSE) due to the

piezoelectric field" resulting from strain in InGaN/GaN structures was well

documented in the field.  Ex. 2003 at -0001.  The scientific literature reported that

this "piezoelectric effect" resulting from "elastic strain relaxation" could have a

"large" impact on "superlattices" composed of, e.g., GaN/InGaN layers.  Ex. 2004

at -0001.  In particular, it had been reported that "***electric fields induced by the***

***piezoeffect dramatically change the band diagram of*** GaN-AlGaN and ***GaInN-***

***GaN superlattices***."  *Id.* at -0005.

Furthermore, strain and piezoelectric effects are not the only phenomena that

affect the bandgap of superlattice structures.  Hybridization of the wave functions

of adjacent layers can be another "important factor[]."  Ex. 2005 at -0002.  In

particular, in InGaN/GaN superlattices with InGaN layers having lower indium

content, the bandgap can be "***dominated by the hybridization effect***" which can

"***increase[]***" the bandgap, and can even cause the bandgap to be "***higher***" than" the

bandgap of a corresponding single, bulk layer.  *Id.* at -0020.

Even though multiple phenomena can have significant effects on the bandgap of a superlattice structure, Petitioner simply ignored all phenomena other than material composition. Petitioner fails to account for strain, the piezoelectric effect, or hybridization at all. Dr. Pattison never claims that the bandgap of Sanga-884's n-side GaN/InGaN superlattice structure is not affected by strain, piezoelectric fields, and/or hybridization. Instead, he simply ignores these phenomena entirely. Furthermore, Dr. Pattison provides no data regarding the bandgap of Sanga-884's superlattice, so Petitioner has provided the Board with no evidence to support ignoring the other physical phenomena that affect bandgap.

Petitioner's and Dr. Pattison's complete disregard of the phenomena other than material composition that affect the bandgap of a GaN/InGaN superlattice is unjustifiable. Dr. Pattison should have known of the need to address such phenomena, and the '210 Patent itself put Petitioner on notice of the need to address such phenomena. The '210 Patent discusses phenomena such as strain and piezoelectric fields and teaches that strain reduction is a purpose of having a multi-layer "spacer layer." Ex. 1001 at 2:12-14, 10:52-61, 11:49-56, 14:23-26.

Neither Petitioner nor Dr. Pattison identify anything to support their simplistic, scientifically unsound approach to determining the bandgap of a multilayer, superlattice structure. Petitioner and Dr. Pattison concede that they rely on Sanga-884's "N-side Multilayer 10 having a Superlattice Structure," but they

identify nothing to support how to determine the bandgap of such a structure—not even a single reference that addresses the bandgap of a superlattice structure. *See* Pet. at 33-34 (quoting Ex. 1004 at 23:7-36); Ex. 1003 at 29-30 (quoting same).

The only two references that Dr. Pattison addresses in discussing "the well-known relationship between bandgaps and indium composition ratios"—Kuramoto-242 and O'Donnell—do not address the strain, piezoelectric fields, and hybridization effects that affect the bandgap of GaN-InGaN superlattices. Dr. Pattison cites Kuramoto-242 for the bandgap of a barrier layer having different compositions, *see* Ex. 1003 at 18 (¶ 39 (quoting Ex. 1005 at ¶ 7)), but Kuramoto-242 does not discuss the bandgap of a superlattice. Similarly, while Dr. Pattison relies on O'Donnell for the dependence of "bandgap energy on indium nitride content in InGaN," O'Donnell does not address the bandgap of a GaN-InGaN superlattice structure. *Id.* at 19 (¶ 42 (showing Figure 8 from Ex. 1006 at 6989)). Petitioner's expert does not even assert that he has any experience, outside of this IPR, in determining the bandgap of any structure—let alone determining the bandgap of a superlattice structure.

In ignoring the phenomena besides material composition that affect bandgap, Petitioner failed to provide any basis to credit its argument that the mere presence of 3% indium in some layers within Sanga-884's n-side superlattice structure inherently lowers its bandgap below that of GaN. Even if the presence of

this minimal amount of indium within the superlattice structure *might* be sufficient in some cases to overcome the other physical phenomena that affect bandgap in a superlattice structure, that is insufficient as a matter of law to support inherency. *See PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1382 (Fed. Cir. 2019) ("The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient.") (emphasis in original).  Petitioner has offered no reasoning or scientific basis that the Board could credit to find that the minimal amount of indium in Sanga-884's n-side superlattice structure is such a dominant factor in determining its bandgap that all other factors can be disregarded.  At most, the Petition raises the *possibility* that Sanga-884's alleged superlattice structure *might* meet the bandgap limitation due to the presence of a tiny amount of indium, but "[i]nherency … may not be established by probabilities or possibilities."  *Id.* (reversing the Board's finding of anticipation; internal quotation marks and citation omitted).

By engaging in an unsupported, scientifically unsound approach to determining the bandgap of Sanga-884's n-side multilayer, superlattice structure, Petitioner has failed to "show[] that there is a reasonable likelihood that the petitioner would prevail with respect to" any challenged claim.  35 U.S.C. § 314(a).

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

## V.      Conclusion

For the foregoing reasons, the Board should decline to institute IPR because

Petitioner has failed to show that there is a reasonable likelihood of prevailing with

respect to any challenged claim.


                              Respectfully submitted,


Dated: March 19, 2020          By: / Charles H. Sanders /

                               Charles H. Sanders (Reg. No. 47,053)
                               charles.sanders@lw.com
                               Latham & Watkins LLP
                               200 Clarendon Street
                               Boston, MA 02116
                               Telephone: 617.948.6000
                               Fax: 617.948.6001

                               Jonathan M. Strang (Reg. No. 61,724)
                               jonathan.strang@lw.com
                               Latham & Watkins LLP
                               555 Eleventh Street, NW, Ste. 1000
                               Washington, D.C. 20004-1304
                               Telephone: 202.637.2200
                               Fax: 202.637.2201

                               *Counsel for Patent Owner*
                               *Seoul Viosys Co., Ltd.*

IPR2020-00248 (USP 9,716,210)          Patent Owner's Preliminary Response

## <u>CERTIFICATE OF COMPLIANCE WITH 37 C.F.R. § 42.24</u>

I hereby certify that this Patent Owner's Preliminary Response complies with the word count limitation of 37 C.F.R. § 42.24(b)(1) because the Patent Owner's Preliminary Response contains 10,288 words using Microsoft Word's counting feature, plus 196 words hand-counted in the imaged text, for a total of 10,484 words, excluding the cover page, signature block, and the parts of the Patent Owner's Preliminary Response exempted by 37 C.F.R. § 42.24(b)(1).

Dated: March 19, 2020                By: / Charles H. Sanders /

Charles H. Sanders (Reg. No. 47,053)
charles.sanders@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Seoul Viosys Co., Ltd.*

IPR2020-00248 (USP 9,716,210)            Patent Owner's Preliminary Response

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to 37 C.F.R. § 42.6(e), I certify that on this 19th day of March,

2020, a copy of **Patent Owner's Preliminary Response and all Exhibits** were

served by electronic mail on Petitioner's lead and backup counsel at the following

email addresses:

Heath J. Briggs (Reg. No. 54,919)
Stephen M. Ullmer (*pro hac vice* forthcoming)
Greenberg Traurig, LLP
1144 15th St. Suite 3300
Denver, CO 80202
Telephone: 303.685.7418
Fax: 720.904.6118
BriggsH@gtlaw.com
UllmerS@gtlaw.com
satco-iprs@gtlaw.com

Barry J. Schindler (Reg. No. 32,938)
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: 973.360.7900
Fax: 973.301.8410
SchindlerB@gtlaw.com

Andrew Sommer (Reg. No. 53,932)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: 703.749.1370
Fax: 703.749.1301
SommerA@gtlaw.com

Scott J. Bornstein (*pro hac vice* forthcoming)
Greenberg Traurig, LLP
200 Park Avenue

New York, NY 10166
Telephone: 212.801.9200
Fax: 212.801.6400
BornsteinS@gtlaw.com

Nicholas A. Brown (*pro hac vice* forthcoming)
Greenberg Traurig, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: 415.655.1271
Fax: 415.520.5609
BrownN@gtlaw.com

By: / Charles H. Sanders /

Charles H. Sanders (Reg. No. 47,053)
charles.sanders@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Seoul Viosys Co., Ltd.*

# EXHIBIT 11

Definition of PORTION                                    https://www.merriam-webster.com/dictionary/portion

# Definition of PORTION

[Synonyms of *portion*](#) ›

1

**:** an individual's part or share of something: such as

a

**:** a share received by gift or inheritance

c

**:** enough food especially of one kind to serve one person at one meal

2

**:** an individual's lot, fate, or fortune **:** one's share of good and evil

3

**:** an often limited part of a whole

# Synonyms

Choose the Right Synonym for *portion*

they ran only *part* of the way

[portion](#) implies an assigned or allotted part.

cut the pie into six *portions*

[piece](#) applies to a separate or detached part of a whole.

[member](#) suggests one of the functional units composing a body.

[division](#) applies to a large or diversified part.

the manufacturing *division* of the company

[section](#) applies to a relatively small or uniform part.

the entertainment *section* of the newspaper

[segment](#) applies to a part separated or marked out by or as if by natural lines of cleavage.

8/31/2023, 11:45 AM

**FINELITE 009371**

the retired *segment* of the population

*fragment* applies to a part produced by or as if by breaking off.

only a *fragment* of the play still exists

the *fate* of the submarine is unknown

*destiny* implies something foreordained and often suggests a great or noble course or end.

the country's *destiny* to be a model of liberty to the world

*lot* and *portion* imply a distribution by fate or destiny, *lot* suggesting blind chance

it was her *lot* to die childless

, *portion* implying the apportioning of good and evil.

remorse was his daily *portion*

*doom* distinctly implies a grim or calamitous fate.

if the rebellion fails, his *doom* is certain

## Example Sentences

Noun A *portion* of the donations will be given to the orphanage. *Portions* of land were used for farming. A considerable *portion* of the city was flooded.

