# EXHIBIT G

Filed on behalf of: Seoul Semiconductor Co., Ltd.

Entered: April 14, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

SATCO PRODUCTS, INC.,
Petitioner,

v.

SEOUL SEMICONDUCTOR CO., LTD.,
Patent Owner.

—————————————

Case IPR2020-00146
Patent No. 7,667,225

—————————————

**PATENT OWNER'S PRELIMINARY RESPONSE**

## **Table of Contents**

I.    Introduction........................................................................................1

II.   Factual Background Relevant To This Preliminary Response.......................2

      A.    The '225 Patent ..........................................................................2

      B.    Prosecution Of The Application For The '225 Patent .........................7

      C.    Overview Of Petitioner's Primary References, Lin and Gerthsen......10

            1.    Overview of Lin.................................................................10

            2.    Overview of Gerthsen ........................................................12

      D.    Exemplary Scientific Literature Discrediting Lin and Gerthsen ........13

III.  Claim Construction..........................................................................22

IV.   Petitioner Failed To Show A Reasonable Likelihood Of Prevailing ...........30

      A.    Petitioner Failed To Show That Either Lin Or Gerthsen
            Discloses A "Light Emitting Device," As Claim 1 Requires .............30

      B.    Petitioner Cannot Show A Reasonable Likelihood That Either
            Lin Or Gerthsen Discloses A "Carrier Trap Portion Having A
            Band-Gap Energy Decreasing From A Periphery Of The Carrier
            Trap Portion To A Center Of The Carrier Trap Portion" .................35

            1.    There is no reasonable basis on rely on Petitioner's
                  argument that Lin discloses a "carrier trap portion having
                  a band-gap energy decreasing from … [its] periphery …
                  to [its] center".................................................................38

            2.    There is no reasonable basis on rely on Petitioner's
                  arguments that Gerthsen discloses a "carrier trap portion
                  having a band-gap energy decreasing from … [its]
                  periphery … to [its] center"...............................................46

            3.    Lin's And Gerthsen's Purported Indium Compositional
                  Fluctuations Had Been Discredited And Shown To Be
                  Merely Electron Beam-Induced Surface Damage ...................49

V.    Conclusion ...................................................................................62

IPR2020-00146 (USP 7,667,225)                Patent Owner's Preliminary Response

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ...................................................36, 60

*Corning Glass Works v. Sumitomo Elec. USA, Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989) ...................................................23, 24

*In re Donohue*,
    766 F.2d 531 (Fed. Cir. 1985) .........................................36, 37, 50, 57

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006) ...............................36, 50, 56, 62

*J.R. Simplot Co. v. McCain Foods Ltd.*,
    IPR2018-00314, Paper 7 (June 29, 2018).........................................25

*LifeWave, Inc. v. Blendermann*,
    IPR2016-00571, Paper 7 (Sept. 7, 2016).........................................25

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ...................................................33, 34

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*,
    851 F.3d 1270 (Fed. Cir. 2017) .......................................................30

*On Demand Machine Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) .......................................................25

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................27, 28

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004) ...................................................23, 26

*Samsung Elecs., Co. v. IXI IP, LLC*,
    IPR2015-01442, Paper 8 (Dec. 30, 2015).........................................26

*Tech. Consumer Prods., Inc. v. Lighting Sci. Grp.*,
    No. 2019-1361, -- F.3d ---, 2020 WL 1696642 (Fed. Cir. Apr. 8,
    2020) ....................................................................................................36

*Teoxane S.A. v. Allergan, plc*, IPR2017-02002,
    Paper 14 (Mar. 9, 2018) ...................................................................26

*Unified Patents, Inc. v. Synchview Techs., Inc.*,
    IPR2019-00470, Paper 11 (July 24, 2019) .......................................26

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .....................................................27, 28

*Vizio, Inc. v. Int'l Trade Comm'n*,
    605 F.3d 1330 (Fed. Cir. 2010) .........................................................27

## STATUTES

35 U.S.C. § 314(a) ...........................................................................................49

## REGULATIONS

37 C.F.R. § 42.104(b) ......................................................................................23

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

## Exhibit List

| Ex. | Description |
|---|---|
| 2001 | T.M. Smeeton et al., *Electron-Beam-Induced Strain Within InGaN Quantum Wells: False Indium "Cluster" Detection in the Transmission Electron Microscope,* 83 Applied Physics Letters 5419 (2003) |
| 2002 | J.P. O'Neill et al., *Electron-Beam-Induced Segregation in InGaN/GaN Multiple-Quantum Wells*, 83 Applied Physics Letters 1965 (2003) |
| 2003 | T.M. Smeeton et al., *The Impact of Electron Beam Damage on the Detection of Indium-Rich Localisation Centres in InGaN Quantum Wells Using Transmission Electron Microscopy,* 41 Journal of Materials Science 2729 (2006) |
| 2004 | Colin J. Humphreys, *Turning Points in Understanding the Emission of Brilliant Light from Highly Defective GaN-Based Materials and Devices*, Chapter 42 in Turning Points in Solid-State, Materials and Surface Science 698 (Kenneth D.M. Harris & Peter P. Edwards eds., 2008) |
| 2005 | V.B. Özdöl et al., *A Nondamaging Electron Microscopy Approach To Map In Distribution in InGaN Light-Emitting Diodes,* 108 Journal of Applied Physics 056103 (2010) |
| 2006 | Samantha E. Bennett et al., *Atom Probe Tomography Assessment of the Impact of Electron Beam Exposure on $In_xGa_{1-x}N/GaN$ Quantum Wells,* 99 Applied Physics Letters 021906 (2011) |
| 2007 | Kamal H. Baloch et al., *Revisiting the "In-Clustering" Question in InGaN Through the Use of Aberration-Corrected Electron Microscopy Below the Knock-On Threshold*, 102 Applied Physics Letters 191910 (2013) |
| 2008 | Woo-Young Jung et al., *Three-Dimensional Indium Distribution in Electron-Beam Irradiated Multiple Quantum Wells of Blue-Emitting InGaN/GaN Devices,* 108 Applied Physics Letters 113111 (2016) |
| 2009 | U.S. Patent No. 6,906,352 |
| 2010 | Steven M. Kaplan, *Wiley Electrical and Electronics Engineering Dictionary* (2004) |

IPR2020-00146 (USP 7,667,225)                Patent Owner's Preliminary Response

## I.      Introduction

The Board should deny institution of *inter partes* review (IPR) of U.S.

Patent No. 7,667,225 ("the '225 Patent") because Petitioner bases its challenges on

discredited literature about experimental samples that are not the claimed light

emitting devices.  Petitioner fails to show a reasonable likelihood that its selected

prior art references disclose two limitations of claim 1—the sole challenged

independent claim.

First, Petitioner has failed to show a reasonable likelihood that either of its

two primary references, Lin or Gerthsen, discloses the "light emitting device"

recited in claim 1.  The preamble—"[a] light emitting device"—is limiting because

the '225 Patent emphasizes that the invention is a "light emitting device."

Emitting light is a fundamental characteristic of the invention.  Petitioner does not

contend otherwise.  Instead, Petitioner contends that Lin and Gerthsen each

disclose a "light emitting device," but neither reference discloses such a device.

Lin and Gerthsen disclose only semiconductor structures that *might* be applied in

light emitting devices, but both references fail to disclose the additional features

required to have a device that emits light.  Furthermore, Petitioner exclusively

alleges anticipation for this limitation—Petitioner never argues that constructing a

light emitting device would have been obvious—so this lack of disclosure in Lin

and Gerthsen is fatal to all proposed grounds.

Second, Petitioner fails to show a reasonable likelihood that either Lin or Gerthsen disclose "least one carrier trap portion having a band-gap energy decreasing from a periphery of the carrier trap portion to a center of the carrier trap portion." Petitioner relies on data purporting to show variations in indium concentration in Lin and Gerthsen, but that data had been discredited in the scientific literature years ago. Long before the Petition was filed, it was well known to those skilled in the art that Lin's and Gerthsen's false detection of indium concentration variations resulted from damage on the surface of the samples that had been introduced during imaging. Accordingly, Lin and Gerthsen only enabled damaging the surface of samples—***not*** creating the claimed "carrier trap portion" with band-gap energy decreasing from its periphery to its center. Petitioner does not address any of the scientific literature discrediting Lin and Gerthsen, let alone try to justify why the Board should rely on their invalid data.

Accordingly, the Board should decline to institute IPR because Petitioner has failed to demonstrate a reasonable likelihood of success.

## II.    Factual Background Relevant To This Preliminary Response

### A.    The '225 Patent

The '225 Patent is entitled "Light Emitting Device." Ex. 1001. This "light emitting device" includes a "carrier trap portion" formed within a "multi-quantum well structure." *Id.* at Abstract. In the Field of the Invention, the '225 Patent

explains that it is directed to light emitting devices having such a carrier trap portion:

> The present disclosure relates to light emitting devices that can be used for light emitting diodes (LEDs) and laser diodes (LDs). More particularly, the present disclosure relates to a light emitting device that includes at least one carrier trap portion in at least one layer within a multi-quantum well structure.

*Id.* at 1:15-21.

In the Background, the '225 Patent acknowledges that an LED generally "includes an n-type semiconductor layer, a p-type semiconductor layer, and an active region interposed between the n-type and p-type semiconductor layers." *Id.* at 1:35-38. The '225 Patent also points out in the Background that, "a buffer layer is formed on the substrate before growing the semiconductor layer, so that crystal defects can be substantially prevented in the semiconductor layer grown on the buffer layer." *Id.* at 1:59-62. Although the buffer layer greatly reduces crystal defects, "the active layer still has a high density of crystal defects," which "trap carriers introduced into the active region and do not emit light, thereby acting as a non-radiative center and significantly deteriorating internal quantum efficiency of the LED." *Id.* at 1:62-2:2. The claimed inventions address this problem. The Summary of the Invention states, "An object of the present invention is to provide a light emitting device configured to prevent a reduction in internal quantum

efficiency which is caused by crystal defects such as dislocations in an active

region." *Id.* at 2:6-9.

Figure 1, copied below shows "a stack structure of a light emitting device

according to one embodiment of the present invention." *Id.* at 3:3-5; *see also id.* at

3:41-42.