See More

Recent Examples on the Web

At least two people were reportedly hospitalized after a *portion* of a parking deck at Shoregate Towers collapsed onto the level below it. —*cleveland*, 24 Aug. 2023 Read full article There have been several near-misses at Logan that have made headlines this year, and the airport received the largest *portion* of the federal funding. —Globe Staff, *BostonGlobe.com*, 24 Aug. 2023

See More

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'portion.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.

## Word History

FINELITE 009372

Etymology

Noun

Middle English *porcioun, porcion* "part allotted to a person or institution, share, section into which a thing is divided, quantity", borrowed from Anglo-French *porciun, porcioun,* borrowed from Latin *portiōn-, portiō* "ratio, proportion, part, share" (earliest in the phrase *prō portiōne* "in the degree proper to each, proportionately"), probably by dissimilation from *\*prōrtiōne,* by univerbation and syncope from *prō ratiōne* "in proportion" (with *ratiō* "reckoning, calculation, proportion") — more at pro- entry 2, reason entry 1

Note: If correct, this etymology represents the first of two univerbations with the preposition/prefix *prō⌣*, the first with *ratiōn-* (whence *\*prō ratiōne > \*prōratiōne > \*prōrtiōne > portiōn-, portiō*), the second with the newly formed noun *portiō* (whence *prō portiōne > \*prōportiōne > prōportiōn-, prōportiō*—see proportion entry 1). Also suggested is derivation of *portiō* from *partitiōn-, partitiō* "sharing out, distribution, division of a speech" (see partition entry 1), assuming *\*prō partiōne* reduced from *\*prō partitiōne*; however, the noun *partītiō* is not attested before Cicero, while *portiō* is used already by Plautus.

Verb

Middle English *portionen, porciounen* "to divide into portions," borrowed from Anglo-French *porcioner,* borrowed from Medieval Latin *portiōnāre,* derivative of Latin *portiōn-, portiō* "ratio, proportion, part, share" — more at portion entry 1

First Known Use

Noun

14th century, in the meaning defined at sense 1

Verb

14th century, in the meaning defined at sense 1

Time Traveler

The first known use of *portion* was in the 14th century

# Dictionary Entries Near *portion*

# Cite this Entry

"Portion." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/portion. Accessed 31 Aug. 2023.

FINELITE 009373

Definition of PORTION                                    https://www.merriam-webster.com/dictionary/portion

# Share

# More from Merriam-Webster on *portion*

Last Updated: 27 Aug 2023 - Updated example sentences

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

[Merriam-Webster unabridged](https://www.merriam-webster.com/dictionary/portion)

8/31/2023, 11:45 AM

**FINELITE 009374**

# EXHIBIT 12

# The American Heritage Dictionary entry: portion

*HarperCollins Publishers*

*n.*

**1.** A section or quantity within a larger thing; a part of a whole.

**2.** A part separated from a whole.

**3.** A part that is allotted to a person or group, as:

**a.** A helping of food.

**b.** The part of an estate received by an heir.

**c.** A woman's dowry: *marriage portion.*

**4.** A person's lot or fate.

*tr.v.* **por·tioned**, **por·tion·ing**, **por·tions**

**1.** To divide into parts or shares for distribution; parcel.

**2.** To provide with a share, inheritance, or dowry.

---

**por·tion·a·ble** *adj.*

---

The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2022 by HarperCollins Publishers. All rights reserved.

## Indo-European & Semitic Roots Appendices

Thousands of entries in the dictionary include etymologies that trace their origins back to reconstructed proto-languages. You can obtain more information about these forms in our online appendices:

Indo-European Roots

Semitic Roots

The Indo-European appendix covers nearly half of the Indo-European roots that have left their mark on English words. A more complete treatment of Indo-European roots and the English words derived

FINELITE 009375

from them is available in our Dictionary of Indo-European Roots.

FINELITE 009376

# EXHIBIT 13

8/31/23, 12:27 PM                    Portion definition and meaning | Collins English Dictionary

☰ LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

portion                                                                    🔍

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar ▾    Conjugation    Sentences

English Dictionary ▾    Thesaurus    Sentences    Conjugation    Grammar

Definition of 'portion'

# portion
Word Frequency ⚬⚬⚬⚬⚬                    S Scrabble Tools

🔗                    Quick Word Challenge

(pɔːʃən) 🔊 ⓘ                    Question: 1 · Score: 0 / 5
                                    FRUIT
**Word forms:** plural **portions** 🔊
                                    What is this an image of?

1. **COUNTABLE NOUN**

   A portion of something is a part of it.

   *Damage was confined to a small
   portion of the castle.* [...]
   *I have spent a fairly considerable
   portion of my life here.* [...]
   *I had learnt a portion of the Koran.* [...]

   *Insurance can represent a significant
   portion of the total price of a holiday.*

   **Synonyms:** part, bit, piece, section
   More Synonyms of **portion**                    tangerine

2. **COUNTABLE NOUN**  B2                          lemon

   A portion is the amount of food that            plum
   is given to one person at a meal.
                                                    kiwi fruit
   *Desserts can be substituted by a
   portion of fresh fruit.*
   *The portions were generous.*
   *...fish and chips at about £2.70 a
   portion.*                                        NEXT

   **Synonyms:** helping, serving, piece,
   plateful   More Synonyms of **portion**

More Synonyms of **portion**

Collins COBUILD Advanced Learner's Dictionary.
Copyright © HarperCollins Publishers            **What's the difference
                                                between able and**

**FINELITE 009361**

8/31/23, 12:27 PM                    Portion definition and meaning | Collins English Dictionary

LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar    Conjugation    Sentences    M

English Dictionary    Thesaurus    Sentences    Conjugation    Grammar



**portion**

· You may also like ·



English Quiz
Confusab



FINELITE 009362

8/31/23, 12:27 PM                                    Portion definition and meaning | Collins English Dictionary

LANGUAGE        TRANSLATOR        GAMES        SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar ▾    Conjugations    Sentences

English Dictionary ▾    Thesaurus    Sentences    Conjugation    Grammar

**3.** an amount of food served to one person; helping

**4.** *law*

**a.** a share of property, esp one coming to a child from the estate of his or her parents

**b.** *archaic*
the property given by a woman to her husband at marriage; dowry

**5.** a person's lot or destiny

VERB (*transitive*)

**6.** to divide up; share out

**7.** to give a share to (a person); assign or allocate

**8.** *law*
to give a dowry or portion to (a person); endow

*Collins English Dictionary. Copyright © HarperCollins Publishers*

### Derived forms

**portionless** (ˈportionless) ADJECTIVE

### Word origin

C13: via Old French from Latin *portiō* portion, allocation; related to *pars* PART

...........................................................................

  

**FINELITE 009363**

LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar    Conjugations    Sentences

English Dictionary    Thesaurus    Sentences    Conjugation    Grammar

**2.** an amount of food served for one person; serving; helping
*He took a large portion of spinach*

**3.** the part of a whole allotted to or belonging to a person or group; share

**4.** the part of an estate that goes to an heir or a next of kin

**5.** *literary*
something that is allotted to a person by God or fate

**6.** (*esp formerly*)
the money, goods, or estate that a woman brought to her husband at marriage; dowry

TRANSITIVE VERB

**7.** (*often fol. by out*)
to divide into or distribute in portions or shares

**8.** to furnish with a portion, as with an inheritance or a dowry
*All of his children have been amply portioned*

**9.** to provide with a lot or fate
*She was portioned with sorrow throughout her life*

SYNONYMS
1. section, segment. See part. 2. ration. 3. allotment, quota, lot, dividend. 4. inheritance. 5. fortune, lot, destiny, doom. 7. allot, apportion. 8. endow.

ANTONYMS
1. whole.

Most material © 2005, 1997, 1991 by Penguin Random House LLC. Modified entries © 2019 by Penguin Random House LLC and HarperCollins Publishers Ltd

Derived forms

**portionable** ADJECTIVE

**FINELITE 009364**

Portion definition and meaning | Collins English Dictionary



LANGUAGE     TRANSLATOR     GAMES     SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar    Conjugations    Sentences

English Dictionary    Thesaurus    Sentences    Conjugation    Grammar



FINELITE 009365

8/31/23, 12:27 PM                                    Portion definition and meaning | Collins English Dictionary

LANGUAGE     TRANSLATOR     GAMES     SCHOOLS

English     French     German     Italian     Spanish

English Dictionary     Thesaurus     Word Lists     Grammar     Conjugations     Sentences

English Dictionary ▾     Thesaurus     Sentences     Conjugation     Grammar

*The procedure worked properly in only a tiny portion of those tested.*
THE GUARDIAN (2015)

*Once done the military gave a military food portion and some food.*
THE GUARDIAN (2015)

*The western portion of the island is crumbling into the sea like a wet cake.*
THE GUARDIAN (2015)

*Another portion has gone towards doubling the care leaver bursary.*
THE GUARDIAN (2018)

*Or you can divide it between smaller glass jars for individual portions.*
THE GUARDIAN (2020)

*Others suggested that such a name and shame list would provide the perfect advertisement for restaurants serving large portions.*
TIMES, SUNDAY TIMES (2016)

*Plus, it contains three portions of veg and fruit per portion - always a bonus.*
THE SUN (2016)

*The most daunting thing about hospital food is the portion sizes.*
THE SUN (2010)

*One way to test for cocoa quality is to heat up a small portion.*
TIMES, SUNDAY TIMES (2011)

*This is because they eat smaller portions of higher quality food.*
THE SUN (2008)

https://www.collinsdictionary.com/dictionary/english/portion                                              6/10

**FINELITE 009366**

Portion definition and meaning | Collins English Dictionary

LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar    Conjugations    Sentences    Vi

English Dictionary ⌄    Thesaurus    Sentences    Conjugation    Grammar

remove a portion
represent a portion
retain a portion
serve a portion
significant portion

Show more...