The '225 Patent describes the "n-GaN" as "first semiconductor layer 15" and the

"p-GaN" as "second semiconductor layer 19." *Id.* at 3:43-54.  Each of those

semiconductor layers connects to a bond pad ("n-pad 25" and "p-pad 23,"

respectively) for supplying electricity to the device.  *Id.* at 4:2-10.

The "carrier trap portion" is formed within the multi-quantum well (MQW) structure 17. *Id.* at 4:11-14. "The carrier trap portion 27 serves to trap carriers by taking the place of dislocations in the multi-quantum well structure 17." *Id.* at 4:14-16. Exemplary carrier trap portions 27 are illustrated in Figure 3, copied below. *Id.* at 3:9-11.

**Fig. 3**



To trap carriers, "the carrier trap portion 27 is configured to have a band-gap energy that gradually decreases from a periphery of the carrier trap portion 27 to the center thereof." *Id.* at 4:16-19. Figure 4, copied below, shows different possible shapes of the band-gap energy diagram for carrier trap portions along line I(a)-I(b), as compared to the band-gap energy diagram along line II(a)-II(b) where carrier trap portions are not present. *See id.* at 4:19-32. As illustrated, the band-

gap energy can "gradually decrease[] towards the center of the carrier trap portion 27" in various ways.  *Id.* at 4:23-26.

**Fig. 4**



The "carrier trap portions 27" can be formed as "a carrier trap cluster."  *Id.* at 5:51-54.  This configuration is shown for example in Figure 6, copied below.  *Id.*

at 5:54-55.  Figure 6 "is an APT [atom probe tomography] image of a multi-quantum well (MQW) having a carrier trap cluster."  *Id.* at 3:19-21.

Fig. 6



## B.    Prosecution Of The Application For The '225 Patent

Issued claim 1 was pending as claim 1 during prosecution.  *See* Ex. 1004 at 27.  The Examiner rejected claim 1 for statutory double patenting and as obvious in view of U.S. Patent No. 7,271,417 to Chen ("Chen").[1]  *See id.* at 64-66.  The Examiner explained the basis for the obviousness rejection with reference to Chen's Figure 4 and associated disclosure.

Chen's Figure 4, copied below with color annotations added, illustrates "the structure of a light-emitting element."  Ex. 1005 at 2:45-47.  This "light emitting element 50 includes a substrate 41, a buffer layer 42, a first conductive cladding layer 43, five porous light-emitting layers 51, 52, 53, 54, and 55, and a second conductive cladding layer 44."  *Id.* at 4:11-14.  "[L]ight-emitting [element] 50

---

[1] Although the Examiner based the rejection on the issued patent to Chen, the Examiner cited to the disclosure of the published application, U.S. Patent Pub. Appl. No. 2006/0081832 (Ex. 1006).

further includes two electrodes 45, 46 to be connected [to] the external power supply." *Id.* at 4:15-17.  There is a "first conductive electrode contact layer 47 … between the first conductive cladding layer 43 and the electrode 45," and a "second conductive electrode contact layer 48 … between the second conductive cladding layer 44 and the electrode 46." *Id.* at 4:34-41.  "[L]ight-emitting layer 51 has a carrier trap layer 511," which includes "chevron structures 512, 513, etc." *Id.* at 4:49-57.  This "light-emitting layer 51" also has "a lower barrier layer 515," "located below the chevron structures 512, 513, etc.," and an "upper barrier layer 516," "located above" those "chevron structures" and covering them. *Id.* at 4:50-57.

     As illustrated below, the Examiner mapped the claimed "substrate" to Chen's "substrate 41," the claimed "first semiconductor layer" to Chen's "first conductive cladding layer 43," the claimed "second semiconductor layer" to Chen's "second conductive cladding layer 44," and the claimed "multi-quantum well structure" to Chen's "five porous light-emitting layers 51, 52, 53, 54, and 55." Ex. 1004 at 66.  The Examiner also mapped the claimed "well layer" to Chen's "carrier trap layer 511," the claimed "barrier layer" to Chen's barrier layers 515, 516, and the claimed "carrier trap portion" to Chen's chevron structures 512, 513. *Id.*



Ex. 1001 at cl. 1 (annotated); Ex. 1005 at Fig. 4 (annotated). The Examiner conceded that Chen did not expressly disclose the claim limitation requiring the band gap of the carrier trap portion to decrease from its periphery to its center, but contended that it would have been obvious to adjust the amount of indium to meet this claim limitation. *See* Ex. 1004 at 66.

Patent Owner overcame the Examiner's rejection. Patent Owner abandoned the application that had served as the basis for the Examiner's provisional statutory double patenting rejection. *See id.* at 36. Patent Owner did not dispute the Examiner's mapping of Chen's Figure 4 structure to claim 1, but argued that it would not have been obvious to achieve "a band-gap energy decreasing from a periphery of the carrier trap portion to a center of the carrier trap portion," as

claimed.  *Id.* at 38-40.  The Examiner credited Patent Owner's arguments in stating

the reasons for allowance:  "The Applicant's arguments solely place the claims in

condition for allowance."  *Id.* at 18.

### C.    Overview Of Petitioner's Primary References, Lin and Gerthsen

Petitioner contends that each of its two primary references, Lin (Ex. 1025)

and Gerthsen (Ex. 1026), anticipate independent claim 1 and relies on secondary

references to address some dependent claims.  Pet. at 22.

### 1.    Overview of Lin

Lin is a 2002 article entitled *Effects of Post-Growth Thermal Annealing on*

*the Indium Aggregated Structures in InGaN/GaN Quantum Wells*.  Ex. 1025 at 6.

Lin studied samples where quantum well (QW) "layers were sandwiched between

a 1.5 μm GaN buffer layer on a (0001) sapphire substrate and a 50 nm GaN cap

layer."  *Id.* at 7.  The QW layers "consisted of ten periods of InGaN wells with 35

Å in thickness."  *Id.*  The "samples were subjected to thermal annealing."  *Id.*

Lin used high-resolution transmission electron microscopy (HRTEM)

"performed with both 200 KeV Philips CM 200 and 300 KeV JEM 3010

microscopes" to investigate the samples, and "[e]nergy filtering (EF) images were

recorded" using an imaging filter available on the "300 KeV JEM 3010

microscope."  *Id.*  Using energy filter transmission electron microscopy (EFTEM),

Lin obtained what Lin asserts are "[i]ndium map and indium composition profiles

along and across the QW layers." *Id.* at 8.  Lin states that Figure 2, copied below,

show such a map and composition profile "of the sample after 900ºC annealing."

*Id.* at 8-9.



Fig. 2.  EFTEM images of the 900°C annealing sample with (a)
zero-loss map, (b) indium map, (c) gallium map, and (d) indium
composition amplitude profile along a QW.

### 2.    Overview of Gerthsen

Gerthsen is a 2003 article entitled *Indium Distribution in Epitaxially Grown InGaN layer Analyzed by Transmission Electron Microscopy*.  Ex. 1026 at 6. Gerthsen claims to have developed a technique to use HRTEM to perform "quantitative analyses" of "In distributions in InGaN" "using the parameters of the Philips CM200 FEG/ST transmission electron microscope."  *Id.* at 7-8.  Gerthsen reports "results of the analysis of an InGaN/GaN QW structure, which contain[ed] 5 InGaN layers separated by 5 nm GaN spacers."  *Id.* at 11.  This "structure was grown on a SiC(0001) substrate on Si-doped 380 nm AlGaN and 75 nm GaN buffer layers," and "was capped by 75 nm GaN and 240 nm AlGaN doped with Mg."  *Id.*  Gerthsen describes Figure 4, copied below, as showing a "color-coded map of the In distribution" and "averaged In concentration."  *Id.*



**Fig. 4** a) Color-coded map of the In distribution of an InGaN/GaN multiple QW structure and b) averaged In concentration along the $[11\bar{2}0]$ direction plotted as a function of the (0002)-plane. number.

## D.  Exemplary Scientific Literature Discrediting Lin and Gerthsen

Soon after Lin and Gerthsen were published, other scientists raised an alarm that the purported indium mapping was erroneous and instead merely reflected damage from the electron beam.  In *Electron-Beam-Induced Strain Within InGaN Quantum Wells: False Indium "Cluster" Detection in the Transmission Electron Microscope*, the authors cited publications by Lin and Gerthsen in noting that "localized regions of strain contrast and lattice fringe displacement in high-resolution TEM (HRTEM) have been attributed to strong fluctuations in [indium]

13

composition."[2]  Ex. 2001, 83 Appl. Phys. Lett. 5419 at -001 (2003) (citing

Gerthsen et al., 177 Phys. Status Solidi A 145 (2000), and Lin, Ex. 1016).  Lin and

Gerthsen relied on a "crucial" "assumption" "that the local strain fields in the

quantum wells" were "solely due to the distribution of indium."  *Id.*  But that

assumption was undermined by the authors' finding "that InGaN quantum wells

can be extremely sensitive to damage by the electron beam in the TEM."  *Id.*  The

authors showed that "inhomogeneous strain introduced as a consequence of

exposure to the beam is very similar to that expected from genuine nanometer scale

strong composition fluctuations," and "[t]herefore, in TEM experiments there is

the potential to detect false indium clustering."  *Id.* at -003; *see also* Ex. 2002,

*Electron-Beam-Induced Segregation in InGaN/GaN Multiple-Quantum Wells*, 83

---

[2] Note that the scientific literature discussed in this section uses the term "cluster"

in a similar, but slightly different, manner than the term is used in the '225

Patent.  In this literature, a "cluster" refers to an indium-rich region.  *See, e.g.,* Ex.

2001 at -001 (defining "clusters" as "nanometer-scale indium rich regions").  In the

'225 Patent, a "cluster" refers to multiple carrier trap portions located relatively

close to one another.  *See* Ex. 1001 at 2:61-62 ("The light emitting device may

further include a carrier trap cluster formed by clustering at least two carrier trap

portions."); *see also id.* at 2:62-67, 5:51-67, cls. 19 & 20.

Appl. Phys. Lett. 1965, at -003 (2003) (citing Lin, Ex. 1025, and "highlight[ing] the need for extreme caution when interpreting data" from such studies because "the results of such electron-beam studies may be adversely influenced by the electron beam radiation itself").