Trends of

# portion

View usage for:  All Years ⌄





FINELITE 009367

Portion definition and meaning | Collins English Dictionary

LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar ▾    Conjugations    Sentences

English Dictionary ▾    Thesaurus    Sentences    Conjugation    Grammar

Brazilian Portuguese: porção
Chinese: 一部分
Croatian: dio
Czech: část
Danish: portion
Dutch: portie
European Spanish: porción
Finnish: osuus
French: portion
German: Portion
Greek: μερίδιο
Italian: porzione
Japanese: 部分
Korean: 부분
Norwegian: del
Polish: porcja
European Portuguese: porção
Romanian: porţiune
Russian: порция
Latin American Spanish: porción
Swedish: portion
Thai: ส่วนแบ่ง
Turkish: parça
Ukrainian: порція
Vietnamese: phần

Translate your text for free

..........................................................................

  

FINELITE 009368

Portion definition and meaning | Collins English Dictionary

LANGUAGE    TRANSLATOR    GAMES    SCHOOLS

English    French    German    Italian    Spanish

English Dictionary    Thesaurus    Word Lists    Grammar ▾    Conjugations    Sentences

English Dictionary ▾    Thesaurus    Sentences    Conjugation    Grammar

portion of profits

All ENGLISH words that begin with 'P'

**Related terms of**

# portion

top portion

equal portion

meal portion

outer portion

portion size

View more related words

**Source**

Definition of **portion** from the Collins English Dictionary

Read about the team of authors behind Collins Dictionaries.

• New from Collins •

Quick Word Challenge

Question 1 -

Score: 0 / 5

Aug 31, 2023

Word of the day

**bouvier**

a large powerful dog of a Belgian breed, having a rough, shaggy coat, used esp.

FINELITE 009369

8/31/23, 12:27 PM                    Portion definition and meaning | Collins English Dictionary



FINELITE 009370

# EXHIBIT 14



WEBSTER'S
Ninth New
Collegiate
Dictionary

FINELITE 009232



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1986 by Merriam-Webster Inc.

Philippines Copyright 1986 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

Based on Webster's third new international dictionary.
Includes index.
1. English language—Dictionaries.   I. Merriam-Webster Inc.
PE1628.W5638     1985       423       84-18979
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

1516171819RMcN86

**olive drab** n (1897) **1** : a variable color averaging a grayish olive **2** : a wool or cotton fabric of an olive drab color   **b** : a uniform of this fabric

**olive green** n (1756) : a variable color that is a greener, lighter, and stronger than average olive color

**ol·iv·en·ite** \ō-'liv-ə-ˌnīt, ə-\ n [G *olivenit*, fr. *oliven-*, *olive* olive] (1820) : a mineral Cu₂(AsO₄)(OH) that is a basic olive green, dull brown, or yellowish arsenate of copper

**Ol·i·ver** \'äl-ə-vər\ n [F *Olivier*] : the close friend of Roland in the Charlemagne legend

**ol·i·vine** \'äl-ə-ˌvēn\ n [G *olivin*, fr. L *oliva*] (1794) : a usu. greenish mineral (Mg,Fe)₂SiO₄ that is a complex silicate of magnesium and iron used esp. in refractories — compare PERIDOT — **ol·i·vin·ic** \ˌäl-ə-'vin-ik\, *or* **ol·i·vin·it·ic** \-vō-'nit-ik\ *adj*

**ol·la** \'äl-ə, 'oi-ə\ n [Sp, fr. L, pot — more at OVEN] (1622) : a large bulging widemouthed earthenware vessel often with looped handles used (as in Latin America) esp. as a pot for stewing or as a container for water

**ol·la po·dri·da** \ˌäl-ə-pə-'drēd-ə, ˌoi-ə-\ n, *pl* **olla podridas** \-'drēd-əz\ *also* **ollas podridas** \ˌäl-ə(z)-, ˌoi-ə(z)-\ [Sp, lit., rotten pot] (1599) **1** : a rich highly seasoned stew of meat and vegetables usu. including sausage and chick-peas that is slowly simmered and is a traditional Spanish and Latin-American dish   **2** : HODGEPODGE

**olo·li·u·qui** \ˌō-lō-lē-'ü-kē\ n [Sp *ololiuque*, fr. Nahuatl *ololiuhqui*, lit., one that covers] (1915) : a woody stemmed Mexican vine (*Rivea corymbosa*) of the morning glory family having small fleshy fruits with single seeds that are used esp. by the Indians for medicinal, narcotic, and religious purposes

**olym·pi·ad** \ō-'lim-pē-ˌad, ə-\ n, *often cap* [ME, fr. MF *Olympiade*, fr. L *Olympiad-*, *Olympias*, fr. Gk, fr. *Olympia*, site of ancient Olympic Games] (14c) **1** : one of the 4-year intervals between Olympic Games by which time was reckoned in ancient Greece   **2** : a quadrennial celebration of the modern Olympic Games

**Olym·pi·an** \-pē-ən\ *adj* (1593) **1** : of or relating to the ancient Greek region of Olympia   **2** : of, relating to, or constituting the Olympic Games

**Olympian** *adj* (1603) **1** : of or relating to Mount Olympus in Thessaly   **2** : befitting or characteristic of an Olympian; *esp* : LOFTY Onis . . . formula of glib simplicity and ~ arrogance —Richard Pollak)

**Olympian** n (1606) : a participant in Olympic Games

**Olympian** n (1843) **1** : one of the ancient Greek deities dwelling on Olympus   **2** : a being of lofty detachment or superior attainments

**Olympian Games** n *pl* (1593) : OLYMPIC GAMES

**Olym·pia oyster** \ō-ˌlim-pē-ə-, ə-\ n [*Olympia*, Washington] (1908) : a small flavorful native oyster (*Ostrea lurida*) of the Puget Sound area of the Pacific coast of N. America

**Olym·pic** \ō-'lim-pik, ə-\ *adj* (1600) **1** : OLYMPIAN 2 : of or relating to the Olympic Games

**Olympic Games** n *pl* (1662) **1** : an ancient Panhellenic festival held every fourth year and made up of contests of sports, music, and literature with the victor's prize a crown of wild olive   **2** : a modified revival of the ancient Olympic Games held once every four years and made up of international athletic contests — called also *Olympics*

**Olym·pus** \ō-'lim-pəs, ə-\ n [L, fr. Gk *Olympos*] (1580) : a mountain in Thessaly that in Greek mythology is the abode of the gods

**om** \'ōm\ n [Skt] (1788) : a mantra consisting of the sound \ōm\ and used in contemplation of ultimate reality

**-oma** \'ō-mə\ n *suffix*, *pl* **-omas** \-məz\, *or* **-oma·ta** \-mət-ə\ [L *-omat-*, *-oma*, fr. Gk *-omat-*, *-oma*, fr. *-ō-* (stem vowel of causative verbs in *-oun*) + *-mat-*, *-ma*, suffix denoting result — more at -MENT] : tumor (*adenoma*) (*fibroma*)

**Oma·ha** \'ō-mə-ˌhȯ, -ˌhä\ n, *pl* **Omaha** *or* **Omahas** [Omaha, lit., those going upstream or against the wind] (1804) : a member of an American Indian people of northeastern Nebraska

**oma·sum** \ō-'mā-səm\ n, *pl* **oma·sa** \-sə\ [NL, fr. L, tripe of a bullock] (1706) : the third chamber of the ruminant stomach that is situated between the reticulum and the abomasum

**om·ber** \'äm-bər; 'äm-brē, 'om-, -ˌbrā\ n [F *or* Sp; F *hombre*, fr. Sp, lit., man] (1660) : an old three-handed card game popular in Europe esp. in the 17th and 18th centuries

**om·bré** \äm-'brā\ *adj* [F, pp. of *ombrer* to shade, fr. It *ombrare*, fr. *ombra* shade, fr. L *umbra* — more at UMBRAGE] (ca. 1896) : having colors or tones that shade into each other — used esp. of fabrics in which the color is graduated from light to dark — **ombré** n

**om·buds·man** \'äm-ˌbüdz-mən, 'om-, -bədz-; ˌäm-'büdz-, ˌom-\ n, *pl* **-men** \-mən\ [Sw, lit., representative, fr. ON *umbothsmathr*, fr. *umboth* commission + *mathr* man] (1959) **1** : a government official (as in Sweden or New Zealand) appointed to receive and investigate complaints made by individuals against abuses or capricious acts of public officials   **2** : one that investigates reported complaints (as from students or consumers), reports findings, and helps to achieve equitable settlements

**-ome** \ˌōm\ n *suffix* [NL *-oma*, fr. L *-oma*] : mass (*phyllome*)

**ome·ga** \ō-'meg-ə, -'mē-gə, -'mā-gə; ō-'meg-ə\ n [Gk *ō mega*, lit., large o] (15c) **1** : the 24th and last letter of the Greek alphabet — see ALPHABET TABLE   **2** : LAST, ENDING   **3** *a* : a negatively charged elementary particle that has a mass 3270 times the mass of an electron and that decays into a xi and a pion — called also *omega minus*   **b** : a very short-lived unstable meson with mass 1532 times the mass of an electron — called also *omega meson*

**om·e·let** *or* **om·e·lette** \'äm-(ə-)lət\ n [F *omelette*, alter. of MF *alumelle*, lit., knife blade, modif. of L *lamella*, dim. of *lamina* thin plate] (1611) : beaten eggs cooked without stirring until set and served folded in half

**omen** \'ō-mən\ n [L, *omin-*, *omen*] (1582) : an occurrence or phenomenon believed to portend a future event : AUGURY

**omen·tum** \ō-'ment-əm\ n, *pl* **-ta** \-ə\, *or* **-tums** [L] (1545) : a fold of peritoneum connecting or supporting abdominal structures (as the viscera); *also* : a fold of peritoneum free at one end — **omen·tal** \-'ment-°l\ *adj*

**omer** \'ō-mər\ n [Heb *'ōmer*] (1611) **1** : an ancient Hebrew unit of dry capacity equal to ¹⁄₁₀ ephah   **2** *often cap* : the sheaf of barley traditionally offered in Jewish Temple worship on a day that marks the start of a 7-week liturgical period of expectancy between Passover and Shabuoth

**omi·cron** \'äm-ə-ˌkrän, 'ōm-, *Brit* ō-'mī-krən\ n [Gk *o mikron*, lit., small o] (15c) : the 15th letter of the Greek alphabet — see ALPHABET TABLE

**om·i·nous** \'äm-ə-nəs\ *adj* (1592) : being or exhibiting an omen : PORTENTOUS; *esp* : foreboding or foreshowing evil : INAUSPICIOUS — **om·i·nous·ly** *adv* — **om·i·nous·ness** n

*syn* OMINOUS, PORTENTOUS, FATEFUL mean having a menacing or threatening aspect. OMINOUS implies having a menacing, alarming character foreshadowing evil or disaster; PORTENTOUS suggests being frighteningly big or impressive but not seldom definitely connotes forewarning of calamity; FATEFUL suggests being of momentous or decisive importance.