A few years later, many of the same authors showed that Lin and Gerthsen might have detected nothing more than the effect of this electron beam-induced damage.  In *The Impact of Electron Beam Damage on the Detection of Indium-Rich Localisation Centres in InGaN Quantum Wells Using Transmission Electron Microscopy*, they showed "that InGaN quantum wells are liable to rapid modification under the TEM electron beam."  Ex. 2003, 41 J. Mater. Sci. 2729, at -002 (2006).  They explained that, unless this damage is taken into account (and neither Lin nor Gerthsen even mention such damage), "there is the potential to *falsely infer* the presence of nanometre-scale indium-rich regions from HRTEM data." *Id.*  They showed that "electron beam damage" "cause[d] contrast variations which are indicative of a nanometre-scale strain inhomogeneity within the InGaN layers," and that this damage began "*immediately*." *Id.* at -006 (original emphasis). Accordingly, the authors stated that it was "obvious" that if "HRTEM images" were "acquired after a couple of minutes exposure to the electron beam," "without consideration of the beam damage effects, then they would give a *false indication* of the strain distribution—and therefore the composition distribution—in the as-

grown quantum well." *Id.*  They concluded that the composition fluctuations in the InGaN quantum wells were "at most substantially smaller than has been frequently reported," and that it was "possible that ***all indicators of composition fluctuations … [we]re due to beam damage***" and, in reality, the composition of the "as-grown quantum wells" was "homogenous."[3]  *Id.* at -008.

By 2008, which was still before the '225 Patent's 2009 priority date (*see* Ex. 1001 at 1), the state of the art had reached a turning point—it was demonstrated that the compositional fluctuations Lin and Gerthsen had reported using TEM in the early 2000s were, in fact, merely the result of electron beam-induced damage. *See* Ex. 2004, *Turning Points in Understanding the Emission of Brilliant Light from Highly Defective GaN-Based Materials and Devices*, Ch. 42 in Turning Points in Solid-State Materials and Surface Science (2008).  Citing Gerthsen as an example of the composition fluctuations in InGaN that had been reported using TEM, *see id.* at -006, the author explained that the fluctuations were caused by "electron-beam damage." *Id.* at -004.  "[N]o In fluctuations" (beyond those "expected of any random alloy") were observed using "three-dimensional (3D) atom probe analysis of InGaN quantum wells." *Id.*; *see also id.* at -006 ("We will now demonstrate that in the wide range of InGaN materials we have examined,

---

[3] All emphases added unless otherwise noted.

such gross indium-rich clusters do not exist, and they are produced by electron beam damage in the TEM.").

Because "InGaN quantum wells damage extremely rapidly in the electron beam of a TEM at the beam currently normally used for imaging," low electron beam currents and short TEM exposure times were used to investigate the effect of electron beam currents.  *Id.* at -008.  It was discovered that there was "***no evidence at all*** of gross indium clustering if low electron beam currents are used."  *Id.*; *see also id.* at -009 ("In *all* the samples we have studied, we observe no gross indium clustering in the TEM at low beam currents and short exposure times.") (original emphasis).  The effect of electron-beam induced damage on an InGaN QW was illustrated in Figure 1, copied below, showing how indium appeared to cluster after "only a few minutes of exposure" to the electron beam.  *Id.* at -007.



**Figure 1**  A pair of HRTEM lattice fringe images demonstrating the electron-beam induced damage to an $In_{0.22}Ga_{0.78}N$ quantum well. The $(0\,0\,0\,2)$ lattice fringe images were obtained using a JEOL 4000 EX operating at 400 kV. (a) Shows the image after minimal exposure to the beam, and (b) the same region after only a few minutes of exposure. (c) Is a lattice parameter map of (a), and (d) is a lattice parameter map of (b).

To avoid the electron beam-induced damage associated with TEM, samples were also analyzed using a "3D atom probe (3DAP)" technique, which "can provide nanometre-scale information about composition variations." *Id.* at -011. Using 3DAP on samples containing InGaN QWs, "[n]o significant deviations were found from that expected in a random alloy for all three of the quantum wells," leading to the conclusion "that ***there is no evidence of indium clustering***." *Id.* Thus, the 3DAP results confirmed the low-dose TEM results showing "***no***

*evidence for indium clustering in InGaN quantum wells*."[4]  *Id.*; *see also id.*

at -013.  Later, another group used yet another technique that does not require

high-energy electron beams, namely "dark-field inline electron holography," to

confirm "that the InGaN QWs exhibit random alloy nature *without any evidence*

of nanometer scale gross indium clustering."  Ex. 2005, *A Nondamaging Electron*

*Microscopy Approach to Map In Distribution in InGaN Light-Emitting Diodes*,

108 J. Appl. Phys. 056103, at -002 (2010).  That group reiterated that, when using

HRTEM (as Lin and Gerthsen did), the effects of beam damage are misinterpreted

as indium clustering.  *Id.* at -003 ("[B]eam damage results in … localized strain

modulations inside the QWs which are then interpreted as inhomogeneous indium

distribution or clustering.").

By 2011, atom probe tomography (APT) had been used to analyze InGaN

QW samples prepared with and without exposure to the electron beam in TEM.

*See* Ex. 2006, *Atom Probe Tomography Assessment of the Impact of Electron*

*Bream Exposure on the $In_xGa_{1-x}N/GaN$ Quantum Wells*, 99 Appl. Phys. Lett.

021906, at -002 (2011).  The authors observed random distribution of indium

---

[4] By contrast, the '225 Patent shows an atom probe tomography (APT) image with

indium clustering according to an embodiment of the invention in Figure 6.  *See*

Ex. 1001 at 3:19-21, 5:51-55.

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

without electron beam exposure and observed non-random distribution of indium after electron beam exposure. *See id.* at -004.  As illustrated below, there are only "small random deviations" from a perfectly random indium distribution ($\Delta F$ is less than about $|5|$) for the sample that was ***not*** exposed to the electron beam in TEM (*see* Figure 3(c)).  *See id.*  By contrast, there are large deviations from a perfectly random indium distribution ($\Delta F$ nearly reaches $|40|$) for the sample that was exposed to the electron beam in TEM (*see* Figure 3(d)), and statistically the distribution is "not random."  *See id.*



FIG. 3. Frequency distributions of QW indium content: (a) for the uppermost QW of the control sample and (b) for the uppermost four QWs in the sample which was exposed to the electron beam in TEM. Each QW was divided into bins of 100 atoms, and the indium fraction *x* was calculated for each bin. The solid line shows the binomial distribution that would be expected in the case of a random ternary alloy. Graphs (c) and (d) are difference plots, for the control and exposed sample respectively, where $\Delta F$ is the difference between the observed and expected frequency.

*Id.* at -003.

This analysis further showed that the data did "not provide any evidence for an inhomogeneous indium distribution" in "as-grown $In_xGa_{1-x}N/GaN$ quantum wells." *Id.* at -004.  Another group confirmed this conclusion using other experimental techniques, namely "atomically resolved $C_S$-corrected scanning transmission electron microscopy and electron energy loss spectroscopy at 120 kV," which also "show[ed] that indium clustering is ***not*** present in as-grown $In_{0.22}Ga_{0.78}N$ QWs."  Ex. 2007, *Revisiting the "In-Clustering" Question in InGaN Through the Use of Aberration-Corrected Electron Microscopy Below the Knock-On Threshold*, 102 Appl. Phys. Lett. 191910, at -003 (2013).

By 2016, it had been shown "that the electron-beam induced" damage Lin and Gerthsen had observed "is a surface-related phenomenon"—***not*** evidence of indium composition fluctuation within a QW.  Ex. 2008, *Three-Dimensional Indium Distribution in Electron-Beam Irradiated Multiple Quantum Wells of Blue-Emitting InGaN/GaN Devices*, 108 Appl. Phys. Lett. 113111, at -002 (2016). Samples with InGaN QWs were "systematically exposed to an electron-beam" "prior to APT analysis."  *Id.* at -003.  The authors confirmed that InGaN QWs "are highly sensitive" to "electron-beam induced damage."  *Id.* at -004.  "High density electron-beam exposure" resulted in "strain contrast" on the surface.  *Id.* at -005. When the damaged surface was removed, however, "APT results obtained from the

core volume … ***revealed no evidence of In clusters, verifying that electron-beam damage during microscopy is more pronounced at the surface***." *Id.*

In sum, years before the Petition was filed, multiple scientific groups collectively had applied a variety of imaging techniques to demonstrate that the purported indium clustering reported in the early 2000s based on use of TEM (as in Lin and Gerthsen) actually was electron-beam induced damage on the surface of the samples.

## III.   Claim Construction

Petitioner addresses construction of two claim terms:  "carrier trap portion[s]" and "multi-quantum well structure."  Petitioner contends that the passage at column 4, lines 40-47, of the '225 Patent defines a "carrier trap portion."  Pet. at 19-20.  For purposes of this preliminary response, Patent Owner accepts and applies this construction.  Petitioner concedes that it "is unnecessary for the purposes of this proceeding" for the Board to resolve any issue regarding interpretation of the claim term "multi-quantum well structure."

Petitioner does not address the claim term "[a] light emitting device" in the preamble of independent claim 1.  Construction of this term is pertinent to Petitioner's challenges, and Patent Owner addresses this term below.

The preamble of claim 1, "[a] light emitting device," is limiting.  If Petitioner disputed that the preamble was limiting, then Petitioner was required to

set forth this claim construction position in its Petition. 37 C.F.R. § 42.104(b)

(Petitioner is required to explain "[h]ow the challenged claim is to be construed.").

Petitioner made no such argument. Petitioner instead advanced arguments on the

assumption that the preamble limits the claims. *See* Pet. at 26, 46 (presenting

arguments that Lin and Gerthsen satisfy the preamble, assuming it is a limitation).

"The effect preamble language should be given can be resolved only on

review of the entirety of the patent to gain an understanding of what the inventors

actually invented and intended to encompass by the claim." *Corning Glass Works*

*v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251, 1256-57 (Fed. Cir. 1989) (holding

that the preamble "[a]n optical waveguide" was a limitation because the

"specification ma[de] clear that the inventors were working on the particular

problem of an effective optical communication system"). Accordingly, preamble

language limits a claim where it recites "an important characteristic of the claimed

invention." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310

(Fed. Cir. 2004). In *Poly-America*, the Federal Circuit held that the phrase "blown-

film" in the preamble was a claim limitation because the specification described

the invention "as a 'blown-film' liner," including in the "title of the patent itself,"

in "the 'Summary of the Invention,'" and "in each of the patent's seven claims."