**omis·si·ble** \ō-'mis-ə-bəl\ *adj* (1816) : that may be omitted

**omis·sion** \ō-'mish-ən, ə-\ n [ME *omissioun*, fr. LL *omission-*, *omissio*, fr. L *omissus*, pp. of *omittere*] (15c) **1** *a* : apathy toward or neglect of duty **b** : something neglected or left undone   **2** : the act of omitting : the state of being omitted

**omit** \ō-'mit, ə-\ *vt* **omit·ted; omit·ting** [ME *omitten*, fr. L *omittere*, fr. ob- toward + *mittere* to let go, send — more at OB, MISSION] (15c) **1** : to leave out or leave unmentioned   **2** : to fail to perform or make use of : FORBEAR   **3** *obs* : DISREGARD   **4** *obs* : GIVE UP   *syn* see NEGLECT

**om·ma·tid·i·um** \ˌäm-ə-'tid-ē-əm\ n, *pl* **-tid·ia** \-ē-ə\ [NL, fr. Gk *ommat-*, *omma* eye] (1884) : one of the elements corresponding to a small simple eye that make up the compound eye of an arthropod — **om·ma·tid·i·al** \-ē-əl\ *adj*

**omni-** *comb form* [L, fr. *omnis*] : all : universally (*omnidirectional*)

**om·ni·bus** \'äm-ni-(ˌ)bəs\ n [F, fr. L, for all, dat. pl. of *omnis*] (1829) **1** *a* : a usu. automotive public vehicle designed to carry a comparatively large number of passengers : BUS   **2** : a book containing reprints of a number of works

**omnibus** *adj* (1842) **1** : of, relating to, or providing for many things at once   **2** : containing or including many items

**om·ni·di·rec·tion·al** \ˌäm-ni-də-'rek-shnəl, -ˌnī-də-, -ni-(ˌ)dī-, -shən-°l\ *adj* (1927) : being in or involving all directions; *esp* : receiving or sending radio waves equally well in all directions (~ antenna)

**om·ni·far·i·ous** \ˌäm-nə-'far-ē-əs, -'fer-\ *adj* [LL *omnifarius*, fr. L *omni-* + *farius* (as in *multifarius* having great diversity) — more at MULTIFARIOUS] (1653) : of all varieties, forms, or kinds

**om·nifi·cent** \äm-'nif-ə-sənt\ *adj* [L *omni-* + E *-ficent* (as in *magnificent*)] (1677) : unlimited in creative power

**om·nip·o·tence** \äm-'nip-ət-ən(t)s\ n (15c) **1** : the quality or state of being omnipotent   **2** : an agency or force of unlimited power

**om·nip·o·tent** \-ət-ənt\ *adj* [ME, fr. MF, fr. L *omnipotent-*, *omnipotens*, fr. *omni-* + *potent-*, *potens* potent] (14c) **1** *often cap* : ALMIGHTY 1   **2** : having virtually unlimited authority or influence   **3** *obs* : ARRANT — **om·nip·o·tent·ly** *adv*

**omnipotent** n (1601) **1** *cap* : one who is omnipotent   **2** *cap* : GOD 1

**om·ni·pres·ence** \ˌäm-ni-'prez-°n(t)s\ n (1601) : the quality or state of being omnipresent : UBIQUITY

**om·ni·pres·ent** \-'nt\ *adj* (1610) : present in all places at all times

**om·ni·range** \'äm-ni-ˌrānj\ n (1946) : a system of radio navigation in which any bearing relative to a special radio transmitter on the ground may be chosen and flown by an airplane pilot — called also *omnidirectional range*

**om·ni·science** \äm-'nish-ən(t)s\ n [ML *omniscientia*, fr. L *omni-* + *scientia* knowledge — more at SCIENCE] (1612) : the quality or state of being omniscient

**om·ni·scient** \-ənt\ *adj* [NL *omniscient-*, *omniscient*, back-formation fr. ML *omniscientia*] (1604) **1** : having infinite awareness, understanding, and insight   **2** : possessed of universal or complete knowledge — **om·ni·scient·ly** *adv*

**om·ni·um-gath·er·um** \ˌäm-ē-əm-'gath-ə-rəm\ n, *pl* **omnium-gatherums** [L *omnium* (gen. pl. of *omnis*) + E *gather* + L *-um*, noun ending] (1530) : a miscellaneous collection (as of things or persons)

**om·ni·vore** \'äm-nə-ˌvōr, -ˌvor\ n [NL *omnivora*, neut. pl. of *omnivorus*] (1890) : one that is omnivorous

**om·niv·o·rous** \äm-'niv-(ə-)rəs\ *adj* [L *omnivorus*, fr. *omni-* + *-vorus* -vorous] (1656) **1** : feeding on both animal and vegetable substances   **2** : avidly taking in everything as if devouring or consuming — **om·niv·o·rous·ly** *adv*

**on** \'ȯn, 'än\ *prep* [ME *an*, *on*, prep. & adv., fr. OE; akin to OHG *ana* on, Gk *ana* up, on] (bef. 12c) **1** *a* — used as a function word to indicate position in contact with and supported by the top surface of (the book is lying ~ the table)   **b** — used as a function word to indicate position in or in contact with an outer surface (the fly landed ~ the ceiling) (I have a cut ~ my finger) (paint ~ the wall)   **c** — used as a function word to indicate position in close proximity with (a village ~ the sea) (stay ~ your opponent)   **d** — used as a function word to indicate direction or location with respect to something (~ the south) (the garden is ~ the side of the house)   **2** *a* — used as a function word to indicate a source of attachment or support (~ a string) (stand ~ one foot) (hang it ~ a nail)   **b** — used as a function word to indicate a cause of dependence (you can rely ~ me) (lives ~ insects) (lives ~ a pension)   **c** — used as a function word to indicate means of conveyance (~ the bus) or presence within the confines or in possession of (had a knife ~ him)   **3** — used as a function word to indicate a time frame during which something takes place (a parade ~ Sunday) or an instant, action, or occurrence when something begins or is done (~ cue) (~ arriving home, I found your letter) (news ~ the hour) (cash ~ delivery)   **4** *archaic* : OF   **5** — used as a function word to indicate manner of doing something: often used with *the* (~ the sly) (keep everything ~ the up-and-up)   **b** — used as a function word to indicate means or agency (cut ~ a knife) (talk ~ the telephone)   **c** — used as a function word to indicate a medium of expression; used orig. to refer to physical position (acting ~ the stage) (best show ~ television)   **6** *a* (1) — used as a function word to indicate active involvement in a condition or status (~ fire) (~ the increase) (~ the lookout)   (2) : regularly using or showing the effects of using (~

\ə\ abut   \ᵊ\ kitten, F table   \ər\ further   \a\ ash   \ā\ ace   \ä\ cot, cart   \au̇\ out   \ch\ chin   \e\ bet   \ē\ easy   \g\ go   \i\ hit   \ī\ ice   \j\ job   \ŋ\ sing   \ō\ go   \ȯ\ law   \ȯi\ boy   \th\ thin   \ṯẖ\ the   \ü\ loot   \u̇\ foot   \y\ yet   \zh\ vision   \a, k, �run, œ, œ, ue, ū̄, ᵞ\ *see* Guide to Pronunciation

**824    on ● onetime**



onager 1



FINELITE 009235

# EXHIBIT 15

On Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/on



Dictionary                                          Thesaurus

# on  1 of 7  preposition

ˈȯn ◀))    ˈän ◀))