*Id.* Similarly, the Federal Circuit held that the term "rotary cutter deck" in the

preamble was a limitation in *Deere & Co. v. Bush Hog, LLC* because the

specification, including the "title of the patent" and "the summary of the invention" "underscore[d] the importance of 'rotary cutter deck' as a limitation of the claimed invention."  703 F.3d 1349, 1358 (Fed. Cir. 2012).

Here the preamble of claim 1 likewise is a limitation because specification of the '225 Patent emphasizes that a fundamental characteristic of the claimed invention is that it is a "light emitting device."  As in *Poly-America* and *Deere*, the '225 Patent's title—"Light Emitting Device"—illustrates that this is the basic nature of the invention.  Ex. 1001 at 1.  Similarly to the patents at issue in in *Poly-America* and *Deere*, the '225 Patent uses the preamble language to describe the invention at a high level.  The "Field of the Invention" in the '225 Patent underscores that the patent is directed to light emitting devices:

> ***The present disclosure relates to light emitting devices*** that can be used for light emitting diodes (LEDs) and laser diodes (LDs). More particularly, ***the present disclosure relates to a light emitting device*** that includes at least one carrier trap portion in at least one layer within a multi-quantum well structure.

*Id.* at 1:15-21; *see also* Ex. 1002 at 12-13 (¶ 26) (quoting same).  Just as the preamble "optical waveguide" was a limitation in *Corning Glass* because the specification revealed that the inventors aimed to solve an optical communication problem, the preamble "light emitting device" is a limitation here because the

specification shows that the inventors were working to solve a problem pertaining to light emitting devices.  *See* 868 F.2d at 1257.

The entire purpose of the claimed invention is to provide an improved "light emitting device," Ex. 1001 at 2:6-13, so the preamble "necessarily limits the claims."  *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343-44 (Fed. Cir. 2006) (concluding that the preamble phrase "high speed manufacture of a single copy of a book" limits the claims because "[t]he high speed manufacture of a single copy is fundamental to the … invention"); *see also J.R. Simplot Co. v. McCain Foods Ltd.*, IPR2018-00314, Paper 7 at 5-7 (June 29, 2018) (denying institution of IPR because the specification underscored that language in the preamble was "an essential feature" that was not disclosed or suggested by the prior art).  Indeed, the preamble "light emitting device" necessarily limits the claims because the utility of the invention lies in enabling light emitting devices to emit more light.  *See On Demand Machine*, 442 F.3d at 1343-44; *see also LifeWave, Inc. v. Blendermann*, IPR2016-00571, Paper 7 at 6 (Sept. 7, 2016) (denying institution of IPR in part based on finding the preamble was limiting because "one of ordinary skill in the art would not understand the utility of the process of the challenged claims, viewed in light of the Specification, without the preamble language of the claims").

The fact that the "Summary of the Invention" describes each "object of the present invention" and "aspect" of the invention with respect to a "light emitting device" reinforces that the preamble is a limitation here.  Ex. 1001 at 2:6-23; *see also Deere*, 703 F.3d at 1358; *Poly-America*, 383 F.3d at 1310; *see also Unified Patents, Inc. v. Synchview Techs., Inc.*, IPR2019-00470, Paper 11 at 8-10 (July 24, 2019) (denying institution of IPR because the prior art did not disclose a "DVR," a term in the preamble which was limiting because, based on the specification, it was an "essential structure of the invention"); *Teoxane S.A. v. Allergan, plc*, IPR2017-02002, Paper 14 at 9-10 (Mar. 9, 2018) (denying institution of IPR based on finding the term "stable" in the preamble was limiting because "the specification repeatedly refers to the ability of the claimed compositions to remain stable" and, as here, Petitioner did not dispute that the term was limiting).

Furthermore, each claim in the '225 Patent is directed to "[a] light emitting device," just as each claim in *Poly-America* restated the preamble language, which further supports treating the preamble as limiting.  Ex. 1001 at cls. 1-20; *see also Samsung Elecs., Co. v. IXI IP, LLC*, IPR2015-01442, Paper 8 at 8-9 (Dec. 30, 2015) (denying institution of IPR because the "hand-held device" recited in the preamble, which appeared in every dependent claim and "appear[ed] prominently in the specification," was a limitation and was not suggested by the prior art).  There is nothing in the intrinsic record to indicate that the claims reach more

broadly to embrace something other than a "light emitting device."  *See Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1341 (Fed. Cir. 2010) (holding preamble language limited a claim because "[t]here [wa]s no indication in the specification or prosecution history that the claims reach" devices that did not meet the preamble language).

Accordingly, the preamble of claim 1, "light emitting device," is limiting. Claim 1 requires a "light emitting device," which is a "semiconductor device that emits light when an electric current is passed through it" as stated the *Nature* article that Petitioner submitted.  Ex. 1008 at 4; *see also* Pet. at 7 (explaining that light is produced when "current can flow" through the device, causing "electrons" from "n-type semiconductor material" and "holes" from "p-type semiconductor material" to "recombine").  This well-understood plain and ordinary meaning of "light emitting device" is reflected in both the intrinsic record and the record in this proceeding.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("[T]he words of a claim 'are generally given their ordinary and customary meaning.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Figure 1 of the '225 Patent, copied below, illustrates "a light emitting device."  Ex. 1001 at 3:3-5, 3:41-43.  This "light emitting device" includes n-type and p-type semiconductor layers 15 and 19 with respective bonding pads 25 and 23

for connection to a source of electricity.  *See id.* at 3:43-4:8, Fig. 1; *Phillips*, 415 F.3d at 1315 (The specification "'is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics*, 90 F.3d at 1582).



**Fig. 1**

The prosecution history also confirms that a "light emitting device" is a semiconductor device that emits light when electric current is passed through it. U.S. Patent No. 6,906,352, which was of record during prosecution, defined "[l]ight emitting devices" as "photonic, p-n junction semiconductor devices that convert electrical power into emitted light," such as "light emitting diodes and laser diodes."  Ex. 2009, U.S. Patent No. 6,906,352, at 1:33-36; *see Phillips*, 415 F.3d at 1317 ("The prosecution history, which we have designated as part of the

'intrinsic evidence,' … includes the prior art cited during the examination of the patent.").

The evidence that Petitioner has submitted in this proceeding likewise is consistent with the plain and ordinary meaning of a "light emitting device"—a semiconductor device that emits light when electric current passes through it. *See* Ex. 1023 at 1:6-10 ("a light-emitting device, such as a laser diode (LD) device or a light-emitting diode (LED)"); Ex. 1024 at 1:8-18 (referring to "a group-III nitride semiconductor light-emitting device comprising an n-type semiconducting layer and a p-type semiconducting layer," and identifying LEDs and LDs "as light-emitting devices"). In his "Overview of Light Emitting Semiconductor Devices," Dr. Dupuis confirms that "[i]n its most basic form" such devices have a "p-n junction," with "a 'p-doped' semiconductor material and an 'n-doped' semiconductor material" that provide "charge carrier[s]" in the form of "holes" and "electrons," respectively. Ex. 1002 at 16-17 (¶ 32). Dr. Dupuis also refers to an example of a "device" (copied below with Dr. Dupuis' annotations) that includes n-type semiconductor 10, p-type semiconductor 12, and respective electrodes "electrically connected to the n and p layers" with electrical wire connections depicted. Ex. 1028 at 9:15-18.



Ex. 1002 at 21 (¶ 36) (showing Ex. 1028 at Fig. 1 (annotated)).

## IV.   Petitioner Failed To Show A Reasonable Likelihood Of Prevailing

### A.   Petitioner Failed To Show That Either Lin Or Gerthsen Discloses A "Light Emitting Device," As Claim 1 Requires

All of Petitioner's grounds rely on Petitioner's contention that either Lin alone or Gerthsen alone anticipates independent claim 1.  *See* Pet. at 22.  Neither Lin nor Gerthsen discloses "each and every limitation" of claim 1, as required for anticipation.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 851 F.3d 1270, 1273 (Fed. Cir. 2017) (reversing the Board's finding of anticipation; internal quotation marks and citation omitted).  As discussed above, the preamble limits claim 1 and therefore Petitioner must show that Lin alone or Gerthsen alone

discloses a "light emitting device."  Petitioner has failed to show that either

reference discloses "a light emitting device."

Lin does not disclose a "light emitting device."  Lin merely discloses a

"sample" that Lin "used" in a "study."  Ex. 1025 at 7.  This sample was comprised

of "ten periods" of "InGaN/GaN" QWs between an undoped "GaN buffer layer on

a (0001) sapphire substrate" and a "GaN cap layer." *Id.*  Lin's sample, however,

did not operate as a light emitting device and lacks the features required to operate

as such a device.  The sample had no n-type and p-type layers to provide carriers

and no electrical contacts.  As the *Nature* publication cited by Petitioner

recognizes, "p-type and n-type semiconductor materials" are a fundamental part of

light emitting devices.  Ex. 1008 at 4.

Lin did not operate this sample as a "light emitting device," i.e., apply

electrical current to this sample to "emit[] light when an electric current is passed

through it," because Lin's sample is incapable of being operated as a device.  Ex.

1008 at 4.  No "voltage" can be "applied" across "terminals" so that "current can

flow" through Lin's sample, causing "electrons" and "holes" "to recombine near" a

"p-n junction" to "produc[e] light," because there are no n-type and p-type layers

and no corresponding terminals.  Pet. at 7.

Lin only studied this sample by conducting "HRTEM" and "PL

[photoluminescence] measurements."  Ex. 1025 at 7.  As discussed above,

31

HRTEM is an electron imaging technique, and photoluminescence is a technique where a light source (specifically "a He-Cd laser at 325 nm" in Lin, *id.*) is used to stimulate a sample to emit photons.  Ex. 2010, Wiley Electrical and Electronics Dictionary (defining photoluminescence as "[l]uminescence resulting from the absorption of light, especially that in the visible, infrared, or ultraviolet ranges").  Lin lacks any disclosure, however, of emitting light when an electrical current is applied to a sample.