Synonyms of *on* ›

**1 a** → used as a function word to indicate position in contact with and supported by the top surface of

    the book is lying *on* the table

  **b** → used as a function word to indicate position in or in contact with an outer surface

    the fly landed *on* the ceiling

    I have a cut *on* my finger

    paint *on* the wall

  **c** → used as a function word to indicate position in close proximity with

    a village *on* the sea

    stay *on* your opponent

  **d** → used as a function word to indicate the location of something

    *on* the left

    *on* the south side of the house

    *on* the farm

**2 a** → used as a function word to indicate a source of attachment or support

    *on* a string

**FINELITE 009263**

<     ✕   🔍

| **Dictionary** | Thesaurus |
|---|---|

feeds *on* insects

lives *on* a pension

**c** → used as a function word to indicate means of conveyance

    *on* the bus

**d** → used as a function word to indicate presence in the possession of

    had a knife *on* him

**3** → used as a function word to indicate a time frame during which something takes place

  a parade *on* Sunday

or an instant, action, or occurrence when something begins or is done

    *on* cue

    *on* arriving home, I found your letter

  news *on* the hour

  cash *on* delivery

**4**   archaic **:** OF

**5 a** → used as a function word to indicate manner of doing something → often used with *the*

    *on* the sly

    keep everything *on* the up-and-up

**b** → used as a function word to indicate means or agency

    cut myself *on* a knife

    talk *on* the telephone

**c** → used as a function word to indicate a medium of expression

    *on* stage

**FINELITE 009264**

<                   × 🔍

| Dictionary | Thesaurus |

*on* the increase

*on* the lookout

**(2)** **:** regularly using or showing the effects of using

*on* drugs

**b** → used as a function word to indicate involvement or participation

*on* tour

*on* the team

*on* duty

**c** → used as a function word to indicate inclusion

put it *on* the agenda

**d** → used as a function word to indicate position or status in proper relationship with a standard or objective

*on* schedule

**7 a** → used as a function word to indicate reason, ground, or basis (as for an action, opinion, or computation)

I have it *on* good authority

*on* one condition

the interest will be 10 cents *on* the dollar

**b** → used as a function word to indicate the cause or source

profited *on* the sale of stock

**c** → used as a function word to indicate the focus of obligation or responsibility

drinks are *on* the house

put the blame *on* me

**8 a** → used as a function word to indicate the object of collision, opposition, or hostile action

**FINELITE 009265**



‹                                                                    ✕    🔍

Dictionary                                              Thesaurus

**b** → used as a function word to indicate the object with respect to some
disadvantage, handicap, or detriment

has three inches in height *on* me

a 3-game lead *on* the second-place team

the joke's *on* me

**9  a** → used as a function word to indicate destination or the focus of some action,
movement, or directed effort

crept up *on* him

feast your eyes *on* this

working *on* my skiing

made a payment *on* the loan

**b** → used as a function word to indicate the focus of feelings, determination, or will

have pity *on* me

keen *on* sports

a curse *on* you

**c** → used as a function word to indicate the object with respect to some misfortune
or disadvantageous event

the crops died *on* them

**d** → used as a function word to indicate the subject of study, discussion, or
consideration

a book *on* insects

reflect *on* that a moment

agree *on* price

**e : with respect to**

go light *on* the salt

**FINELITE 009266**



trouble *on* trouble

# on  2 of 7  adverb

**1 a :** in or into a position of contact with an upper surface especially so as to be positioned for use or operation

  put the plates *on*

**b :** in or into a position of being attached to or covering a surface

*especially* **:** in or into the condition of being worn

  put his new shoes *on*

**2 a :** forward or at a more advanced point in space or time

  went *on* home

  later *on*

**b :** in continuance or succession

  rambled *on*

  and so *on*

**3 :** into operation or a position permitting operation

  switched the light *on*

# on  3 of 7  adjective

**1 :** engaged in an activity or function (such as a dramatic role)

**2 a (1) :** being in operation

  The radio is *on.*

**(2) :** placed so as to permit operation

  The switch is *on.*

**FINELITE 009267**

<          ✕   🔍

| Dictionary | Thesaurus |
|---|---|

**4**    **:** INTENDED, PLANNED

      has nothing *on* for tonight

**5**    **British**  **:** talking or harping incessantly → used with *about*

**6**    **chiefly British**  **:** regarded as possible or feasible → usually used in negative constructions

**7 a**  **:** engaged in or as if in a performance

      The comedian was always *on*.

    **b**  **:** being at a high level of performance

# ON   4 of 7   abbreviation

**variants**  *or* **Ont**

 Ontario

# –on   5 of 7   noun suffix (1)

 **:** chemical compound not a ketone or other oxo compound

   parathi*on*

# –on   6 of 7   noun suffix (2)

**1**    **:** subatomic particle

      nucle*on*

**2 a**  **:** unit **:** quantum

       phot*on*

**FINELITE 009268**



Dictionary

Thesaurus

**−on**   7 of 7   **noun suffix (3)**

**:** noble gas

rad*on*

**Preposition**

8/3/2023, 4:25 PM

**FINELITE 009269**

https://www.merriam-webster.com/dictionary/on

<

✕  🔍

**Dictionary**                          Thesaurus

as respects                          as to
concerning                           of
regarding                            respecting
touching                             toward
towards

**Adverb**
ahead                                forth
forward                              onward
onwards

**Adjective**
active                               alive
functional                           functioning
going                                live
living                               operating
operational                         operative
running                              working

See all Synonyms & Antonyms in Thesaurus ›

Preposition

8/3/2023, 4:25 PM

**FINELITE 009270**

On Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/on



## Adverb

See More ⌄

## Recent Examples on the Web

**Preposition**

Read *on* below: Want more recipes and tips from the Voraciously team?

— Becky Krystal, *Washington Post*, 26 July 2023

Before a tornado struck the Rocky Mount, North Carolina Pfizer plant *on* Wednesday, hundreds of medicines were already in short supply across the country, including cancer drugs, antibiotics, and ADHD treatments.

— Ike Swetlitz, *Fortune*, 21 July 2023

See More ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'on.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.

FINELITE 009271



| Dictionary | Thesaurus |
|---|---|

## Etymology

### Preposition, Adverb, and Adjective
Middle English *an, on*, preposition & adverb, from Old English; akin to Old High German *ana* on, Greek *ana* up, on

### Noun suffix (1)
International Scientific Vocabulary, alteration of -*one*

### Noun suffix (2)
from -*on* (in *ion*)

### Noun suffix (3)
New Latin, from -*on* (in *argon*)

## First Known Use

### Preposition
before the 12th century, in the meaning defined at sense 1a

### Adverb
before the 12th century, in the meaning defined at sense 1a

### Adjective
circa 1541, in the meaning defined at sense 1

## Time Traveler

**The first known use of *on* was before the 12th century**

See more words from the same century

**FINELITE 009272**



‹                                                              ✕        🔍

Dictionary                                    Thesaurus

Omura

**on**

**-on**

See More Nearby Entries ›

**Style**    MLA

"On." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merria m-webster.com/dictionary/on. Accessed 3 Aug. 2023.

📋 Copy Citation



**f**              **𝕏**

**Facebook**      **Twitter**

# on  1 of 3  preposition

( ˈ )ȯn 🔊     ( ˈ )än

**1  a :** in contact with and supported by

<   ✕   🔍

**Dictionary**                                    Thesaurus

**c** → used to indicate the location of something

  *on* the other side of the house

  *on* the right

**2  a** → used to indicate means of being attached or supported

  *on* a string

  stood *on* one foot

  hang your coat *on* the peg

  you can rely *on* me

  lives *on* insects

**b** → used to indicate means of being carried

  rode *on* a horse

  went *on* the bus

  have only five dollars *on* me

**3** → used to indicate a time or an instance when something takes place

  *on* arriving home, I found your letter

  arrived *on* Monday

  news *on* the hour

**4  a** → used to indicate the way something is done

  told her *on* the sly

**b** → used to indicate what something is done with or done by

  cut *on* broken glass

  talk *on* the phone

  type *on* a keyboard

**FINELITE 009274**

‹                                                              ✕   🔍

Dictionary                                    Thesaurus

~~on tour~~

**b :** in a state or process of

  *on* fire

  *on* the increase

**c :** in keeping with a goal or objective

  *on* schedule

**6  a** → used to indicate a reason or basis

  *on* one condition

  interest of 10 cents *on* the dollar

**b** → used to indicate who or what is responsible

  this treat is *on* me

  blamed it *on* the weather

**7** → used to indicate someone or something an action or feeling is directed toward

  was creeping up *on* us

  have pity *on* me

  the joke's *on* you

**8  a :** CONCERNING, ABOUT

  a book *on* cats

  agree *on* price

**b :** with respect to

  go light *on* the salt

  short *on* cash

**9** : following in series

  loss *on* loss

**FINELITE 009275**



‹                                                               ✕   🔍

Dictionary                                    Thesaurus

: in or into contact with a surface

put the kettle *on*

has new shoes *on*

**2**    : forward in space, time, or action

went *on* home

*on* came the storm

getting *on* in years

**3**    : from one to another

pass the word *on*

and so *on*

**4**    : into operation or a position allowing operation

turn the light *on*

# on   3 of 3   *adjective*

ˈȯn,   ˈän

**1**    : doing an activity (as a role in a play)

you're *on* next

**2 a :** being in operation

the radio is *on*

**b :** set so as to permit operation

the switch is *on*

**c :** taking place or being broadcast

the game is *on*

**3**    : having been planned

**FINELITE 009276**

On Definition & Meaning - Merriam-Webster                    https://www.merriam-webster.com/dictionary/on



Dictionary                                    Thesaurus

# on preposition

ˈȯn, ˈän ◀))

: regularly using or showing the effects of using

is *on* an ACE inhibitor to control hypertension

was *on* drugs for two years before entering rehab

Nglish: Translation of *on* for Spanish Speakers

Britannica English: Translation of *on* for Arabic Speakers

FINELITE 009277

On Definition & Meaning - Merriam-Webster                                        https://www.merriam-webster.com/dictionary/on

Dictionary                                              Thesaurus



Can you solve 4 words at once?

**Play**

WORD OF THE DAY

**incarcerate**

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          **SUBSCRIBE**

# Word Games

FINELITE 009278

On Definition & Meaning - Merriam-Webster                          https://www.merriam-webster.com/dictionary/on



Dictionary                                          Thesaurus

### Name That Animal: Volume 2

Can you tell a meerkat from a wombat?

**Take the quiz**

### Challenging Words You Should Know

Not a quiz for the pusillanimous

**Take the quiz**

### True or False?

Test your knowledge - and maybe learn something a...

**Take the quiz**

### Spelling Bee Quiz

Can you outdo past winners of the National Spelli...