None of the evidence cited by Petitioner establishes a reasonable likelihood that Lin discloses a "light emitting device."  Petitioner points to Lin's disclosure of "improving photon emission efficiency of InGaN/GaN quantum well structures," but this is not disclosure of a light emitting device.  Pet. at 26 (quoting Ex. 1025 at 6).  Although a QW structure such as Lin's sample might be used in a light emitting device, it is not a device itself.  It lacks the additional features (e.g., n-type and p-type layers and electrical contacts) required to serve as a device.  Petitioner emphasizes Lin's reference to "photon emission," asserting that this "refers to a device that emits light."  *Id.*  Petitioner is incorrect for two reasons.  First, the only "photon emission" disclosed in Lin is photoluminescence due to stimulating its sample with a laser—not application of electrical current to stimulate light emission.  Second, even if Lin could be interpreted as suggesting that its InGaN/GaN QW structure could be used to improve photon emission in some

device outside of the "four corners" of Lin, that is insufficient for anticipation as a matter of law. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) ("[I]n order to demonstrate anticipation, the proponent must show that the four corners of a single, prior art document describe every element of the claimed invention.") (internal quotation marks and citation omitted).

Petitioner also points to Lin's statement that, "[i]n order to achieve optimum performance of a practical device, regular structures of indium-rich clusters are preferred, including their sizes, shapes and distributions." Pet. at 26 (quoting in part Ex. 1025 at 6). This statement of a desired objective does not disclose a light emitting device. As Petitioner's expert Dr. Dupuis admits, this statement is merely recognition of a "design goal." Ex. 1002 at 45-46 (¶ 82). Lin's statement of a "design goal," *id.*, for a device that is nowhere disclosed in Lin is insufficient to anticipate a "light emitting device" as a matter of law. *See Net MoneyIN*, 545 F.3d at 1369 ("[T]he four corners of a single, prior art document" must "describe every element of the claimed invention.").

Gerthsen similarly fails to disclose a "light emitting device." Petitioner relies on Gerthsen's "structure" containing "InGaN/GaN" QWs "grown on a Si(0001) substrate on Si-doped 380 AlGaN and 75 nm GaN buffer layers," which was "capped by 75 nm GaN and 240 nm AlGaN doped with Mg." Ex. 1026 at 11 (cited in Pet. at 46). Gerthsen does not disclose that its "structure" is or can

33

operate as a "light emitting device," i.e., emit light by supplying electric current. This is unsurprising. Like Lin's structure, Gerthsen's structure lacks features required to constitute a device, such as electrical contacts, and thus cannot function as a "light emitting device." *See* Ex. 1008 at 4 ("The light-emitting diode … is a relatively simple semiconductor ***device that emits light when an electric current is passed through it***."). Gerthsen thus does not disclose passing electrical current through the structure to emit light, and instead merely studied the structure using HRTEM, in the same manner as Lin. Ex. 1026 at 11-12.

Petitioner points to the following statement in Gerthsen discussing the "goal" of prior "studies": "The investigation of the structural properties and composition – in particular composition fluctuations – of InGaN contained in group-III nitride heterostructures has been the goal of a very large number of studies because the defects and In distribution strongly affect the performance of light-emitting and electronic devices." *Id.* at 6 (quoted in part in Pet. at 46). Just as Lin's statement of a design goal did not disclose a device itself, Gerthsen's description of the "goal" of prior "studies" does not disclose a "light emitting device." Regardless of whether prior studies did or did not disclose other devices, that is insufficient as a matter of law for Gerthsen to anticipate claim 1 because Gerthsen fails to disclose a "light emitting device" within its "four corners." *Net MoneyIN*, 545 F.3d at 1369.

**B.** **Petitioner Cannot Show A Reasonable Likelihood That Either Lin Or Gerthsen Discloses A "Carrier Trap Portion Having A Band-Gap Energy Decreasing From A Periphery Of The Carrier Trap Portion To A Center Of The Carrier Trap Portion"**

Petitioner asks the Board to credit its argument that Lin and Gerthsen disclose variation in indium composition measured using TEM. There is no reasonable basis for the Board to credit Petitioner's argument. Petitioner's arguments about Lin's disclosure are contradictory, and Lin itself is internally inconsistent. Petitioner's arguments based on Lin and Gerthsen also conflict with disclosures in the references Petitioner submitted, including in Gerthsen itself.

Moreover, Lin's and Gerthsen's TEM measurements of indium composition were thoroughly discredited and shown to be the result of damage on the surface induced by the electron beam used in TEM. *See supra* Section II.D. Petitioner nevertheless blindly accepts Lin's and Gerthsen's TEM measurements, and invites the Board to do the same, ignoring the fact that those measurements were thoroughly discredited years ago. Although Petitioner submitted at least thirty technical references, Petitioner conspicuously failed to acknowledge *any* of the scientific literature that discredited Lin's and Gerthsen's measurements, demonstrating that those references did not disclose the features claimed here. Regardless of whether this omission was intentional, Petitioner failed to provide

the Board with any reasoned argument to support crediting Lin's and Gerthsen's measurements.

As the Federal Circuit recently observed, "[i]t is well established … that a prior art reference must be enabling to anticipate a claim." *Tech. Consumer Prods., Inc. v. Lighting Sci. Grp.*, No. 2019-1361, -- F.3d ---, 2020 WL 1696642, at *5  (Fed. Cir. Apr. 8, 2020); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008) ("An anticipating reference must enable that which it is asserted to anticipate.").  The Federal Circuit stated over thirty-five years ago that, "even if the claimed invention is disclosed" in a reference, "that disclosure will ***not*** suffice as prior art if it was not enabling."  *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).  A prior art reference must enable making "the claimed subject matter" to anticipate, and it is "not enabling so as to be anticipating if it does not enable a person of ordinary skill in the art to carry out the invention." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1381 (Fed. Cir. 2006).

Neither Lin nor Gerthsen enables a person of ordinary skill in the art ("POSA") to achieve a "carrier trap portion" with a band-gap energy decreasing from its periphery to its center and thus are "not enabling so as to be anticipating." *Impax*, 468 F.3d at 1381.  POSAs knew at the time of the invention that Lin and Gerthsen had misinterpreted damage from the electron beam as indium clusters, and later events only added additional confirmation that Lin and Gerthsen had

misinterpreted their TEM measurements.  A POSA following Lin and Gerthsen's disclosures would have arrived a sample with electron beam-induced damage on its surface—*not* a "carrier trap portion" having a band-gap energy decreasing form its periphery to its center, as the claimed invention requires.

Indeed, POSAs having possession of Lin and Gerthsen who replicated their work demonstrated, using several imaging techniques that do not require high-intensity electron beams, that there were no indium clusters.  "Such failures by those skilled in the art (having possession of the information disclosed by the publication[s]) are *strong evidence* that the disclosure[s] of the publication[s] w[ere] nonenabling."  *In re Donohue*, 766 F.2d at 533.  Furthermore, POSAs confirmed that the purported indium clusters disclosed in Lin and Gerthsen were actually electron beam-induced damage resulting from the TEM measurements themselves.  Lin and Gerthsen thus provide no basis to find anticipation of a "carrier trap portion" with band-gap energy decreasing from its periphery to its center.  *See id.* ("[E]ven if the claimed invention is disclosed" in a reference, "that disclosure will not suffice as prior art if it was not enabling.").

Accordingly, institution should be denied.

>    **1.    There is no reasonable basis on rely on Petitioner's argument that Lin discloses a "carrier trap portion having a band-gap energy decreasing from … [its] periphery … to [its] center"**

Even without considering the ample literature discrediting Lin's

measurements, there is no reasonable basis to credit Petitioner's argument that Lin

discloses "carrier trap portion having a band-gap energy decreasing from … [its]

periphery … to [its] center." Ex. 1001 at cl. 1. Petitioner advances contradictory

arguments, Lin's explanations contradict those in other references Petitioner

submitted, and Lin itself is inconsistent.

>    **a)    Petitioner's contradictory arguments about Lin's disclosure**

Petitioner contradictorily argues that Lin shows thermal annealing led to an

increase in bandgap energy *and* a decrease in bandgap energy and attributes *both*

this increase and decrease in bandgap energy to "blue shift" in (PL) spectra.

Petitioner first argues that the existence of purported carrier trap portions is

demonstrated by "an *increase* in bandgap … energy" due to thermal annealing,

which is shown "as a 'blue shift'" (i.e., shift to higher energy) in Figure 5, copied

below. Pet. at 29 (original emphasis). Specifically, Petitioner states that the

presence of purported "carrier trap portions" is confirmed by "the observation that

the thermal annealing led to an *increase* in the bandgap or photon energy

(described as a 'blue shift' in the resulting emission spectrum)." *Id.* Two pages

later in the Petition, however, Petitioner takes the opposite position.  Petitioner

asserts that, as a result of forming the alleged claimed carrier trap portions, "the

bandgap energy *decreases* given the inverse relationship between indium

concentration and bandgap energy."  *Id.* at 31 (original emphasis).  Petitioner then

attributes the "blue shift" in Figure 5 to a *reduction* in bandgap energy resulting

from thermal annealing.  *Id.*  ("[A]nnealing at 900ºC resulted in 'blue shifts,'

which shows that the distribution of indium reduces the bandgap energy.").



Fig. 5. Temperature dependencies of PL spectral peak of
various samples.

Ex. 1025 at 10.

Petitioner cannot have it both ways.  Forming the alleged carrier trap

portions either increases or decreases the bandgap—not both.  Similarly, a "blue

shift" either reflects an increase or a decrease in the bandgap—not both.[5]

Petitioner's inconsistent arguments based on Lin show that Petitioner is twisting

Lin to fit its explanations, rather than being faithful to Lin's (discredited)

disclosure.

> **b)** **Petitioner's reliance on Lin and Lin's explanations contradict the disclosures in Gleize and Gerthsen**

Petitioner's reliance on Lin for evidence of purported carrier trap portions

with bandgap energy decreasing from their peripheries to their centers conflicts

with disclosures in the Gleize and Gerthsen.  Petitioner ignores these

inconsistencies.