**Take the quiz**

**Learn a new word every day. Delivered to your inbox!**

FINELITE 009279



**Dictionary** | Thesaurus

OTHER MERRIAM-WEBSTER DICTIONARIES

MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY

SCRABBLE® WORD FINDER

MERRIAM-WEBSTER DICTIONARY API

NGLISH - SPANISH-ENGLISH TRANSLATION

BRITANNICA ENGLISH - ARABIC TRANSLATION

Browse the Dictionary:  A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W
X  Y  Z  0-9  BIO  GEO

Home | Help | About Us | Shop | Advertising Info | Dictionary API | Contact Us |
Join MWU | Videos | Word of the Year | Kid's Dictionary | Law Dictionary |
Medical Dictionary | Privacy Policy | Terms of Use

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary |
Browse the Kid's Dictionary

© 2023 Merriam-Webster, Incorporated

**FINELITE 009280**

# EXHIBIT 16

# On definition and meaning | Collins English Dictionary

pronunciation note:   The preposition is pronounced (ɒn 🛈 ). The adverb and the adjective are pronounced (ɒn 🛈 ).In addition to the uses shown below, on is used after some verbs, nouns, and adjectives in order to introduce extra information. On is also used in phrasal verbs such as 'keep on', 'cotton on', and 'sign on'.

1. preposition **A1**

If someone or something is on a surface or object, the surface or object is immediately below them and is supporting their weight.

He is sitting beside her on the sofa.

On top of the cupboards are vast straw baskets which Pat uses for dried flower arrangements.

On the table were dishes piled high with sweets.

The cushions were soft blue to match the Chinese rug on the floor.

**Synonyms:** on top of, supported by, resting on, in contact with   More Synonyms of **on**

2. preposition **A1**

If something is on a surface or object, it is stuck to it or attached to it.

I admired the peeling paint on the ceiling.

The clock on the wall showed one minute to twelve.

There was a smear of gravy on his chin.

I know how to darn, and how to sew a button on.

3. preposition **A1**

If you put, throw, or drop something on a surface, you move it or drop it so that it is then supported by the surface.

He got his winter jacket from the closet and dropped it on the sofa.

He threw a folded dollar on the counter.

4. preposition **A1**

You use on to say what part of your body is supporting your weight.

He continued to lie on his back and look at clouds.

He raised himself on his elbows, squinting into the sun.

FINELITE 009281

She was on her hands and knees in the bathroom.

5. preposition  **A1**

You use on to say that someone or something touches a part of a person's body.

He leaned down and kissed her lightly on the mouth.

His jaw was broken after he was hit on the head.

6. preposition  **B1**

If someone has a particular expression on their face, their face has that expression.

The maid looked at him, a nervous smile on her face.

She looked at him with a hurt expression on her face.

7. adverb [ADVERB after verb]  **A2**

When you put a piece of clothing on, you place it over part of your body in order to wear it. If you have it on, you are wearing it.

He put his coat on while she opened the front door.

I had a hat on.

8. preposition  **B2**

You can say that you have something on you if you are carrying it in your pocket or in a bag.

I didn't have any money on me.

I have those numbers, but not on me at the moment, they're at home.

9. preposition  **B1**

If someone's eyes are on you, they are looking or staring at you.

Everyone's eyes were fixed on him.

It's as if all eyes are focused on me.

Ellen is eating, her eyes on her food.

10. preposition  **B2**

If you hurt yourself on something, you accidentally hit a part of your body against it and that thing causes damage to you.

Mr Pendle hit his head on a wall as he fell.

She cut her hand on a broken glass.

11. preposition  **A2**

8/3/2023, 4:27 PM

FINELITE 009282

On definition and meaning | Collins English Dictionary                    https://www.collinsdictionary.com/dictionary/english/on

If you are on an area of land, you are there.

He was able to spend only a few days at a time on the island.

You lived on the farm until you came back to America?

...a tall tree on a mountain.

...their winter retreat on Barbados.

I've eaten ostrich meat on the continent.

12. preposition  **A2**

If something is situated on a place such as a road or coast, it forms part of it or is by the side of it.

The company has opened a men's store on Fifth Avenue.

The hotel is on the coast.

He visited relatives at their summer house on the river.

13. preposition  **A2**

If you get on a bus, train, or plane, you go into it in order to travel somewhere. If you are on it, you are travelling in it.

We waited till twelve and we finally got on the plane.

I never go on the bus into the town.

His son came up with me to Birmingham every day on the train.

On is also an adverb.

He showed his ticket to the conductor and got on.

14. preposition  **A1**

If there is something on a piece of paper, it has been written or printed there.

The writing on the back of the card was cramped but scrupulously neat.

The numbers she put on the chart were 98.4, 64, and 105.

How does a poem change when you read it out loud as opposed to it being on the page?

15. preposition  **A2**

If something is on a list, it is included in it.

I've seen your name on the list of deportees.

Nutritionists placed certain seafood dishes on the list of foods to limit or avoid.

...the range of topics on the agenda for their talks.

**FINELITE 009283**

On definition and meaning | Collins English Dictionary                   https://www.collinsdictionary.com/dictionary/english/on

16. preposition  **B1**

Books, discussions, or ideas on a particular subject are concerned with that subject.

The longest chapter in almost any book on baby care is on feeding.

They offer a free counselling service which can offer help and advice on legal matters.

He declined to give any information on the Presidential election.

The ambassador's comments on the U.S. decision were relatively restrained.

17. preposition  **B2**

You use on to introduce the method, principle, or system which is used to do something.

...a television that we bought on credit two months ago.

...a levelling system which acts on the same principle as a spirit level.

They want all groups to be treated on an equal basis.

18. preposition  **B1**

If something is done on an instrument or a machine, it is done using that instrument or machine.

...songs that I could just sit down and play on the piano.

I could do all my work on the computer.

She sewed the dresses on the sewing machine.

19. preposition  **B1**

If information is, for example, on tape or on computer, that is the way that it is stored.

Tourists try, and fail, to capture the view on film.

Descriptions of the pieces have been logged on computer by the Art Loss Register.

20. preposition  **A2**

If something is being broadcast, you can say that it is on the radio or television.

Every sporting event on television and satellite over the next seven days is listed.

Here, listen, they're talking about it on Radio-Paris right now.

...teenagers complaining there's nothing good on.

21. adjective [verb-link ADJECTIVE]  **B1**

When an activity is taking place, you can say that it is on.

There's a marvellous match on at Wimbledon at the moment.

8/3/2023, 4:27 PM

**FINELITE 009284**

On definition and meaning | Collins English Dictionary          https://www.collinsdictionary.com/dictionary/english/on

Every year they put a play on at Saint Holy Cross Church.

We in Berlin hardly knew a war was on during the early part of 1941.

22. adverb [ADVERB after verb]   B2

You use on in expressions such as 'have a lot on' and 'not have very much on' to indicate how busy someone is.

[spoken]

I have a lot on in the next week.

23. preposition   B1

You use on to introduce an activity that someone is doing, particularly travelling.

I've always wanted to go on a cruise.

They look happy and relaxed as they stroll in the sunshine on a shopping trip.

Students on the full-time course of study are usually sponsored.

He died suddenly while on a skiing holiday with his family in Val d'Isere.

24. adverb [be ADVERB, ADVERB after verb]   B1

When something such as a machine or an electric light is on, it is functioning or in use. When you switch it on, it starts functioning.

The light was on and the door was open.

The central heating's been turned off. I've turned it on again.

The light had been left on.

He didn't bother to switch on the light.

25. preposition

Claire and Beryl were on the organizing committee.

He was on the Council of Foreign Relations.

26. preposition   A1

You can indicate when something happens by saying that it happens on a particular day or date.

This year's event will take place on June 19th, a week earlier than usual.

She travels to Japan on Monday.

I was born on Christmas day.

Dr. Keen arrived about seven on Sunday morning.

FINELITE 009285

On definition and meaning | Collins English Dictionary                    https://www.collinsdictionary.com/dictionary/english/on

27. preposition

You use on when mentioning an event that was followed by another one.

She waited in her hotel to welcome her children on their arrival from London.

On reaching Dubai, the evacuees are taken straight to Dubai international airport.

28. adverb [ADVERB after verb]  **B2**

You use on to say that someone is continuing to do something.

They walked on in silence for a while.

If the examination shows your company enjoys basically good health, read on.

He happened to be in England when the war broke out and he just stayed on.

29. adverb [be ADVERB, ADVERB after verb]

If you say that someone goes on at you, you mean that they continually criticize you, complain to you, or ask you to do something.

She's been on at me for weeks to show her round the stables. [+ at]

He used to keep on at me about the need to win. [+ at]

He'll go on at me for telling.

She hadn't learned to drive, but she had kept going on at him to let her try.

30. adverb [from n ADV]

You use on in expressions such as from now on and from then on to indicate that something starts to happen at the time mentioned and continues to happen afterwards.

Perhaps it would be best not to see much of you from now on.

We can expect trouble from this moment on.

Morrison took the news badly and from then on his spirits noticeably sagged.

31. adverb [adv ADV]

The market square is a riot of colour and animation from early on in the morning.

Later on I learned how to read music.

The pub where I had arranged to meet Nobby was a good five minutes walk further on.

32. preposition

Someone who is on a drug takes it regularly.

She was on antibiotics for an eye infection that wouldn't go away.

FINELITE 009286

On definition and meaning | Collins English Dictionary                    https://www.collinsdictionary.com/dictionary/english/on

Many of the elderly are on medication.

33. preposition  B2

If you live on a particular kind of food, you eat it. If a machine runs on a particular kind of power or fuel, it uses it in order to function.

The caterpillars feed on a wide range of trees, shrubs and plants.

He lived on a diet of water and tinned fish.

The system could be used to ensure that cars are converted to run on unleaded petrol.

...making and selling vehicles that run on batteries or fuel-cells.

34. preposition

If you are on a particular income, that is the income that you have.

...young people who are unemployed or on low wages.

He's on three hundred a week.

You won't be rich as an MP, but you'll have enough to live on.

35. preposition

Taxes or profits that are obtained from something are referred to as taxes or profits on it.