Petitioner's reliance on the "blue shift" in Lin's Figure 5, copied above, as

evidence of quantum dots (QDs) conflicts with Gleize (Ex. 1018).  Petitioner relies

on Lin's supposition that the "blue shifts" resulting from thermal annealing "can be

attributed to the stronger quantum confined effect with smaller sizes of QDs."  Ex.

---

[5] Petitioner's characterization of a "blue shift" as showing that bandgap energy has

been "reduce[d]" (Pet. at 31) is wrong as a matter of basic science.  A "blue shift"

is a shift toward shorter wavelength/higher frequency, and thus higher energy,

light.  *Cf.* Pet. at 7-8; Ex. 1002 at 17-19 (¶ 33) (quoting the equation for the inverse

relationship between bandgap energy and wavelength from Ex. 1024 at 1:40-42).

1025 at 10 (quoted in Pet. at 29).  Petitioner also relies on Gleize, *see* Pet. at 2, 10,

13, 17, contending that Gleize is confirmatory evidence of Lin's purported finding

of QDs, *id.* at 17.  But Gleize did not disclose any "blue shift" as a result of

forming purported QDs.  Gleize disclosed the opposite, stating, "[O]ur results

show that the formation of indium rich dot-like regions (A) induced a ***redshift*** from

50 meV to 100 meV with respect to perfectly random alloy QWs (B and C)."[6]  Ex.

1018 at 24-25.  Consequently, Petitioner's reliance on Lin for the proposition that a

"blue shift" is associated with "well-defined quantum dots," Pet. at 29, is directly

contrary to Gleize, on which Petitioner relies for purported confirmation of Lin's

findings.

Petitioner's reliance on Lin, and Lin's explanations for its purported

findings, is also inconsistent with Gerthsen in two ways.  First, Petitioner's reliance

on Lin's Figure 2 for purported variation in indium concentration *within* purported

QDs, *see* Pet. at 28-32, is inconsistent with Gerthsen's recognition that TEM

measurements average composition through the thickness of the sample, which

may include many purported QDs.  Gerthsen admonishes, "[I]t has to be kept in

---

[6] A "redshift" is a shift toward lower energies—the opposite of a "blue shift."  *Cf.*

Pet. at 7-8; Ex. 1002 at 17-19 (¶ 33) (quoting the equation for the inverse

relationship between bandgap energy and wavelength from Ex. 1024 at 1:40-42).

mind, that the ***composition is averaged through the sample thickness***, typically between a few and 30 nm for HRTEM samples." Ex. 1026 at 8. Petitioner does not acknowledge this fact, and Lin does not disclose the sample thickness.

Lin states that the purported "[r]egularly arrayed" QDs shown in Figure 2 are "2-5 nm," which means that even very thin sample of only 10 nm would contain multiple purported QDs of varying sizes through the depth of the sample. Ex. 1025 at 8. Consequently, even putting aside the problem of electron-beam-induced damage, Lin's purported indium concentration map would reflect average indium composition over QDs of various sizes detected through the thickness of the sample—***not*** the indium profile of individual QDs. *See* Ex. 1026 at 8; *see also* Ex. 2003, 41 J. Mater. Sci. 2729, at -008 (2006) ("Even without the complication of damage artefacts, it would be very difficult to detect such small fluctuations in composition at this nanometre-scale using TEM because of the averaging effects of projection through the specimen thickness."). As illustrated below, showing purported QDs as red spheres, a two-dimensional TEM image "sees" multiple QDs of varying sizes through the thickness of a sample.



Accordingly, Lin's "indium composition amplitude profile along a QW,"
Ex. 1025 at 9, that Petitioner assumes (without justification) constitutes the
"periphery" of a purported QD, *see* Pet. at 30-32, cannot be distinguished from,
e.g., a larger purported QD aligned in front of or behind smaller QDs.

Second, Lin's explanation of the purported increase in InN is inconsistent
with Gerthsen. Lin's samples were grown with a relatively low percentage of
indium. "The designated indium content of the sample was about 19%" in Lin.
Ex. 1025 at 7. Lin suggests that "spinodal decomposition in InGaN" explains the
purported enhancement of "the relative intensity of InN phase" "after thermal
annealing." *Id.* at 9. Gerthsen, however, recognized that spinodal decomposition
is ***not*** expected to occur indium concentrations below about 20% at the relevant

temperatures.  *See* Ex. 1026 at 18 ("Spinodal decomposition is not expected to

occur at low average In concentrations because the spinodal points for the relevant

temperatures are predicted at In concentrations of approximately 20 and 80%.")

(footnote omitted).

These conflicts between Petitioner's interpretation of Lin and Lin's own

explanation of the results, on the one hand, and Gleize's and Gerthsen's

disclosures, on the other hand, illustrate that there is no reasonable basis to credit

Petitioner's arguments based on Lin.

### c)     Lin is internally inconsistent

Even within the four corners of Lin, there is a major conflict between what

Lin claims to have done and the results of Lin's measurements.  Lin states that the

sample "consisted of ten periods of InGaN wells" at a "designated indium content"

of "19%."  Ex. 1025 at 7.  Lin claims to have grown "InGaN," identifying its

"growth temperature."  *Id.*  Lin asserts that these samples with "InGaN QWs" were

thermally annealed at different temperatures.  *Id.* at 8.  As discussed, Lin proposes

that "spinodal decomposition in InGaN" "after thermal annealing" explains the

increased "intensity of In phase" in the "XRD spectra."  *Id.* at 9.  But the XRD

spectra (copied on the left below) ***show no peak for InGaN***, either in the as-grown

sample (Figure 4(a)) or after "900ºC thermal annealing" (Figure 4(b)).  *Id.* at 10.  If

Lin had grown InGaN (at a "designated indium content" of "19%," *id.* at 7), then

an InGaN peak should have appeared in the XRD spectra—at least for the as-grown sample.

Indeed, the fact that InGaN peaks should have been detected is confirmed by another Lin reference that Petitioner submitted. *See* Ex. 1016. In that reference, Lin reported growing "samples I, II, III" with "designated indium compositions" of "15%, 20%, and 25%," respectively. Ex. 1016 at 7. As noted in the XRD spectra copied on the right below from Exhibit 1016, Lin detected InGaN peaks in the XRD spectra for each of these samples. Lin provides no explanation of why such peaks were not detected when, two years later, Lin grew the samples purportedly containing InGaN QWs discussed in Exhibit 1025.



Fig. 4. XRD spectra of the as-grown (a) and 900°C annealing (b) samples. The relative intensities of indium-rich peak with respect to gallium-rich peak are quite different between parts (a) and (b).

FIG. 1. XRD patterns of samples I (a), II (b), and III (c).

Ex. 1025 at 10; Ex. 1016 at 8.

**2.    There is no reasonable basis on rely on Petitioner's arguments that Gerthsen discloses a "carrier trap portion having a band-gap energy decreasing from … [its] periphery … to [its] center"**

Petitioner relies on Figure 4(a) in Gerthsen, copied below. *See* Pet. at 49.



**Fig. 4** a) Color-coded map of the In distribution of an InGaN/GaN multiple QW structure and b) averaged In concentration along the [11$\bar{2}$0] direction plotted as a function of the (0002)-plane. number.

Ex. 1026 at 11.  Petitioner asserts that "the indium concentration ($X_{In}$[%]) in, for example, the bottom most well-layer of the MQW structure is nominally at 37% and increases in regions of the quantum dots from 48% to a concentration of greater than 60%."  Pet. at 49.  Petitioner recognizes in a footnote that Figure 4(a) only shows "apparent In concentration," although Petitioner does not explain why Figure 4(a) does not show the actual indium concentration.  *Id.*  Petitioner contends that it "is evident" in Gerthsen's Figure 4(a) "that the indium concentration *increases* from the outer periphery of the carrier trap portion to the maxima for each quantum dot."  *Id.* at 50 (original emphasis).

Petitioner's arguments are not supported by, and are contrary to, Gerthsen's disclosure.  Contrary to Petitioner's statement that "the indium concentration

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

($X_{In}$[%]) in, for example, the bottom most well-layer of the MQW structure is nominally at 37%," *id.* at 49, Gerthsen shows in Figure 4(a) and states in the text that the concentration in the bottom well layer is 23%, *see* Ex. 1026 at 12 ("[T]he average In concentration $\overline{x}_{In}$ decreases from the bottom QW (23%).").

Petitioner also fails to acknowledge that, according to Gerthsen, the depicted "In concentrations are an ***averaged value*** determined by the composition of the cluster and the embedding matrix along the electron-beam direction ***for HRTEM sample thicknesses*** which typically range between 5 and 20 nm." *Id.* Petitioner does not explain why, in Petitioner's view, it "is evident" in Figure 4(a) "that the indium concentration *increases* from the outer periphery of the carrier trap portion to the maxima for each quantum dot." Pet. at 50 (original emphasis). Petitioner seems to rely on the fact that there is some yellow visible between the red and the green in Gerthsen's color-coded map. But Petitioner does not provide any basis for assuming that this yellow region means that there is a decrease in indium composition within a QD from its center to its periphery. There is no basis for such an assumption.

As Gerthsen stated, the indium concentration was averaged through the thickness of the sample, so even if purported QDs were present (and were not merely Gerthsen's misinterpretation of electron beam-induced damage on the surface), multiple purported QDs would have been detected through the sample

48

thickness.  Figure 4(a) in Gerthsen shows that the size of purported QDs varies up to a few nanometers, and Lin reported size variation of approximately 150% ("2-5 nm").  Ex. 1025 at 8.  Rather than show the indium concentration profile of individual QDs, Gerthsen's indium concentration map thus would show an average indium composition over QDs of various sizes detected through the sample, just as explained above with respect to Lin.  *See* Ex. 2003, 41 J. Mater. Sci. 2729, at -008 (2006) ("Even without the complication of damage artefacts, it would be very difficult to detect such small fluctuations in composition at this nanometre-scale using TEM because of the averaging effects of projection through the specimen thickness.").

Furthermore, Gerthsen itself casts doubt on the "compositional fluctuations" Gerthsen purported to detect, pointing out that although they occurred on a "time" scale that was "typical for spinodal decomposition," two other factors were "inconsistent with this mechanism."  Ex. 1026 at 19.