...a general strike to protest a tax on food and medicine last week.

The Church was to receive a cut of the profits on every record sold.

Loans were extended to help pay the interest on the old ones.

36. preposition  B2

When you buy something or pay for something, you spend money on it.

I resolved not to waste money on a hotel.

He spent more on feeding the dog than he spent on feeding himself.

More money should be spent on education and housing.

37. preposition  B2

When you spend time or energy on a particular activity, you spend time or energy doing it.

People complain about how children spend so much time on computer games.

You all know why I am here. So I won't waste time on preliminaries.

...the opportunity to concentrate more time and energy on America's domestic agenda.

Collins COBUILD Advanced Learner's Dictionary. Copyright © HarperCollins Publishers

8/3/2023, 4:27 PM

**FINELITE 009287**

# EXHIBIT 17

https://dictionary.cambridge.org/dictionary/english/on?q=on_1



*Meaning of **on** in English*

# on

*preposition*

UK 🔊 /ɒn/   US 🔊 /ɑːn/

## on *preposition* (ABOVE)

Add to word list ☰

**A1**

**used to show that something is in a position above something else and touching it, or that something is moving into such a position:**

- *Look at all the books on your desk!*

- *Ow, you're standing on my foot!*

- *Your suitcase is on top of the wardrobe.*

- *They live in that old house on the hill.*

- *I got on my bike and left.*

– **Fewer examples**

  - *A hovercraft travels on a cushion of air.*

  - *Don't put your elbows on the table.*

  - *Your dinner is on the table.*

  - *The oil tanker ran aground on a mud bank in thick fog.*

  - *They've built a new church on the site of the old one.*

+ **SMART Vocabulary: related words and phrases**   ⌃

FINELITE 009236



**on** *preposition* (CONNECTED)

**A1**

**covering the surface of, being held by, or connected to something:**

- *There's blood on your shirt.*

- *Which finger do you wear your ring on?*

- *Can you stand on your head?*

- *We could hang this picture on the wall next to the door.*

- *Dogs should be kept on their leashes at all times.*

- UK *We've just moved house and we're not on the phone (= not connected to the phone service) yet.*

**+** **More examples**

**+** **SMART Vocabulary: related words and phrases**

**on** *preposition* (TIME)

**A1**

**used to show when something happens:**

- *Hair salons don't usually open on Sundays.*

- *What are you doing on Friday?*

- *My birthday's on 30 May.*

- *Would you mind telling me what you were doing on the afternoon of Friday the 13th of March?*

- *The bells in the clock tower ring every hour on **the** hour (= at exactly one o'clock, two o'clock, etc.).*

- *On a clear day you can see the mountains from here.*

- *She was dead on **arrival** (= dead when she arrived) at the hospital.*

- *Please leave your key at the reception desk on your departure from (= when you*

**FINELITE 009237**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

                                        

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (WRITING)

A2

**used to show where something has been written, printed, or drawn:**

- *Which page is that curry recipe on?*
- *His initials were engraved on the back of his watch.*
- *What's on the menu tonight? (= What food is available?)*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (TRAVEL)

A2

**used for showing some methods of travelling:**

- *I love travelling on trains.*
- *She's coming in on the 5.30 bus.*
- *We went to France on the ferry.*
- *It'd be quicker to get there on **foot**.*
- *two figures on **horseback***

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

8/3/2023, 6:00 PM

**FINELITE 009238**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

   

**used to show that a condition or process is being experienced:**

- *He accidentally set his bed on **fire**.*
- *Max's on **holiday** this week.*
- *I often get carsick when I'm on a long journey.*
- *Crime is on the increase (= is increasing) again.*
- UK *Their flights to Paris are on special **offer** at the moment.*
- UK *I'll be away on a training course next week.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* **(RECORDING)**



A2

**used to show the form in which something is recorded or performed:**

- *How much data can you store on the flash drive?*
- *When's the movie coming out on DVD?*
- *I was really embarrassed the first time I saw myself on film.*
- *What's on TV tonight?*
- *I wish there was more jazz on the radio.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* **(PAIN)**

B2

**FINELITE 009239**



- *I hit my head on the shelf as I was standing up.*

- *Be careful not to cut yourself on that knife.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* **(TO)**

**A2**

## to or towards:

- *Our house is the first on the left after the post office.*

- *The attack on the village lasted all night.*

- *I wish you wouldn't sneak up on me like that!*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* **(RELATING)**

**B1**

## relating to:

- *a book on pregnancy*

- *Her talk is on Italian women's literature.*

- *The minister has refused to comment on the allegations.*

- *Criticism has no effect on him.*

- *Do the police have anything on you (= do they have any information about you that can be used against you)?*

                                            

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (MONEY)

A2

**used to show something for which a payment is made:**

• *He spent €180 on a hat.*

• *I've wasted a lot of money on this car.*

• *We made a big profit on that deal.*

• *How much interest are you paying on the loan?*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (NECESSARY)

**used to show a person or thing that is necessary for something to happen or that is the origin of something:**

• *We're relying on you.*

• *I might come - it **depends** on Andrew.*

• *Most children remain dependent on their parents while they are at university.*

• *His latest movie is **based** on a fairy tale.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

**FINELITE 009241**




**used to show when someone is involved or taking part in something:**

- *I'm working on a new book.*

- *"Where had we got up to?" "We were on page 42."*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (FINANCIAL SUPPORT)



**used to show what is providing financial support or an income:**

- *I only have $70 a week to **live** on at the moment.*

- *He retired on a generous pension from the company.*

- UK *She's on (= earning) £25,000 a year.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (FOOD/FUEL/DRUG)

B2

**used to show something that is used as food, fuel, or a drug:**

- *What do mice **live** on?*

- *Does this radio **run** on batteries?*

- *Is he on drugs?*

**+ More examples**

**FINELITE 009242**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

                                     

**on** *preposition* **(NEXT TO)**

**B1**

**next to or along the side of:**

- *It's a small town on the Mississippi River.*
- *Our house was on Sturton Street.*
- *Strasbourg is on the border of France and Germany.*

**+** **More examples**

**+** **SMART Vocabulary: related words and phrases**

**on** *preposition* **(MEMBER)**

**C1**

**used to show when someone is a member of a group or organization:**

- *Have you ever served on a jury?*
- *There are no women on the committee.*
- *How many people are on your staff?*
- UK *She's a researcher on a women's magazine.*

**+** **More examples**

**+** **SMART Vocabulary: related words and phrases**

**on** *preposition* **(TOOL)**

**B1**

**used when referring to a tool, instrument, or system that is used to do**

**FINELITE 009243**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1



- *I do all my household accounts on the computer.*

- *Chris is on drums and Mike's on bass guitar.*

- *I'm on (= talking on) the phone.*

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (AGAIN)

**+ ≡**

UK literary

**used to show when something is repeated one or more times:**

- *The government suffered defeat on defeat in the local elections.*

- *Wave on wave of refugees has crossed the border to escape the fighting.*

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (COMPARISON)

**+ ≡**

**used when making a comparison:**

- *That's my final offer, and I can't improve on it.*

- *The manufacturer has never improved on the earliest model of the car.*

- UK *The productivity figures are **down/up** on last week's.*

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (POSSESSION)

**+ ≡**

**C2**  [ before pronoun ]

**used to show when someone has something in a pocket or in a bag that they are carrying:**                                                                    ∧

---

9 of 27                                                                    8/3/2023, 6:00 PM

FINELITE 009244



**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (AFTER)                                    **+ ☰**

**happening after and usually because of:**

• *Acting on information given to them anonymously, the police arrested him.*

• *He inherited a quarter of a million pounds on his mother's death.*

• *On their return they discovered that their house had been broken into.*

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (PAYMENT)                                  **+ ☰**

informal

**used to show who is paying for something:**

• *Dinner meal is on me.*

• *She had her operation done on the National Health Service.*

**+ SMART Vocabulary: related words and phrases**

---

**on** *preposition* (FAULTY)                                   **+ ☰**

**used to show who suffers when something does not operate as it should:**

• *The phone suddenly went dead on me.*

• *Their car broke down on them on the way home.*

**+ SMART Vocabulary: related words and phrases**

ˆ

**FINELITE 009245**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

                                                 

UK

**used to show the number of points a person or team has in a competition:**

• *Clive's team is on five points while Joan's is on seven.*

➕ **SMART Vocabulary: related words and phrases**

**Grammar**

At, on and in (place)
*We use at: …*

On, onto
*On and onto are prepositions. …*

At, on and in (time)
*We use at: …*

Other uses of in with time
*We use in to say how long it takes someone to do something: …*

Time expressions without at, on, in
*We don't normally use at, on or in before time expressions beginning with each, every, next, last, some, this, that, one, any, all: …*

At, on and in (time): typical errors
*We use on not at to talk about a particular day: …*

**Idioms**

on it
on the go
be on someone



**FINELITE 009246**



***adverb***

UK 🔊 /ɒn/ US 🔊 /ɑːn/

## on *adverb* (CONNECTED)

**A2**

**on your body or someone's body:**

- *It's very cold so **put** a coat on.*
- *She wanders around the house with **nothing** on.*
- *Can you remember what he **had** on (= was wearing)?*
- *I **tried** on a few jackets, but none of them looked nice.*

**covering the surface of something or connected to something:**

- *Screw the lid on tightly.*
- *Surgeons managed to sew the finger back on.*

**+** More examples

**+** SMART Vocabulary: related words and phrases

## on *adverb* (OPERATING)

**B2**

**used to show when something is operating or starting to operate:**

- *Could you **switch** on the radio?*
- *Would you **turn** the TV on?*
- *You **left** the bedroom light on.*

**+** More examples

FINELITE 009247

 

## on *adverb* (NOT STOPPING)

+ ☰

**continuing or not stopping:**

- *The referee waved at the player to play on.*

- *Read on to discover the amazing properties of coconut water.*

- *The police officers shook their heads and drove on.*

- *When Jenny walks the dog, she ignores his hunting behaviour and just walks on till he comes back.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