### 3.    Lin's And Gerthsen's Purported Indium Compositional Fluctuations Had Been Discredited And Shown To Be Merely Electron Beam-Induced Surface Damage

Petitioner failed to demonstrate that either Lin or Gerthsen anticipates the claimed "carrier trap portion" having a band-gap energy decreasing from its periphery to its center.  35 U.S.C. § 314(a); Pet. at 30, 49.  Petitioner failed to do so not only for the reasons discussed above but also because POSAs demonstrated

(before and after the date of invention) that Lin and Gerthsen had mistaken electron-beam-induced damage for indium clusters.  Petitioner ignores the abundant scientific literature establishing that (i) Lin and Gerthsen measured the result of electron-beam-induced surface damage and wrongly inferred the presence of indium clusters, and (ii) the purported indium clusters simply did not exist in Lin and Gerthsen's samples.

Accordingly, POSA following Lin and Gerthsen's disclosures would ***not*** have arrived at the claimed device, but rather would have achieved something else entirely—namely, samples with a damaged surface.  Petitioner offers no argument that could support relying on Lin's and Gerthsen's faulty interpretation of their HRTEM measurements to find anticipation.  *See, e.g., Impax*, 468 F.3d at 1381 (A reference is "not enabling so as to be anticipating if it does not enable a person of ordinary skill in the art to carry out the invention."); *In re Donohue*, 766 F.2d at 533 ("[E]ven if the claimed invention is disclosed" in a reference, "that disclosure will not suffice as prior art if it was not enabling.").

> **a)**     **Lin and Gerthsen relied on a flawed assumption that local strain was due to composition, rather than electron-beam-induced damage, and took no steps to avoid electron-beam-induced damage**

The HRTEM technique that Lin and Gerthsen used to map purported indium distribution relies on assuming that the detected variations in local lattice

parameters (LLPs) result from changes in indium distribution, but it was proven that electron-beam-induced damage causes these variations in LLPs.  Lin and Gerthsen failed to account for this electron-beam-induced damage and thus incorrectly attributed variation in LLPs to variations in indium concentration.  There is no reasonable basis to believe that Lin's and Gerthsen's purported indium mapping reflects the ***actual*** indium distribution, as opposed to electron-beam-induced damage.

As explained in Gerthsen, "composition evaluation" using "HRTEM" is based on "measurement of local lattice parameters (LLPs)" and "assuming" that they correspond to "local compositions."  Ex. 1026 at 7-9.  Lin's and Gerthsen's conclusion that "strong fluctuations in composition" existed thus rested on a "crucial" "assumption" that "the local strain fields in the quantum wells" were "solely due to the distribution of indium in the grown alloy."  Ex. 2001, *Electron-Beam-Induced Strain Within InGaN Quantum Wells: False Indium "Cluster" Detection in the Transmission Electron Microscope*, 83 Appl. Phys. Lett. 5419 at -001 (2003) (citing Gerthsen et al., 177 Phys. Status Solidi A 145 (2000), and Lin, Ex. 1016 at 7).

There was a major problem with Lin's and Gerthsen's assumption that LLPs corresponded to local indium composition.  Persons of skill ***immediately*** recognized "that InGaN quantum wells can be extremely sensitive to damage by

the electron beam in the TEM," and this damage causes "inhomogeneous strain" that "is very similar to that expected from genuine nanometer scale strong composition fluctuations." *Id.* at -001, -003.  In other words, it was immediately apparent that the "TEM experiments" conducted by Lin and Gerthsen had "the potential to detect ***false*** indium clustering." *Id.* at -003 (citing Lin and Gerthsen's work).  "[E]xtreme caution" was therefore warranted "when interpreting data" from HRTEM studies, such as those conducted by Lin and Gerthsen, because the results could have been "adversely influenced by the electron irradiation itself." Ex. 2002, *Electron-Beam-Induced Segregation in InGaN/GaN Multiple-Quantum Wells*, 83 Appl. Phys. Lett. 1965, at -003 (2003) (citing Lin, Ex. 1025).

Electron-beam-induced damage occurs rapidly, and InGaN QWs are particularly susceptible to damage.  Accordingly, even "after a very short period of irradiation by a relatively low electron beam current density, images of the specimen could be interpreted as indicating the presence of … indium 'clusters'" due to "beam damage."  Ex. 2003, *The Impact of Electron Beam Damage on the Detection of Indium-Rich Localisation Centres in InGaN Quantum Wells Using Transmission Electron Microscopy*, 41 J. Mater. Sci. 2729, at -001 (2006).  Beam damage could easily result in data that would be misinterpreted as showing indium "clusters" because "InGaN quantum wells are liable to ***rapid modification*** under the TEM electron beam." *Id.* at -002.  Therefore, unless "beam damage artefacts

are taken into account," "there is the potential to ***falsely*** infer the presence of

nanometer-scale indium-rich regions from HRTEM data," as evidenced in Lin and

Gerthsen.  *Id.*  As illustrated below, the increasing damage to InGaN QWs from

longer electron beam exposure results in "strong contrast fluctuations" that can be

misinterpreted as variations in indium composition.  *Id.* at -003-4.  The increasing

size and contrast of the darker regions with longer electron beam exposure in

HRTEM is readily apparent in the series of images below showing 20 seconds to

560 seconds of exposure.



*Figure 1*   A series of (0002) HRTEM lattice fringe images of three quantum wells in the In$_{0.22}$Ga$_{0.78}$N/GaN MQW sample. The images were acquired after exposure of the specimen to an electron beam flux of ~35 A cm$^{-2}$ for the labelled times. The positions of the quantum well interfaces are indicated by the horizontal lines; the growth direction was from the bottom to the top of the page.

*Id.* at -004.  Accordingly, by 2006 it was "obvious" that "HRTEM images" or LLPs "acquired after a couple of minutes of exposure to the electron beam" "and without consideration of the beam damage effects" "would give a ***false*** indication of the strain distribution—and therefore the composition distribution—in the as-grown quantum well." *Id.* at -006.

In sum, because "InGaN quantum wells are extremely sensitive to damage by the electron beam in a TEM," "there [wa]s the potential to falsely infer the presence of strong indium compositional fluctuations," and scientists recognized that "it [wa]s possible that ***all*** indicators of compositional fluctuations … [we]re due to beam damage and that the as-grown quantum wells [we]re homogenous." *Id.* at -008.

Neither Lin nor Gerthsen took any steps to address beam damage.  Lin and Gerthsen do not even state the intensity of the electron beam they used or the amount of time that this electron beam was applied to the samples they analyzed. They appear to have used electron beam energies of 200 keV to 300 keV, which are common, and create the type of electron beam damage shown above.[7]  *See id.*

---

[7] Lin used "200 KeV Philips CM 200 and 300 KeV JEM 3010 microscopes," Ex. 1025 at 7, and Gerthsen refers to "using the parameters of the Philips CM200

("The extreme electron beam sensitivity described here seems to be a general effect: … it was observed for all commonly used TEM beam energies (200–400 keV) ….").  Nothing in either Lin or Gerthsen suggests they did anything more than detect the results of the damage induced by the electron beams they applied in performing HRTEM.  Petitioner has offered no basis to believe that Lin or Gerthsen actually detected indium clustering, as opposed to merely detecting electron-beam-induced damage.  Indeed, as discussed below, subsequent scientific literature confirmed that there was no indium clustering.

> **b)   Scientific literature before and after the date of invention confirmed that there was no actual indium clustering, but rather only electron-beam-induced damage on the surface**

After Lin and Gerthsen published their purported indium mapping using TEM, several groups of scientists collectively applied multiple different imaging techniques that do not require high-energy electron beams to investigate whether there was actually indium clustering.  They all reached the same conclusion: ***no*** actual indium clustering was present.  Lin and Gerthsen thus are "not enabling so

---

FEG/ST transmission electron microscope," Ex. 1026 at 8.  There is nothing in either Lin or Gerthsen to indicate use of a microscope to apply a lower electron beam intensity than the microscope can, and is commonly used to, provide.

as to be anticipating" because neither Lin nor Gerthsen enabled a POSA to achieve

a "carrier trap portion" with band-gap energy decreasing from its periphery to its

center. *Impax*, 468 F.3d at 1381.  Lin and Gerthsen had incorrectly inferred

indium clustering from variations in LLPs that actually were caused by electron-

beam-induced damage.  Furthermore, scientists demonstrated that the damage is on

the surface—it does not cause any redistribution of indium within the QWs.

　　　Petitioner ignores all of this scientific literature.  There is no reasonable

basis for the Board to accept Petitioner's arguments based on Lin's and Gerthsen's

discredited indium mapping.

　　　Using TEM with low electron beam current and using an entirely different

technique that does not suffer from the problem of electron-beam-induced

damage—"three-dimensional (3D) atom probe analysis"—"it [wa]s found that

indium-rich clusters ***d[id] not exist*** in the InGaN."  Ex. 2004, *Turning Points in*

*Understanding the Emission of Brilliant Light from Highly Defective GaN-Based*

*Materials and Devices*, Ch. 42 in Turning Points in Solid-State Materials and

Surface Science, at -003-4 (2008).  Thus, before the date of invention, it was

known in the art that Lin and Gerthsen had observed false "In-rich clusters …

produced in InGaN in the electron microscope due to electron-beam damage,"

because, in reality, there were "***no*** In fluctuations other than would be expected of

any random alloy."  *Id.* at -004; *see also id.* at -006.  The false indium clustering

reported in Lin and Gerthsen cannot support an anticipation finding because Lin and Gerthsen did not actually enable POSAs to achieve the claimed "carrier trap portion" with band-gap energy decreasing from its periphery to its center.  *See In re Donohue*, 766 F.2d at 533 ("[E]ven if the claimed invention is disclosed" in a reference, "that disclosure will ***not*** suffice as prior art if it was not enabling.").

Before the time of the invention, POSAs demonstrated that even "minimal exposure" to the electron-beam-induced strain that caused "a lattice parameter map" to exhibit false indium clustering (*see* Figure (1(d) on the left below), just like the purported indium clustering Gerthsen had measured (*see* Figure 4(a) on the right below).



Figure 1  A pair of HRTEM lattice fringe images demonstrating the electron-beam induced damage to an In$_{0.27}$Ga$_{0.73}$N quantum well. The (0002) lattice fringe images were obtained using a JEOL 4000 EX operating at 400 kV. (a) Shows the image after minimal exposure to the beam, and (b) the same region after only a few minutes of exposure. (c) Is a lattice parameter map of (a), and (d) is a lattice parameter map of (b).