## on *adverb* (TRAVEL)

+ ☰

B1

**into a bus, train, plane, etc., or in the correct position to start using some other method of travelling:**

- *The train suddenly started moving as I was getting on.*

- *Her horse galloped off as soon as she was on.*

**+ SMART Vocabulary: related words and phrases**

## on *adverb* (PERFORMING)

+ ☰

C2

**performing:**

- *Hurry up with the make-up - I'm on in ten minutes.*

- *The audience cheered as the band came on (= came onto the stage).*

⌃

**FINELITE 009248**

                                        

**+ SMART Vocabulary: related words and phrases**

---

**on** *adverb* (MOVING FORWARD)                                    **+ ≣**

**B2**

## continuing forward in time or space:

- *They never spoke to each other **from that day** on (= after that day).*

- *What are you doing **later** on?*

- *When you're done with it, would you pass it on to Paul?*

- <small>UK</small> *Move on, please, and let the ambulance through.*

- <small>UK</small> *You cycle on and I'll meet you there.*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

---

**on** *adverb* (HAPPENING)                                    **+ ≣**

**B2**

## happening or planned:

- *Is the party still on **for** tomorrow?*

- *I'm busy tomorrow, but I've got nothing on the day after.*

- *I've got a lot on at the moment.*

- *Food had to be rationed when the war was on.*

- *Are there any good movies on (= being shown) this week?*

**+ More examples**

**+ SMART Vocabulary: related words and phrases**

**FINELITE 009249**

 

**used when talking about the position of one thing compared with the position of another:**

- *It's amazing nobody was injured because the two buses crashed **head** on (= the front parts of the buses hit each other).*

- UK *The bike hit our car **side** on (= hit the side of the car rather than the front or back).*

- UK *It would be easier to get the bookcase through the doorway if we turned it **sideways** on (= turned it so that one of its sides is at the front).*

✛ SMART Vocabulary: related words and phrases

**Grammar**

On, onto

*On and onto are prepositions. …*

**Idioms**

be not on

be on about

be/go on at someone

on and off

you're on!



# on

***noun*** [ U ] • SPORTS • specialized

UK 🔊 /ɒn/    US 🔊 /ɑːn/

(also **on side**)

**FINELITE 009250**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

      

- *The captain moved the fielder from off to on.*

- *She tapped the ball into the on side and ran through for a single.*

+ **SMART Vocabulary: related words and phrases**

---

*(Definition of* **on** *from the* **Cambridge Advanced Learner's Dictionary & Thesaurus** *© Cambridge University Press)*

**on** | AMERICAN DICTIONARY

# on

*preposition*, *adverb* [ not gradable ]

US 🔊 /ɔn , ɑn/

---

**on** *preposition*, *adverb* [not gradable] **(SUPPORTED BY)**

Add to word list ≡

## supported by or resting at the top of another thing:

- *There is snow on the ground.*

- *You put pudding in the pie crust and then put whipped cream on.*

f  🐦

# on

*preposition*, *adjective*, *adverb* [ not gradable ]

US 🔊 /ɔn , ɑn/

---

**on** *preposition*, *adjective*, *adverb* [not gradable] **(ATTACHED TO)**

+ ≡

## attached to or forming a part of another thing:

- *Read the instructions on the bag.*

- *Hang your coat on that hook.*

- *Don't screw the lid on so tight.*

^

8/3/2023, 6:00 PM

**FINELITE 009251**



  

**covering or wrapping another thing:**

- *The child had no shoes on her feet.*

- *You should put a coat on.*

- *The baby's got nothing on (= is not wearing anything).*

---

**on** *preposition*, *adjective*, *adverb* [not gradable] (BROADCAST)

**being broadcast:**

- *What's on TV tonight?*

- *I wish there were more jazz on the radio.*

---

**on** *preposition*, *adjective*, *adverb* [not gradable] (TRAVEL BY)

**used to show a method of travel; via:**

- *It's easy to get to the beach on foot.*

- *Two people rode by on horseback.*

**On is also sometimes used to show you are getting in a vehicle:**

- *It's time to get on the bus.*

 

# on

*preposition*

US 🔊 /ɔn, ɑn/

---

**on** *preposition* (AT)



- *They live on Carlisle Street.*

- *Which page is that cheesecake recipe on?*

- *El Paso is on the Mexican border.*

- *Princess Caroline was seated on my left.*

**on** *preposition* **(STORED AS)**

**used to show the form in which information is stored or recorded for use with an electronic device:**

- *How much data can you store on your hard disk?*

- *That movie just came out on video.*

**on** *preposition* **(USING)**

**showing what tool, instrument, system, etc., is used to do or achieve something:**

- *I made this chart on my computer.*

- *I'm on the telephone.*

- *You'll cut yourself on that knife if you're not careful.*

**on** *preposition* **(TAKING)**

**showing that a drug is taken or used:**

- *My doctor put me on antibiotics.*

**on** *preposition* **(NEEDING HELP FROM)**

**used after some verbs and adjectives to show that help is needed from a person or thing:**

**FINELITE 009253**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

**on** *preposition* (EXISTING)

**used to show that a condition or process exists or is being experienced:**

• *The musicians are on strike.*

• *Are winter coats on sale?*

**on** *preposition* (INVOLVED IN)

**involved in or doing a particular thing:**

• *I'm working on a new book.*

• *She's on a diet.*

**On is also used to show that someone is doing something he or she was chosen to do:**

• *There was a guard on duty.*

**on** *preposition* (CONNECTED WITH)

**connected with or part of a group or process:**

• *Have you ever served on a jury?*

• *There are two women on the committee.*

**on** *preposition* (ABOUT)

**about or having something as a subject:**

• *Did you see that documentary on volcanoes last night?*

• *Sarita's thesis is on George Crumb.*

FINELITE 009254

   

**showing that something is paid for or how something is paid for:**

- *I've wasted a lot of money on this car.*
- *Lunch is on me.*

---

**on** *preposition* **(WHEN)**

**used to show when something happens:**

- *What are you doing on Friday?*
- *My birthday's on May 30th.*
- *The flight arrived on time (= at the time it was expected).*

---

**on** *preposition* **(COMPARED WITH)**

**used to make a comparison:**

- *This week's sales figures are down on last week's.*
- *He's got two inches on me (= is two inches taller).*

---

**on** *preposition* **(HAVING AN EFFECT)**

**used to show that something has happened to someone:**

- *Marty is always playing jokes on people.*
- *My car broke down on me this morning.*

---

**on** *preposition* **(POSSESSING)**

**possessing, carrying, or having something with you now:**

- *Do you have any money on you?*
- *I don't have my driver's license on me.*

**FINELITE 009255**



# on

***adverb*** [ not gradable ]

US 🔊 /ɔn, ɑn/

---

**on** *adverb* [not gradable] **(NOT STOPPING)**                    + ☰

**continuing or not stopping:**

• *If her line's busy, keep on trying.*

---

**on** *adverb* [not gradable] **(TOWARD)**                    + ☰

**toward or to something or someone:**

• *You go on and I'll meet you at the lake.*

• *Pass the newsletter on to Emily.*

f 🐦

# on

***adjective***, ***adverb*** [ not gradable ]

US 🔊 /ɔn, ɑn/

---

**on** *adjective*, *adverb* [not gradable] **(OPERATING)**                    + ☰

**operating or made to start operating:**

• *Would you turn the TV on?*

• *The electricity hasn't been turned back on yet.*

+ ☰

**infml Someone who is on is either performing very well or is in a situation where the person must be aware of everything that is happening and be ready to act:**

• *Andy was really on last night – I haven't heard him sing like that in months.*                    ^

FINELITE 009256

# on

***adjective*** [ not gradable ]

US 🔊 /ɔn , ɑn /

---

**on** *adjective* [not gradable] **(HAPPENING)**                                    ✚ ☰

**happening or planned:**

• *I have nothing on for tomorrow.*

• *Is the party still on?*

---

*(Definition of* **on** *from the* **Cambridge Academic Content Dictionary** *© Cambridge University Press)*

**What is the pronunciation of *on*?**                                    ›

Translations of **on**

in Chinese (Traditional)
**在…之上, 在…上面, 到…上面…**

See more

in Chinese (Simplified)
**在…之上, 在…上面, 到…上面…**

See more

in Spanish
**en, sobre, de…**

See more

in Portuguese
**em, sobre, de…**

See more

in more languages                                    ⌄

---

FINELITE 009257

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1



Get a quick, free translation!

 



**Translator tool**

**Browse**

omnivore

omnivorous

omnivorously

omohyoid

**on**

on (an) impulse *phrase*

on (special) offer *phrase*

on (the) condition that *phrase*

on (your) guard *idiom*

Test your vocabulary with our fun image quizzes

 

8/3/2023, 6:00 PM

**FINELITE 009258**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1



<facebook icon> <twitter icon>

WORD OF THE DAY

# play

UK 🔊 /pleɪ/ US 🔊 /pleɪ/

activity that is not serious but done for enjoyment, especially when children enjoy themselves
with toys and games

**About this**

8/3/2023, 6:00 PM

**FINELITE 009259**

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1

   



BLOG

Now you're talking! Phrases with the verb 'talk'

August 02, 2023

**Read More**

8/3/2023, 6:00 PM

FINELITE 009260

ON | English meaning - Cambridge Dictionary                    https://dictionary.cambridge.org/dictionary/english/on?q=on_1



**NEW WORDS**

# salt tooth

July 31, 2023

**More new words**

Contents                                          To top  ⊕

LEARN                                                        +

DEVELOP                                                      +

ABOUT                                                        +

ON | English meaning - Cambridge Dictionary

https://dictionary.cambridge.org/dictionary/english/on?q=on_1



© Cambridge University Press & Assessment 2023

8/3/2023, 6:00 PM

**FINELITE 009262**