Fig. 4 a) Color-coded map of the In distribution of an InGaN/GaN multiple QW structure and b) averaged In concentration along the [11$\bar{2}$0] direction plotted as a function of the (0002)-plane. number.

Ex. 2004 at -007; Ex. 1026 at 11.

As shown above, "InGaN quantum wells damage extremely rapidly in the electron beam of a TEM at the beam currents normally used for imaging,"

resulting in false identification of indium clustering.  Ex. 2004 at -008.  On the other hand, there was "no evidence at all of gross indium clustering if low electron beam currents [we]re used."  *Id*.  It was found that, "[i]n *all* the samples," "no gross indium clustering in the TEM at low beam currents and short exposure times" was observed, and false indium clustering "*only* appear[ed] at higher electron doses."  *Id.* at -009 (original emphasis).  This finding that as-grown InGaN QWs do not exhibit indium clustering was confirmed using an entirely different imaging technique—"3D atom probe (3DAP)" analysis—that likewise "indicate[d] that the distribution of In in the InGaN studied is that of a random alloy."  *Id.* at -011; *see also id.* at -011 ("Two independent direct imaging techniques, TEM and 3DAP, have therefore found **no evidence** for indium clustering in InGaN quantum wells."), -013 (Conclusions 1 and 2).

The finding that "beam damage" in TEM—the imaging technique that Lin and Gerthsen both used—was incorrectly "interpreted as inhomogeneous indium distribution or clustering" was later independently confirmed by another group using yet another imaging technique.  Ex. 2005, *A Nondamaging Electron Microscopy Approach to Map In Distribution in InGaN Light-Emitting Diodes*, 108 J. Appl. Phys. 056103, at -003 (2010).  That group used "dark-field inline electron holography," which does not require high-current density electron beams, to confirm "that the InGaN QWs exhibit random alloy nature without any evidence

IPR2020-00146 (USP 7,667,225)                    Patent Owner's Preliminary Response

of nanometer scale gross indium clustering." *Id.* at -002; *see also id.* at -004

("[W]e have found ***no evidence*** for significant deviation from the indium

distribution expected for a random alloy.").[8]  As shown in Figure 4(c) below, the

indium fraction of the QWs (shown as blue and red lines in Figure 4(c)) varied by

less than a few percent, randomly across the well.



FIG. 4. (Color online) (a) Indium distribution map derived from the geometric phase image in Fig. 3(a). (b) The composition profile extracted along the growth direction (horizontally averaged over 40 nm). (c) The composition profiles extracted within the QWs and within the reference GaN barrier layer (averaged over a width of 1.6 nm).

---

[8] By 2008, the Gerthsen group had abandoned their conclusions about indium-rich

clusters in the 2003 publication on which Petitioner relies, but the Gerthsen group

for a time maintained that its finding of "In-rich clusters … in HRTEM images

taken after only 20 s of exposure" reported elsewhere indicated that "lower"

concentration "In-rich clusters genuinely existed."  Ex. 2004 at -010 (citing Ex.

1026).  This conjecture was disproved when analyses performed using low-dose

TEM, 3DAP, and dark-field inline electron holography all "found no evidence for

indium clustering in InGaN quantum wells."  *Id.* at -011; Ex. 2005 at -002.

*Id.* at -004.  POSAs thus proved that neither Lin nor Gerthsen observed ***actual***

indium clustering, as required to support Petitioner's anticipation argument.  *See*

*Abbott*, 544 F.3d at 1345 ("An anticipating reference must enable that which is

asserted to anticipate.").

> The fact that electron-beam-induced damage was responsible for the false

inference of indium clustering by Lin and Gerthsen was further confirmed by

performing atom probe tomography (APT) on InGaN QW samples prepared with

and without exposure to an electron beam in TEM.  *See* Ex. 2006, *Atom Probe

Tomography Assessment of the Impact of Electron Bream Exposure on the $In_xGa_{1-x}N/GaN$ quantum wells*, 99 Appl. Phys. Lett. 021906, at -002 (2011).  These APT

analyses confirmed "indium was randomly distributed" in "as-grown $In_xGa_{1-x}N/GaN$ QWs" "prior to exposure of the electron beam," and "compositional

homogeneities" were only perceived due to "damage" resulting from the "electron

beam."  *Id.* at -004; *see also id.* at -003 (Figure 3, copied above in Section II.D,

illustrates the difference between the random distribution without electron beam

exposure and the non-random distribution after electron beam exposure.).  Other

techniques that avoid use of high-energy electron beams—"atomically resolved

$C_S$-corrected scanning transmission electron microscopy and electron energy loss

spectroscopy at 120 kV"— similarly "show[ed] that indium clustering is ***not***

present in as-grown $In_{0.22}Ga_{0.78}N$."  Ex. 2007, *Revisiting the "In-Clustering"*

*Question in InGaN Through the use of Aberration-Corrected Electron Microscopy*

*Below the Knock-on Threshold*, 102 Appl. Phys. Lett. 191910, at -003 (2013).

As demonstrated above, various groups of scientists using multiple different imaging techniques confirmed that Lin and Gerthsen had falsely inferred indium clustering from electron-beam-induced damage.  Furthermore, this "electron-beam induced" damage was shown to be "a surface-related phenomenon," rather than any actual rearrangement of indium across a QW.  Ex. 2008, *Three-Dimensional Indium Distribution in Electron-Beam Irradiated Multiple Quantum Wells of Blue-Emitting InGaN/GaN Devices*, 108 Appl. Phys. Lett. 113111, at -002 (2016).  To determine whether the damage was a surface-related effect, samples were "systematically exposed" to "electron-beam induced damage," and then the damaged surface was removed.  *Id.* at -003.  After exposure to the electron beam, the "damage contrasts" that Lin and Gerthsen had seen were again observed, confirming that InGaN QWs "are highly sensitive" to "electron-beam induced damage."  *Id.* at -004.  Importantly, once the surface with electron-beam-induced damage was removed, the samples showed "no evidence of inhomogeneous In distribution."  *Id.* at -005.

In conclusion, the purported indium clustering that Lin and Gerthsen inferred from TEM measurements did not exist in the samples; instead, Lin and Gerthsen measured damage on the surface caused by using a high-intensity

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

electron beam.  Lin and Gerthsen failed to enable a POSA "to carry out the invention" (i.e., a "carrier trap portion" with band-gap energy decreasing from its periphery to its center), but rather disclosed how to damage the surface of samples *without* indium clustering.  *Impax*, 468 F.3d at 1381.  Nevertheless, Petitioner misleadingly relied on Lin and Gerthsen while ignoring *all* the subsequent literature discussed above.  Petitioner has given the Board no reasonable basis to conclude that Lin's or Gerthsen's discredited TEM measurements anticipate the claimed invention.

## V.      Conclusion

For the foregoing reasons, the Board should decline to institute IPR because Petitioner has failed to show that there is a reasonable likelihood that Petitioner would prevail with respect to any challenged claim.


Respectfully submitted,


Dated: April 14, 2020               By: / Charles H. Sanders /

                                    Charles H. Sanders (Reg. No. 47,053)
                                    charles.sanders@lw.com
                                    Latham & Watkins LLP
                                    200 Clarendon Street
                                    Boston, MA 02116
                                    Telephone: 617.948.6000
                                    Fax: 617.948.6001

Jonathan M. Strang (Reg. No. 61,724)
jonathan.strang@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone: 202.637.2200
Fax: 202.637.2201

Michael B. Eisenberg (Reg. No. 50,643)
michael.eisenberg@hklaw.com
Holland & Knight LLP
31 West 52nd Street, 12th Floor
New York, New York 10019
Telephone: 212.513.3529
Fax: 212.385.9010

*Counsel for Patent Owner*
*Seoul Semiconductor Co., Ltd.*

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

## **CERTIFICATE OF COMPLIANCE WITH 37 C.F.R. § 42.24**

I hereby certify that this Patent Owner's Preliminary Response complies with the word count limitation of 37 C.F.R. § 42.24(b)(1) because the Patent Owner's Preliminary Response contains 11,521 words using Microsoft Word's counting feature, plus 798 words hand-counted in the imaged text, for a total of 12,319 words, excluding the cover page, signature block, and the parts of the Patent Owner's Preliminary Response exempted by 37 C.F.R. § 42.24(b)(1).

Dated: April 14, 2020                    By: / Charles H. Sanders /

Charles H. Sanders (Reg. No. 47,053)
charles.sanders@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Seoul Semiconductor Co., Ltd.*

IPR2020-00146 (USP 7,667,225)          Patent Owner's Preliminary Response

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to 37 C.F.R. § 42.6(e), I certify that on this 14th day of April,

2020, a copy of **Patent Owner's Preliminary Response and all Exhibits** were

served by electronic mail on Petitioner's lead and backup counsel at the following

email addresses:

Andrew Sommer (Reg. No. 53,932)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Telephone: 703.749.1370
Fax: 703.749.1301
SommerA@gtlaw.com
satco-iprs@gtlaw.com

Barry J. Schindler (Reg. No. 32,938)
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: 973.360.7900
Fax: 973.301.8410
SchindlerB@gtlaw.com

Heath J. Briggs (Reg. No. 54,919)
Stephen M. Ullmer (*pro hac vice* forthcoming*)*
Greenberg Traurig, LLP
1144 15th St. Suite 3300
Denver, CO 80202
Telephone: 303.685.7418
Fax: 720.904.6118
BriggsH@gtlaw.com
UllmerS@gtlaw.com

Scott J. Bornstein (*pro hac vice* forthcoming*)*
Greenberg Traurig, LLP
200 Park Avenue

New York, NY 10166
Telephone: 212.801.9200
Fax: 212.801.6400
BornsteinS@gtlaw.com

Nicholas A. Brown (*pro hac vice* forthcoming*)*
Greenberg Traurig, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: 415.655.1271
Fax: 415.520.5609
BrownN@gtlaw.com

By: / Charles H. Sanders /

Charles H. Sanders (Reg. No. 47,053)
charles.sanders@lw.com
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: 617.948.6000
Fax: 617.948.6001

*Counsel for Patent Owner*
*Seoul Semiconductor Co., Ltd.*